1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF OHIO
 3               EASTERN DIVISION
 4                 - - -
 5   Keith F. Bell, Ph.D.,        :
 6          Plaintiff,            :
 7       vs.                      : Case No. 2:18-cv-961
 8   Caught My Eye Photography    :
     of Columbus, et al.,         :
 9                                :
10          Defendants.           :
11                 - - -
12
13     DEPOSITION OF KEITH BELL, Ph.D.
14       Taken at Lane, Alton & Horst, LLC
           Two Miranova Place, Suite 220
15             Columbus, Ohio  43215
16        Thursday, December 19, 2019
                 9:38 a.m.
17                 - - -
18
19
20
21
22
23
24
```

2

1             A P P E A R A N C E S

2

3 APPEARING ON BEHALF OF THE PLAINTIFF:

4     Joseph A. Gerling, Esq.
    Lane, Alton & Horst, LLC
    Two Miranova Place, Suite 220
5     Columbus, Ohio  43215

6 APPEARING ON BEHALF OF DEFENDANT WORTHINGTON CITY SCHOOL
DISTRICT:

7

8     Michael J. Valentine, Esq.
    Keona R. Padgett, Esq.
    Reminger Co., LPA
9     200 Civic Center Drive, Suite 800
    Columbus, Ohio  43215

10            - - -

11
12
13
14
15
16
17
18
19
20
21
22
23
24

3

1          Thursday Morning Session,

2          December 19, 2019.

3           - - -

4         S T I P U L A T I O N S

5           - - -

6      It is stipulated by and between counsel for the

7 respective parties that the deposition of Keith Bell,

8 Ph.D., Plaintiff herein, called by Defendant Worthington

9 City School District under the applicable Rules of

10 Federal Civil Court Procedure, may be taken at this time

11 by the notary pursuant to notice and stipulations of

12 counsel; that said deposition may be reduced to writing

13 in stenotypy by the notary, whose notes may thereafter

14 be transcribed out of the presence of the witness; that

15 proof of the official character and qualification of the

16 notary is waived.

17          - - -

18
19
20
21
22
23
24

4

1         INDEX TO EXHIBITS

2          - - -

3 DEFENDANT'S EXHIBITS         IDENTIFIED

4  1 Curriculum Vitae of Dr. Keith Bell     26

5  2 Publications of Dr. Keith Bell     26

6  3 Dr. Keith Bell/Sports Psychology     32

7  4 *Winning Isn't Normal* Screen Shot     77

8  5 Sean Luzader Twitter Screen Shot     92

9  6 Licensing Calculator - Fixed Price Per Book 158

10  7 Dr. Keith Bell Standard Rate Schedule     163

11  8 Transaction Summary for 1-1-19 to 8-4-19     186

12  9 Transaction Summary     193

13 10 Keel Publications - Invoice Sent     194

14 11 Invoice to Matt Caldwell     195

15 12 Sales Spreadsheets 12/14/17 - 6/11/19     196

16 13 Sales Spreadsheets 2014     200

17 14 Sales Spreadsheets 2015     203

18 15 Sales Spreadsheets 2016     206

19 16 Sales Spreadsheets 2017     207

20 17 Sales Spreadsheets 2018     208

21 18 Sales Spreadsheets 2019     208

22 19 Exhibit A, B, C     228

23 20 Joe Reid Quote of the Week     237

24 21 New Zealand Management Article     238

5

1        INDEX TO EXHIBITS (Continued)
2                - - -
3  DEFENDANT'S EXHIBITS                    IDENTIFIED
4  22 Facebook Screen Shot Reading Rockets      240
5  23 Settlement Agreement Quote                240
6  24 Release of Claims Quote                   241
7  25 Fay Sharpe, LLP Letter to Brenda Kerns    241
8  26 Email from John to Sandy Neilson-Bell     243
9                - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

7

1        Otherwise, if you answer the question then I'll
2  assume that you understood and heard my question, okay?
3        **A. Okay.**
4        **Q.** Okay. Also, because Connie is taking down a
5  transcript, if you can let me finish asking my question
6  before you start answering, and I'll do the same, I'll
7  let you finish your answer before I start asking another
8  question. That helps her get everything down in the
9  transcript clearly, okay?
10       **A. Okay.**
11       **Q.** All right. And then same thing along those lines
12 with the transcript, sometimes it feels like a
13 conversation. People might say uh-huh, huh-uh, shake
14 their head yes or no. If you can give verbal answers
15 like a yes or a no, that also helps her with the
16 transcript, okay?
17       **A. Yes.**
18       **Q.** All right. And I'll try to -- if I notice it,
19 I'll try to catch you.
20       Are you taking any medication today or is there
21 any reason that you can think of that would affect your
22 ability to testify honestly and accurately?
23       **A. No.**
24       **Q.** Have you been deposed before?

6

1                 KEITH BELL, Ph.D.
2  being by me first duly sworn, as hereinafter certified,
3  deposes and says as follows:
4                  EXAMINATION
5  By Ms. Padgett:
6        **Q.** Good morning. My name is Keona Padgett, and I
7  along with Mike Valentine represent the Worthington City
8  School District in the lawsuit that you have filed here
9  in the Southern District of Ohio.
10       Before I get too far into it, could you just give
11 your name for the record, please.
12       **A. Keith Bell.**
13       **Q.** Okay.
14       **A. Can I just ask you to speak up. I'm a little**
15 **hard of hearing.**
16       **Q.** Sure.
17       **A. And I'm a little soft spoken too, so I'll try and**
18 **do that as well.**
19       **Q.** Okay. And that kind of leads into a few -- I
20 have a few we call them ground rules to go over. If you
21 don't understand or hear one of my questions, just let
22 me know, and I will either clarify the question if you
23 didn't understand it or say it again louder if you
24 didn't hear it.

8

1        **A. Yes.**
2        **Q.** Do you know about how many times you've been
3  deposed?
4        **A. Two.**
5        **Q.** Two times?
6        **A. Uh-huh.**
7        **Q.** Okay. So this is --
8        **A. Yes.**
9        **Q.** So this is your third?
10       **A. Yes.**
11       **Q.** Okay. So you might be a little bit familiar with
12 the process, but if at any time you need a break or
13 something, just let us know. The only thing is I would
14 ask you to finish the question or answer the question
15 that I have pending before we take a break, okay?
16       **A. Yes.**
17       **Q.** Okay. Did you do anything to prepare for your
18 deposition today?
19       **A. No.**
20       **Q.** Did you review any documents?
21       **A. I don't think so.**
22       **Q.** Okay. And outside of your attorneys, I don't
23 want to know about that, but did you talk to anybody
24 about your deposition today?

9

1    A. No.
2    Q. Did you bring any documents with you today?
3    A. No.
4    Q. What is your current address?
5    A. 3101 Mistyglen Circle, Austin, Texas, 78746.
6    Q. And is that also your current business address?
7    A. Yes.
8    Q. And how long have you lived there?
9    A. A couple of short breaks but other than that
10   since 1979.
11   Q. Okay. And are you married?
12   A. Yes.
13   Q. What's your wife's name?
14   A. Sandy Neilson-Bell.
15   Q. Does your wife have any involvement with your
16   businesses?
17   A. Yes.
18   Q. And what's her role in those?
19   A. She helps me with some computer stuff. Well,
20   some of our businesses are interrelated.
21   Q. Okay. We'll talk a little bit in detail about
22   those in a little bit. Does she have a formal position
23   or role, or is she a co-owner with you in any of your
24   businesses?

10

1    A. Well, Texas is a community property state, so
2    she's --
3    Q. So she's co-owner with your businesses?
4    A. Yes.
5    Q. Okay. What's your date of birth?
6    A. 8-8-48.
7    Q. And I want to go briefly over your education. I
8    see you're wearing a Kenyon swimming shirt. You went to
9    Kenyon for undergrad, correct?
10   A. Correct.
11   Q. And when did you graduate from Kenyon?
12   A. 1970.
13   Q. What was your degree in?
14   A. I had a double major in psychology and economics.
15   Q. And then where did you go to school after Kenyon?
16   A. University of Texas.
17   Q. And what was that program there that you
18   attended?
19   A. It was a counseling program.
20   Q. And when did you graduate?
21   A. 1974.
22   Q. And was that a master's degree or a Ph.D.?
23   A. Well, I was accepted into the Ph.D. program
24   directly out of Kenyon, but in January of 19 -- I don't

11

1    remember. About the last semester before I graduated I
2    filed for a master's degree because I got paid a little
3    more for my research with a master's degree.
4    Q. Okay. So when you graduated from the University
5    of Texas in 1974 was that with your master's?
6    A. Master's and doctorate.
7    Q. Okay. And what was the master's and doctorate
8    in?
9    A. Well, it was in the school of education in the
10   counseling program.
11   Q. Okay. And then you have a -- or you did a
12   post-doctoral fellowship?
13   A. Yes.
14   Q. And where was that?
15   A. The University of Texas.
16   Q. And what was that in?
17   A. I think technically it was called campus
18   community health or campus community mental health.
19   Q. And when did you complete that fellowship?
20   A. I think 1975.
21   Q. Okay.
22   A. I'm not positive.
23   Q. Is there any other, I guess, advanced degrees
24   that you have other than those three that we just went

12

1    through?
2    A. No.
3    Q. Okay. And I actually -- I think you produced in
4    discovery a copy of your CV. Let me just give you that
5    and see if that's your current CV.
6    A. Well, it's very old, I mean, I can't call it
7    current because I haven't updated it in a long time.
8    Q. Okay. Is there anything as far as your
9    education, current employment or other experience on
10   here that it's missing?
11   A. I'm sorry, if there's anything what?
12   Q. Sure. Is there anything missing? Have you done
13   any other -- do you have any other employment or
14   professional experience that this would not contain?
15   A. Well, I've been self-employed, so I don't know
16   how to answer that.
17   Q. Okay. Essentially what I'm asking -- so when I
18   asked you if it's current, I just meant does this have
19   all of your relevant education, employment history, that
20   kind of stuff, not necessarily whether or not you just
21   recently created the document.
22      So I'm trying to figure out is there anything
23   about your employment that this is missing since from
24   the time that you created this to today, is it missing

13

1  any kind of employment or professional experience?
2  **A. I put on or we put on a bunch of swimming events.**
3  **Q.** Okay. Let's just go through -- we'll go through
4  your employment a little bit.
5  **A. Okay.**
6  **Q.** So according to this version of your CV you are
7  currently a sports performance consultant; is that
8  correct?
9  **A. Yes.**
10 **Q.** And you've been a sports performance consultant
11 since 2007; is that correct?
12 **A. Yes, I think that's correct.**
13 **Q.** Okay. And can you tell me a little bit about
14 what that means, what do you do as a sports performance
15 consultant?
16 **A. I do consult with individual athletes and**
17 **business people, human performance consulting**
18 **individually, groups, teams, national governing bodies,**
19 **businesses, public speaking. I do --**
20 **Q.** So when you're meeting with those people, what
21 are you actually doing, is it like counseling? Are you
22 coaching or training them? What does it mean to be a
23 sports performance consultant?
24 **A. Well, the way I look at it is helping people to**

14

1  **perform better, to win and to enjoy what they're doing**
2  **more.**
3  **Q.** Do you have set fees for that?
4  **A. Yes, I have set fees, but they're also flexible.**
5  **Q.** Are the fees by event, by meeting, are they
6  hourly fees? How do you charge for your sports
7  performance consulting?
8  **A. Well, again, I'm actually doing human performance**
9  **consulting as well as sports performance.**
10 **Q.** Okay.
11 **A. And my fees are changing. Right now for**
12 **individual consultations I usually charge $300 an hour,**
13 **sometimes less.**
14 **My fees for accompanying a team to competition**
15 **vary. It's usually at least I can remember 1,500 a day**
16 **plus expenses. And it depends on where I'm going.**
17 **International is different than within the country.**
18 **Local is different. Some of it depends on who I'm**
19 **working with.**
20 **Q.** Okay. It also says on the copy of your CV that
21 you produced that you are currently the president of the
22 American Swimming Association. Are you still the
23 president of the American Swimming Association?
24 **A. Yes.**

15

1  **Q.** And it says on here you've been in that role
2  since 2002; is that correct?
3  **A. I think so.**
4  **Q.** Okay. What is the American Swimming Association?
5  **A. Well, it's an LLC, and we put on a bunch of**
6  **swimming events.**
7  **Q.** Is this a business that you own?
8  **A. Yes.**
9  **Q.** And do you own it with someone else?
10 **A. Well, my wife, and we have a board.**
11 **Q.** Okay. And I should have asked you this when we
12 were talking about your sports or your human performance
13 consulting. Is there a business name for that?
14 **A. I don't know.**
15 **Q.** Okay. All right. So what are your -- what is
16 your role as president of the American Swimming
17 Association?
18 **A. Well, most of the time I've been creating events,**
19 **and together with my wife we organize and run the**
20 **events.**
21 **Q.** What type of events?
22 **A. Mostly open water swimming. We have a couple of**
23 **pool events.**
24 **Q.** Are those events usually in Texas or are they --

16

1  **A. They're all in Texas.**
2  **Q.** All in Texas, okay. And then as president of the
3  American Swimming Association, is that a paid position
4  then?
5  **A. I don't know how to answer that.**
6  **Q.** Okay. Do you have some income from the American
7  Swimming Association in your role with it?
8  **A. Yes.**
9  **Q.** Okay. So when you say you're creating events,
10 are people paying you to create and organize and run the
11 events, or are these events that you are creating on
12 your own for people to come to?
13 **A. People pay to participate in the events.**
14 **Q.** Okay. And is that how you derive income from
15 your role with the American Swimming Association?
16 **A. I'm not sure how to sort that out. That plus**
17 **sponsorships.**
18 **Q.** Okay. And then you also have on the copy of the
19 CV that you produced that you are the co-head coach of
20 the Team Texas Master Swimming Team. Are you currently
21 the co-head coach?
22 **A. Technically I think so. I haven't been doing as**
23 **much of the coaching as my wife.**
24 **Q.** Okay. And it says on here you've been in that

17

1 role since September of 1996; is that correct?
2 **A. Where are we looking at this?**
3 **Q.** Under "Current Employment."
4 **A. I think that's probably right.**
5 **Q.** Okay. How long would you say it's been since you
6 were -- I know you said technically you're still the
7 co-head coach but you haven't been doing much with it
8 lately. When is the last time that you were actively
9 serving as the co-head coach?
10 **A. Let me clarify that. I'm still actively serving**
11 **as the co-head coach. I haven't been doing as much of**
12 **the on-deck coaching, which is just a small part of what**
13 **it is.**
14 **Q.** And what is on-deck coaching?
15 **A. That's when I'm at the site for swimming**
16 **practices and running the practice.**
17 **Q.** So then what do you do then as the co-head coach,
18 the part that you are active in?
19 **A. I write practices, consult about how we handle**
20 **the team, interface with people on the pools, things**
21 **like that.**
22 **Q.** How many people are on the team, the swimming
23 team?
24 **A. I don't know today.**

18

1 **Q.** And what is that team, the Team Texas Master
2 Swimming Team?
3 **A. It's a team that -- it's a competitive swimming**
4 **team for adults.**
5 **Q.** Do they compete only in Texas, or do they compete
6 outside of Texas?
7 **A. Yes, some of the swimmers compete outside of**
8 **Texas, some only in Texas, and some don't compete at**
9 **all, they just train.**
10 **Q.** Is this a team that you created?
11 **A. Yes.**
12 **Q.** And when did you create the team?
13 **A. I've created six masters teams over the years,**
14 **and this one, the one by this name is probably since**
15 **1986 maybe.**
16 **Q.** Okay. As far as your current employment as of
17 today, are there any other things that you're currently
18 involved with other than those three that we just went
19 through?
20 **A. Can you define employment for me there.**
21 **Q.** Well, you've got a current employment section on
22 your CV, so I'm assuming you have some kind of
23 understanding of that. Is there anything else
24 that -- well, let me ask you before that are you paid as

19

1 the co-head coach of Team Texas Master Swimming Team?
2 **A. Self-employed, so my income comes from**
3 **distributions of all the things I do.**
4 **Q.** Okay. Is there -- let me just follow up on that
5 last question. Are you paid as the co-head coach of the
6 Team Texas Master Swimming Team?
7 **A. I don't know how to answer that.**
8 **Q.** And why is that?
9 **A. Because my wife and I get income from all of**
10 **these businesses.**
11 **Q.** Okay. So you get some income from that position?
12 **A. I don't know how to answer that. I don't know**
13 **how she divvies that up.**
14 **Q.** Okay. So are there any other businesses that you
15 currently own that we did not just go through?
16 **A. I own whatever business I do. I'm self-employed.**
17 **Q.** So I am asking you what other businesses do you
18 own or do you do something with other than the three
19 that we just went through?
20 **A. Keel Publications.**
21 **Q.** Tell me about Keel Publications.
22 **A. It's a small publishing company that my wife and**
23 **I own that sells mostly my books, some other books and**
24 **some other related items.**

20

1 **Q.** And you said you own Keel Publications with your
2 wife?
3 **A. Yes.**
4 **Q.** When did you first open or start Keel
5 Publications?
6 **A. Somewhere in the early '80s.**
7 **Q.** And did you start it to publish your books?
8 **A. Yes.**
9 **Q.** And we'll talk about some of your books in a
10 little bit. You said you also sell or publish other
11 books through Keel Publications?
12 **A. I have, yes.**
13 **Q.** What other books?
14 **A. Most recently *The Literary Genius of Little***
15 ***Wayne.* I can't remember the name of the marketing book**
16 **that we did for a guy in Pennsylvania. And I can't**
17 **remember the name of a book that we did for a woman in**
18 **Austin.**
19 **Q.** Are most of the books that you have published
20 through Keel Publications your own books?
21 **A. Yes.**
22 **Q.** And then you said it sells mostly your books and
23 some other items. What other items does it also sell?
24 **A. *Winning Isn't Normal* T-shirts, mugs. I'm trying**

21

1  to think of what's -- we have some stuff in the works,
2  but right offhand that's all I can think of.
3     Q.  Okay.
4     A.  Posters, sorry.
5     Q.  So besides Keel Publications and your work as a
6  performance consultant and your role with the American
7  Swimming Association, do you own any other businesses
8  currently?
9     A.  Not that I recall at this second.
10    Q.  Besides the businesses that you currently own,
11 are you currently employed anywhere?
12    A.  I'm only self-employed.
13    Q.  Okay.  So at this point we have covered multiple
14 ways that you currently derive income.  Are there any
15 other businesses or entities from which you derive
16 income currently?
17    A.  Any other businesses?
18    Q.  Or entities or any other roles that you serve in
19 that you derive income from?
20    A.  I guess it depends on how you look at it.
21    Q.  Okay.  What do you mean by that?
22    A.  Well, I'm getting partially -- I don't think
23 that's any different.
24    Q.  So we've covered everything?

22

1     A.  As far as I understand it, yes.
2     Q.  I want to just talk briefly with you about
3  your private practice in sports psychology.  My
4  understanding from your CV that you produced is that you
5  previously had a private practice in sports psychology,
6  correct?
7     A.  Yes.
8     Q.  Okay.  And from your CV it looks like you had
9  that practice from September of 1975 through 2007; is
10 that accurate?
11    A.  I think so.
12    Q.  And you've been retired from that practice since
13 2007?
14    A.  I retired my license.
15    Q.  Okay.  You retired your psychology license?
16    A.  Yes.
17    Q.  And I think also from your CV you had -- you were
18 a licensed psychologist in the state of Texas from 1974
19 through 2007; is that correct?
20    A.  I think so.
21    Q.  So you are no longer a licensed psychologist in
22 Texas or any other state?
23    A.  Correct.
24    Q.  Did you have to do something to retire your

23

1  license, or did you just let it lapse and not renew it?
2     A.  I don't remember.
3     Q.  Okay.
4     A.  I think I notified the board that I was retiring,
5  but I don't remember.
6     Q.  Okay.  Without that state licensure, you can no
7  longer see or treat patients as a psychologist; is that
8  correct?
9     A.  I can't call myself a psychologist.
10    Q.  Okay.  But you're saying you could still treat
11 patients?
12    A.  I don't know what that means in this context, to
13 treat patients.  I consult with people.
14    Q.  Okay.  So essentially since your psychology
15 license is no longer current, you can't call yourself a
16 psychologist, but you can do consulting work without
17 that license, is that what you're telling me?
18    A.  Yes.
19    Q.  Okay.  It looks like from the CV that you
20 produced that you have some prior teaching experience,
21 but you are not currently teaching; is that correct?
22    A.  Correct.
23    Q.  And you also have on that CV that you produced
24 some of the prior coaching experience that you have, but

24

1  my understanding is the only team that you're currently
2  coaching is the Team Texas Master Swimming Team; is that
3  correct?
4     A.  Correct.
5     Q.  Okay.  I want to make sure I understand from some
6  of what you've alleged either in the complaint or in
7  discovery.  Have you ever coached an Olympic team?
8     A.  I've consulted with Olympic teams.
9     Q.  Okay.  And when you say consulted with them, is
10 that the type of consulting that we talked about earlier
11 with the human performance consulting?
12    A.  Yes.
13    Q.  And when's the last time that you consulted with
14 an Olympic team?
15    A.  I think early 2000s.
16    Q.  Okay.
17    A.  If that doesn't include consulting with Olympic
18 team members.
19    Q.  Okay.  When's the last time you consulted with an
20 Olympic team member?
21    A.  Probably last year.  I'm not sure.
22    Q.  When you're consulting with either an Olympic
23 team or an Olympic pick team member, has it always been
24 swimming teams?

25

1    A.  No.
2    Q.  Other sports as well?
3    A.  Yes.
4    Q.  What other sports besides swimming?
5    A.  Oh, man, just about anything you can think of
6    except for some of the winter sports like luge and
7    skeleton.  Do you want me to try and list the ones --
8    Q.  That's okay.  That's helpful enough.  It also
9    looks like from the CV that you produced that you have
10   been a sports psychologist for several teams; is that
11   correct?
12   A.  Yes.
13   Q.  What does that involve?
14   A.  It depends on the team.  It involves helping them
15   perform better, prepare for competition, win and enjoy
16   it more.
17   Q.  When you say enjoy it more, you mean enjoy
18   competing more?
19   A.  Enjoy the whole deal, training, competing.
20   Q.  Okay.  Are all of the teams that you have served
21   as a sports psychologist with on your CV?  They're under
22   miscellaneous.
23   A.  No, I don't think so.
24   Q.  Okay.  So that's missing some?

26

1    A.  Huh?
2    Q.  The CV is missing some?
3    A.  This CV isn't a current CV.
4    Q.  Okay.
5    A.  And I really hadn't had any use for it for a long
6    time.
7    Q.  Okay.  The last time -- this says that the last
8    time you were a sports psychologist for a team was in
9    2004.  Have you served as a sports psychologist for a
10   team since 2004?
11   A.  Probably not as a sports psychologist.  Maybe as
12   a sports psychology consultant.
13   MS. PADGETT:  Okay.  Let's go ahead and mark his
14   CV as Exhibit 1.  While you're doing that let's mark
15   that as Exhibit 2.
16   (EXHIBITS MARKED FOR IDENTIFICATION.)
17   Q.  So Connie's handing you what we just marked as
18   Exhibit 2 which is also something that you produced in
19   discovery in this case.  Did you create this document?
20   A.  Yes.
21   Q.  Okay.  And just from the heading to me it looks
22   like it's a list of your publications; is that correct?
23   A.  I think it's correct up until the day I did it.
24   Q.  Okay.  Do you remember when you created it?

27

1    A.  No.
2    Q.  Okay.  Well, let's look at the books first.
3    A.  Yeah.
4    Q.  Is this a complete list of all of the books that
5    you have published?
6    A.  No.
7    Q.  It is not.  What is it missing?
8    A.  Well, I published some other people's books.  Let
9    me see what else.
10   Q.  Let me clarify my question.  Is this a complete
11   list of the books that you yourself have written and
12   published in your name?
13   A.  Yes, I think so.
14   Q.  And the last book that I see on here that you
15   wrote and published in your name was published in 2005.
16   Have you published -- written and published a book in
17   your name since 2005?
18   A.  No.
19   Q.  And then it looks like from this list *Winning
20   Isn't Normal* was the second of ten books that you wrote
21   and published, I guess chronologically it was the second
22   of ten books?
23   A.  I don't think so.
24   Q.  Okay.

28

1    A.  I think it was the third.
2    Q.  All right.  And *Winning Isn't Normal* was
3    published by Keel Publications, correct?
4    A.  Correct.
5    Q.  And it looks like from here all ten of your books
6    are currently published by Keel Publications; is that
7    correct?
8    A.  Correct.
9    Q.  And I think only one was originally published by
10   a different publisher and that was Apprentice Hall?
11   A.  Correct.
12   Q.  Okay.  Then from the list of articles it looks
13   like the last article that you wrote and published was
14   in 2000.  Does that sound right to you?
15   A.  No.
16   Q.  Okay.  So you've written articles since 2000?
17   A.  I think so.
18   Q.  Do you remember which articles you've written
19   since then?
20   A.  I've written some articles for Austin Fit
21   Magazine, I believe, since then.
22   Q.  Okay.  Were you paid for any of the articles that
23   you've written or published?
24   A.  I don't think so.

29

1     **Q.** Okay. Then let me ask you a little bit more. We
2 talked a little bit already about Keel Publications, and
3 we just went through the books, your own books that you
4 have published through Keel Publications. As the
5 publisher of the books, what goes into that? What do
6 you have to do to publish one of your books?
7     **A. Well, I have to write them. I have to get them**
8 **printed.**
9     **Q.** Do you print them, or do you have somebody print
10 them?
11     **A. I have somebody print them, copyright them.**
12     **Q.** Are all of your books copyrighted?
13     **A. Yes.**
14     **Q.** What about the -- do you also design and print
15 the shirts, posters, and mugs that you sell?
16     **A. Design them.**
17     **Q.** And then somebody else prints them?
18     **A. Yes.**
19     **Q.** How do you keep the supply of the -- do you have
20 like a place that you keep them, or do you print or
21 produce them as they're ordered?
22     **A. It depends on the book.**
23     **Q.** Okay.
24     **A. So *Winning Isn't Normal*, for example, right now**

30

1 we print on demand. We might print 100 at a time or
2 **something. And some books we still have stock of and**
3 **the others we print on demand or electronically.**
4     **Q.** What about the shirts, posters, and mugs, are
5 those printed at the time of order, or do you keep a
6 stock of those?
7     **A. We have a little bit of stock, I think, of**
8 **T-shirts and a small stock of mugs.**
9     **Q.** Of what?
10     **A. Mugs.**
11     **Q.** Okay. You said that some books you still have in
12 stock. Is there a certain number that when you
13 initially print one of your books do you initially print
14 a certain number of them?
15     **A. Yes.**
16     **Q.** And what's that number?
17     **A. 10,000. I'm not sure that we've done that on**
18 **every book.**
19     **Q.** Do you remember how many of the *Winning Isn't*
20 *Normal* book you initially printed?
21     **A. 10,000.**
22     **Q.** And then you said now you print it on demand and
23 you print 100 copies at a time of that book in
24 particular?

31

1     **A. We don't have the stock unless we've printed**
2 **something like 100 of them. Normally that's what we've**
3 **done, but I'm not exactly sure.**
4     **Q.** So it kind of varies whether you print on demand
5 or you may print 100 at a time and then have stock?
6     **A. Right now.**
7     **Q.** Right now what?
8     **A. Right now it varies, yes.**
9     **Q.** Okay.
10     **A. As far as I know.**
11     **Q.** Okay. Does your wife do the printing?
12     **A. Mostly, yes.**
13     **Q.** Is there anyone else involved with Keel
14 Publications besides you and your wife?
15     **A. I think my youngest son has some involvement.**
16     **Q.** And what's his name?
17     **A. Cooper.**
18     **Q.** Is his last name Bell?
19     **A. Yes. And my older son has at least -- yeah, he**
20 **has some involvement.**
21     **Q.** What's their involvement with the publications?
22     **A. Mostly computer stuff we don't understand.**
23     **Q.** So are they putting products online, that kind of
24 thing?

32

1     **A. Helping with website. I don't know offhand.**
2     **Q.** Okay. And you mentioned your oldest son. What
3 is his name?
4     **A. Bridger, B-R-I-D-G-E-R.**
5     **Q.** And is his last name Bell?
6     **A. Yes.**
7     **Q.** Is anyone else involved with Keel Publications?
8     **A. My daughter did some typing of one of the books.**
9     **Q.** Okay.
10     **A. My older daughter.**
11     **Q.** And what's her name?
12     **A. Kirsten, K-I-R-S-T-E-N.**
13     **Q.** Is her last name Bell?
14     **A. Bell.**
15     **Q.** So she did some actual typing?
16     **A. Yes.**
17     **Q.** All right. Anyone else involved?
18     **A. I don't think so.**
19     **Q.** Okay. You also produced in discovery a list of
20 swim clubs that you have worked with, so let's mark this
21 Exhibit 3.
22     (EXHIBIT MARKED FOR IDENTIFICATION.)
23     **Q.** You can go ahead and look at that. Let me know
24 when you're ready.

33

1    **A. I'm ready.**
2    Q. Did you create this list?
3    **A. Yes.**
4    Q. Okay. And, again, just from the heading I'm
5 assuming that this is a list of swim clubs you have
6 worked with over the years; is that correct?
7    **A. No.**
8    Q. No, okay. What is it?
9    **A. It's a partial list of mostly swim clubs, but**
10 **there's a lot of other stuff on here.**
11    Q. Okay. Over what time frame does this cover?
12    **A. Sometime in the '80s to whenever I did this list.**
13    Q. And you don't remember when you did this list?
14    **A. I don't.**
15    Q. Do you know if it was within the last year or
16 two?
17    **A. I don't think so.**
18    Q. Okay. So sometime before 2018?
19    **A. I would think so, but I don't know.**
20    Q. Have we already talked about -- when you say it's
21 a list of swim clubs or some other clubs that you have
22 worked with, when you say work with them, is that the
23 type of consulting that we talked about earlier?
24    **A. Yes.**

34

1    Q. There's a key on the fourth page at the bottom.
2 It says Bell 9 is the Bates number. And it kind of goes
3 through the different colors you've used in this list,
4 and one of the colors in the key is purple, and you put
5 on there purple means unrelated to *Winning Isn't Normal*
6 or not a speaking engagement; is that correct?
7    **A. No, I don't think that's correct.**
8    Q. Okay. You agree with me that that's what it does
9 say on that page, correct?
10    **A. Yes.**
11    Q. All right. But you're telling me that the teams
12 in purple does not mean that they were unrelated to
13 *Winning Isn't Normal* or not a speaking engagement?
14    **A. Could you repeat that, please.**
15    Q. Tell me what's incorrect about that.
16    **A. The U.S. Olympic trial swimmers.**
17    Q. And you're saying that that was related to
18 *Winning Isn't Normal?*
19    **A. Yes.**
20    Q. Is that the only team that's incorrect on there?
21    **A. No, Cayman Island Amateur Swimming Association is**
22 **not correct.**
23    Q. Okay. So that one was also related to *Winning*
24 *Isn't Normal?*

35

1    A. Yes.
2    Q. Does that mean then that all of the other teams
3 or organizations on the list that are not purple plus
4 the addition of those two were related to *Winning Isn't*
5 *Normal?*
6    A. Yes.
7    Q. Okay. And when you say on here related to
8 *Winning Isn't Normal* what does that mean?
9    **A. Well, when I said on here that it's not related**
10 **to *Winning Isn't Normal*, I was -- I think I was**
11 **referring to the Smart Parent Training for Texas Amateur**
12 **Athletic Foundation is mostly related to my book,**
13 **parenting book.**
14    Q. So then typically when you're consulting with
15 these teams, that consulting that you're doing is
16 related to *Winning Isn't Normal?*
17    **A. As I understand it, yes.**
18    Q. Okay. Does that mean it's related to the book
19 you've written, *Winning Isn't Normal,* or the general
20 idea that winning isn't normal?
21    **A. Both.**
22    Q. Okay. When you are working with these clubs and
23 organizations are you typically getting paid for that?
24    A. Yes.

36

1    Q. You have Worthington High School in Ohio on this
2 list.
3    A. Yes.
4    Q. When did you work with Worthington High School?
5    **A. Oh, it's been a while.**
6    Q. Does about the mid '80s sound correct?
7    **A. It could have been.**
8    Q. The Worthington School District has multiple high
9 schools at this point, and I think at one point they had
10 one high school. When you worked with them was it one
11 high school?
12    **A. I don't remember.**
13    Q. Okay. Do you remember if it wasn't one high
14 school, do you remember which specific high school it
15 was that you would have worked with?
16    **A. Wherever James Callahan was coaching.**
17    Q. And what did you do with Worthington High School?
18    **A. I did -- as I recall, it was a weekend seminar.**
19    Q. Was it the school's swim team?
20    **A. I think it was with the school's swim team and**
21 **with also with the club team that he coached, but it's**
22 **been a while.**
23    Q. Okay. Were you paid for that weekend seminar?
24    A. Yes.

37

1    Q.  Do you remember how much?
2    A.  No.
3    Q.  Were you paid for anything through Worthington
4   High School besides the weekend seminar?
5    A.  Well, I expect that I sold a bunch of books, but
6   I don't remember how many or how they were paid for.
7    Q.  Do you remember if you sold *Winning Isn't Normal*?
8    A.  I'm pretty sure I did.
9    Q.  But you don't remember how many copies?
10   A.  No.
11   Q.  Have you worked with Worthington High School or
12  any of the schools in the Worthington City School
13  District more than that one time?
14   A.  I don't think so.
15   Q.  You also have on this list some -- you've got a
16  heading that says "Speaker/Coaches Clinics" and you also
17  have swim camps on here.  Are those complete lists of --
18   A.  You said I also have something else?
19   Q.  I said you also have a list of it's titled
20  "Speaker/Coaches Clinics" and then there's also a list
21  that says "Swim Camps," and I was just asking if those
22  are complete lists of those clinics?
23   A.  I don't know.  As I told you originally this is a
24  partial list.

38

1    Q.  Okay.  Have we already discussed the types of
2   things you would be doing as or when you have coaches
3   clinics or is this something different than what we've
4   discussed?
5    A.  I don't know how to answer that.
6    Q.  Okay.  What do you do when you serve as a speaker
7   or do a coaches clinic?
8    A.  I speak.
9    Q.  Okay.
10   A.  Or I --
11   Q.  Is it different from the consulting that you do?
12   A.  Well, each one is different.
13   Q.  Okay.  Are you still serving presently?  Are you
14  still serving as a speaker or doing coaches clinics?
15   A.  No, I'm right here.
16   Q.  I don't mean right this very minute.  I mean in
17  the year 2019 are you still serving as a speaker and
18  doing coaches clinics?
19   A.  I don't think I've done any this year, but I'm
20  not sure.
21   Q.  Have you done any swim camps in the year 2019?
22   A.  Have I done any swim camps, I don't understand.
23   Q.  Swim camps?
24   A.  Swim camps, no.

39

1    Q.  Do you remember the last time that you would have
2   done either a speaking engagement, a coach's clinic or a
3   swim camp?
4    A.  No, I don't remember the exact time.
5    Q.  On the last page of this exhibit, it's Bell 10,
6   you've got a list of companies.  Are those companies
7   that you've worked with or that you've consulted with?
8    A.  Yes.
9    Q.  You consulted with them?
10   A.  Yes.
11   Q.  Okay.  Is that a complete list?
12   A.  I don't know.
13   Q.  Do you remember the last time you've consulted
14  with a company?
15   A.  Yes, actually I know this is not a complete list.
16   Q.  Okay.
17   A.  I don't remember the exact date but within the
18  last few years, I think.
19   Q.  Have you done any consulting with companies in
20  2019?
21   A.  I don't think so.
22   Q.  And then you have a list just above that that's
23  titled "Other."  What are those types of things that you
24  do?

40

1    A.  What was the last part of that?
2    Q.  I said you have a list just above that that says
3   "Other."
4    A.  Yes.
5    Q.  It's titled "Other," and I was just asking what
6   are these types of things on here under "Other"?
7    A.  Well, they're various things.
8    Q.  All right.  Are you consulting with the entities
9   listed on here?
10   A.  With the what?
11   Q.  With the entities or organizations listed on
12  here?
13   A.  Can you repeat the question, please.
14   Q.  Sure.  I asked -- I'm just trying to figure out
15  what you were doing with these organizations or
16  entities, and I asked were you consulting with them or
17  was this something else?
18   A.  Some of it's speaking engagements.  Some of it's
19  consulting with them.  University of Ulster was I think
20  they classified it as a class that I taught there.
21  Saint Edwards I gave a commencement address, various
22  stuff, really all related kind of stuff.
23   Q.  For the types of things that are listed in this
24  Exhibit 3, are you paid for these types of things, so

41

1 working with clubs or organizations --
2    A.  Yes.  I'm sorry.
3    Q.  -- being a speaker, doing a coaches clinic,
4 having a swim camp, you're paid for those?
5    A.  Yes.
6    Q.  Okay.
7    A.  Almost all the time.  Sometimes I've done some
8 for -- just comp'd them.
9    Q.  I want to talk a little bit about some of your
10 allegations in the complaint related to your career.
11 You have in the complaint that you are an
12 internationally recognized sports psychologist who has
13 worked with over 500 teams.  What's the basis for that
14 number, over 500 teams?
15    A.  I think I've worked with over 500 teams.
16    Q.  Do you keep track somehow?
17    A.  Yes.
18    Q.  Okay.  So you have some kind of recordkeeping
19 where you've kept track of the teams you've worked with?
20    A.  Not anymore.
21    Q.  Are you saying you no longer keep track?
22    A.  Correct.
23    Q.  Okay.  But you have a record somewhere up to a
24 certain point where you were keeping track?

42

1    A.  No, I had a record.
2    Q.  Okay.  You no longer have that record?
3    A.  No.
4    Q.  Okay.  Do you remember the last time you had that
5 record?
6    A.  No.
7    Q.  Do you know the exact number of teams you worked
8 with?
9    A.  At least this many.
10    Q.  When's the last time you had that record where
11 you were keeping track?
12    A.  I don't know.
13    Q.  The last time that you were aware of that record
14 it did have over 500 teams on it?
15    A.  I don't know.  Some of these, for example, had --
16 sometimes I've done seminars where there were ten teams
17 there, so as much as I could remember.
18    Q.  Okay.  And I think we've -- obviously you work
19 with swimming teams.  What other types of sports are you
20 working with teams?
21    A.  I've worked with just about every sport you can
22 think of except some of the winter sports.
23    Q.  Okay.
24    A.  I think I already answered that.

43

1    Q.  Well, we were talking about Olympics
2 specifically.
3    A.  Oh, Olympic teams.
4    Q.  Previously we were talking about Olympic teams.
5 I'm just asking you generally where you say that you
6 have worked with over 500 teams, I'm just trying to
7 figure out what types of sports you've worked with.
8    A.  Just about every sport you can think of.
9    Q.  Okay.  When is the last time you worked as a
10 sports psychologist with a team?
11    A.  Well, I guess 2007 when I gave up my license.
12    Q.  Okay.  You also have in the complaint that you
13 are a sports performance consultant, and we've already
14 talked about what that is.  Is that included -- when you
15 say you've worked with over 500 teams, is that both as a
16 sports psychologist and a sports consultant?
17    A.  Probably.
18    Q.  Okay.  So that number is comprehensive of both of
19 those roles?
20    A.  To the best of my recollection.
21    Q.  Okay.  And what's the -- I don't think I asked
22 you this earlier.  When's the last time that you worked
23 as a sports performance consultant or a human
24 performance consultant?

44

1    A.  I don't know right offhand.
2    Q.  I didn't hear you.
3    A.  I don't know right offhand.
4    Q.  Okay.  Has it been within the last year or two?
5    A.  Oh, yes.
6    Q.  Okay.  You also talk about in the complaint your
7 success as an athlete and a coach.  Are you still
8 competing as an athlete?
9    A.  I last competed in October.
10    Q.  Of 2019?
11    A.  2019, yes.
12    Q.  Okay.  What about coaching, when's the last time
13 that you coached?
14    A.  Sometime this year.
15    Q.  Okay.  Do you derive income as a swimmer or as an
16 athlete?
17    A.  I think I derive income based on everything that
18 I do, based on my reputation and they're all
19 interrelated.  So sometimes people buy books because
20 they know me as a swimmer.  Sometimes people buy books
21 because they know of me as a coach.  Sometimes I
22 get -- it's the other way around, you know, they're all
23 interrelated.  People join the team because of books,
24 because of my seminars, because of my events and all the

Deposition of Keith Bell, Ph.D.

45

1 way around.
2    Q.  Okay.  We've talked about your speaking
3 engagements and you also have an allegation in there
4 that you've been a speaker at national and international
5 coaching symposia.  When was the last time you spoke at
6 one of those either national or international coaching
7 symposia?
8    A.  Probably early 2000s.
9    Q.  Okay.  And one of the things we asked for in
10 written discovery was the documents that you have
11 related to your role as a speaker at national,
12 international coaching symposia.  Have you produced all
13 the documents that you have that support that claim?
14    A.  Related to what?
15    Q.  Being a speaker at coaching symposia.
16    A.  Have I -- do I have what?
17    Q.  Have you produced all the documents that you have
18 related to that?
19    A.  I assume I have.
20    Q.  Okay.  You also have in here that you have
21 authored and published ten books and over 80 articles
22 related to sports psychology and sports performance.
23 We've gone over the books that you've written and
24 published.

46

1    A.  Yes.
2    Q.  And we've covered all of them, correct?
3    A.  Yes.
4    Q.  Okay.  What was the last time that you had
5 published a book?
6    A.  I think we already answered that.
7    Q.  And what was it?
8    A.  76 Rules.
9    Q.  Okay.  And when was that published?
10    A.  2005, I think.
11    Q.  Are you still selling all ten of those books that
12 you published?
13    A.  Some of them are out of stock.
14    Q.  But they're still available for sale?
15    A.  Yes.
16    Q.  All right.  Besides this lawsuit that you've
17 brought against the Worthington City School District
18 have you been involved in any other lawsuits?
19    A.  Yes.
20    Q.  Okay.  Tell me about those.  Well, let me ask you
21 this.  Are you currently involved in other lawsuits?
22    A.  Yes.
23    Q.  Do you know about how many you're currently
24 involved with?

47

1    A.  I can't think of it right offhand.  I don't know
2 the exact number.
3    Q.  Would you say more or less than 20?
4    A.  I think less.
5    Q.  More or less than 10?
6    A.  I don't know.
7    Q.  Somewhere between 10 and 20?
8    A.  I don't know.
9    Q.  Okay.  So less than 20 you know?
10    A.  I'm sure of that.
11    Q.  But you're not sure where under 20.  What about
12 prior lawsuits, have you been involved in past lawsuits
13 other than the ones you're currently involved with?
14    A.  Yes.
15    Q.  Do you know about how many?
16    A.  No.
17    Q.  Can you give me an estimate?
18    A.  No.
19    Q.  Is it more or less than 100?
20    A.  I would guess less than 100.
21    Q.  Okay.  What about more or less than 50?
22    A.  I would guess less than 50.
23    Q.  So you would say somewhere between 20 and 50 past
24 lawsuits?

48

1    A.  I don't know.
2    Q.  Okay.  All you know is less than 50?
3    A.  Okay.
4    Q.  Is that correct?
5    A.  I don't know.
6    Q.  Okay.  Do all of those lawsuits have to do with
7 copyright or trademark infringement?
8    A.  Yes.
9    Q.  Have you been involved with any other lawsuits
10 other than -- well, let me ask you this.  Have you ever
11 been sued?
12    A.  A couple of counterclaims.
13    Q.  Okay.  Are you currently involved with a
14 counterclaim?
15    A.  Yes.
16    Q.  And which state or case is that?
17    A.  In Utah.
18    Q.  And what's that counterclaim for?
19    A.  I don't understand the question.
20    Q.  What's the claim against you in that lawsuit?
21    A.  I don't remember technically what it was.
22    Q.  Does it have to do with your copyright?
23    A.  I'm not sure whether it's copyright or trademark
24 or both.

49

1  Q. Is it a claim to invalidate your copyright or
2  trademark?
3  A. I don't think so, but I don't know.
4  Q. Okay.
5  A. Not my copyright.
6  Q. Any other current claims that are pending against
7  you?
8  A. I don't think so.
9  Q. All right. Have you been involved with any
10 bankruptcies?
11 A. Have I been involved with any bankruptcies?
12 Q. Yeah, have you filed any bankruptcies?
13 A. I filed a bankruptcy back in 1974 maybe.
14 Q. Was that in Florida?
15 A. No.
16 Q. Was it in Texas?
17 A. Yes.
18 Q. Okay. Do you remember if it was Chapter 11 or
19 Chapter 7?
20 A. Chapter 7, I think.
21 Q. Okay. Have you been involved with any kind of
22 personal injury or property damage cases either where
23 you were bringing the lawsuit or someone was suing you?
24 A. I don't think so.

50

1  Q. Okay. Do you keep track of the current lawsuits
2  that you're involved in?
3  A. Do I keep track of them?
4  Q. Do you have like a list or a record somewhere?
5  A. I don't know that I've made a list. I think I
6  may have.
7  Q. Do you keep track of the past lawsuits, like,
8  again a list or some kind of record?
9  A. I might have.
10 Q. Do you currently have those lists or records?
11 A. I don't think I have a current list.
12 Q. But you do have a list of past lawsuits?
13 A. I think I do.
14 Q. So that was one of the things we requested in
15 discovery, and I would ask that you when you return home
16 look for those lists and if you find them provide them
17 to your attorneys so that they can produce them.
18 A. Okay.
19 Q. So I want to talk to you a little bit about -- go
20 ahead.
21 A. I want a way of remembering that I need that.
22 Q. Sure. Do you want paper?
23 A. Yeah, if I can.
24 Q. Sure.

51

1  A. You want a list of --
2  Q. Your current lawsuits and then a list of past
3  lawsuits, whichever you have or both if you have them.
4  A. Those are all publicly available to you.
5  Q. I understand. I'm asking for the list that
6  you've already created or the record, whatever you have
7  that you've already created.
8  THE WITNESS: Can we take a short break?
9  MS. PADGETT: Sure.
10 (Recess taken.)
11 Q. (By Ms. Padgett) So before we took a break we
12 were talking about some of the lawsuits you've been
13 involved in, and you had mentioned you were involved in
14 a couple -- there had been a couple counterclaims filed
15 against you. Have any of those counterclaims been
16 successful?
17 A. No.
18 Q. Okay. And one is currently pending --
19 A. Yes.
20 Q. -- in Utah. Okay. Most of the -- or the
21 allegations in this lawsuit have to do with your *Winning
22 Isn't Normal* book and specifically a passage from that
23 book, correct?
24 A. Yes.

52

1  Q. Okay. And that is the book that was originally
2  published -- we went through earlier originally
3  published in '82 or '83?
4  A. Yes.
5  Q. Okay. You with your complaint provided some
6  information about the copyright registration. I think
7  you say that the copyright registration for the actual
8  book was obtained in 1989; is that correct?
9  A. Correct.
10 Q. Okay. And then you -- do you have to renew that,
11 or once you have it, you have it?
12 A. Once you have it, you have it is my
13 understanding.
14 Q. Okay. You also claim that you have a copyright
15 for the derivative work for *Winning Isn't Normal*; is
16 that correct?
17 A. I don't claim, I do.
18 Q. Okay. When you say a copyright for the
19 derivative work, what is that, is that that passage?
20 A. Yes.
21 Q. Okay. When did you obtain that copyright?
22 A. 2017.
23 Q. 2017?
24 A. Uh-huh.

53

1    Q.   Is that yes?
2    A.   Yes.
3    Q.   Okay.  So you had the copyright for the book
4  since 1989 but the copyright on the specific *Winning*
5  *Isn't Normal* passage since 2017, correct?
6    A.   No.
7    Q.   Okay.  What's wrong?
8    A.   I had a copyright for the book the second I wrote
9  it.  I registered the copyright in 1989.
10   Q.   Okay.  And you've had the copyright for the
11 derivative work for that passage since 2017?
12   A.   Correct, the registered copyright.
13   Q.   Okay.  And then you also claim in the complaint
14 that you have a trademark registration for you say
15 "Winning Isn't Normal"; is that correct?
16   A.   No, I don't claim that.  I have one.
17   Q.   Okay.  What is that trademark of, is it just the
18 phrase "Winning Isn't Normal"?
19   A.   No, I have a trademark for a series of books,
20 printed matter, *Winning Isn't Normal.*
21   Q.   So the trademark is for the book called *Winning*
22 *Isn't Normal?*
23   A.   No, it's for the series of books, the *Winning*
24 *Isn't Normal* series of books.

54

1    Q.   I see.  So you have a *Winning Isn't Normal* series
2  of books?
3    A.   Yes.
4    Q.   What books are in that series?
5    A.   I think all ten.
6    Q.   Okay.  So the trademark registration is for the
7  series of books?
8    A.   *Winning Isn't Normal* series of books.
9    Q.   Okay.  And all ten of your books are part of that
10 series?
11   A.   Yes.
12   Q.   When did you obtain that trademark registration?
13   A.   I think 2013, but I'm not sure.
14   Q.   Okay.  So your understanding is that trademark
15 registration covers all ten of the books you have
16 written?
17   A.   Yes.
18   Q.   Has your copyright or trademark ever been
19 invalidated?
20   A.   No.
21   Q.   Have any claims ever been filed against you for
22 copyright misuse?
23   A.   No, not that I know of.
24   Q.   Have any claims been filed against you for

55

1  alleging fraud against the United States Patent Office?
2    A.   Not that I know of.
3    Q.   And you don't know what the counterclaims that
4  have been filed against you were for?
5    A.   I don't.  I don't recall exactly what it said.
6    Q.   Okay.  Since authoring the book *Winning Isn't*
7  *Normal* you claim in the complaint that you continue to
8  promote, distribute, offer for sale and sell numerous
9  copies of the book.
10       Tell me a little bit about how you promote the
11 book and specifically *Winning Isn't Normal.*
12   A.   Well, it's advertised on Keel Publications'
13 website.  It's available through Amazon and Kindle and
14 Apple iBooks.
15   Q.   Besides listing it as an available book on those
16 websites, do you do anything else to promote or
17 advertise the book?
18   A.   I can't think of anything right offhand.
19   Q.   Okay.  And we've already talked about how you
20 keep an inventory or keep the book.  When somebody
21 actually orders it, are you the one distributing it,
22 sending it out?
23   A.   Usually my wife.
24   Q.   Okay.  And besides those websites that you just

56

1  mentioned where it's available for sale, is it available
2  for sale anywhere else?
3    A.   I think there's still some swim shops that sell
4  it.
5    Q.   So actual store locations?
6    A.   Yes.  There are some other organizations or
7  companies that offer it for sale.
8    Q.   Do they have an inventory, or do they just offer
9  it for sale and when they get an order they then contact
10 you?
11   A.   It depends on the ones, I think.
12   Q.   Okay.  Anywhere else that you offer it for sale?
13   A.   I don't think so.
14   Q.   Okay.  And then from your list it sounds like
15 there are electronic versions available through Kindle
16 and Apple?
17   A.   Correct.
18   Q.   Okay.  Do you know how many copies of the *Winning*
19 *Isn't Normal* book you have sold total since you wrote
20 and started publishing it?
21   A.   Well, I thought it was at least 40,000 to 50,000,
22 but I think it's possible it's as many as 80,000.
23   Q.   And why do you say it's possible it's as many as
24 80,000?

57

1    A.  Well, I know that the first few times, I think at
2  least four or five times we produced 10,000, and I'm not
3  sure of the amounts after that.  But I thought we had
4  six printings before we started doing on demand, and
5  apparently recently we discovered that we had eight
6  printings.
7    Q.  Okay.  So it sounds like you initially thought it
8  was 40,000 to 50,000, but now you think it might be up
9  to 80,000 copies sold?
10    A.  Yeah.
11    Q.  But we know at least somewhere between 40,000 or
12  80,000 copies?
13    A.  I think so.
14    Q.  Okay.  Do you know how many copies -- do you keep
15  a breakdown, like, how many copies you're selling each
16  year?
17    A.  No, I don't.
18    Q.  Okay.  Does your wife or somebody with your
19  business?
20    A.  Yes.
21    Q.  Do you know as we sit here today how many copies
22  you have sold of the *Winning Isn't Normal* book in each
23  of the last ten years?
24    A.  Each of the last ten years?

58

1    Q.  Yeah.
2    A.  No, I don't.
3    Q.  Okay.  But you would have that somewhere?
4    A.  Probably not.
5    Q.  You don't have that?
6    A.  Probably not for ten years, no.
7    Q.  Okay.
8    A.  We certainly have it for the last couple of
9  years, last few years.
10    Q.  I've got some documents I want to go through with
11  you later, and if we've determined that you've already
12  produced those documents that you're referring to then
13  that's fine, but if not then I would ask that you add
14  that to your list as well.
15        MR. GERLING:  And that's the amount in the last
16  several years?
17        MS. PADGETT:  Yeah, whatever record.  I asked ten
18  years, but if he has less than that, then whatever he
19  has.
20        THE WITNESS:  You just want sales records for
21  that?
22        MS. PADGETT:  Yes, and specifically for the
23  *Winning Isn't Normal* book.
24    Q.  (By Ms. Padgett)  Okay.  How much do you sell the

59

1  book for, the *Winning Isn't Normal* book?
2    A.  $24.95 plus shipping and handling.
3    Q.  And I think the E books, the electronic book
4  versions are $9.99; is that correct?
5    A.  I think so, yes.
6    Q.  I think one of the documents you produced in
7  discovery, and I can give it to you, I don't know if
8  we'll mark it as an exhibit or not, that first page
9  which was marked Bell 297 lists the price as $97.50 and
10  $105.01.  Is that -- you don't charge that?
11    A.  No.
12    Q.  Okay.  I just want to make sure.  And then in
13  this packet I see the version sold on Apple for $9.99,
14  the Kindle version sold on Amazon for $9.99, and then
15  the book version, the hard copy version on Keel
16  Publications or on your website for $24.95.  And then I
17  think you said you also sell it on Amazon for $24.95; is
18  that correct?
19    A.  Yes.
20    Q.  Okay.  All right.  I won't mark that.  Do you
21  track the types of sales, whether it's hard copies or
22  electronic copies separately?
23    A.  Yes.
24    Q.  And I'm assuming that when you sell on Amazon or

60

1  Apple or Kindle some part of that total list price goes
2  to Amazon or Kindle or Apple for selling those books; is
3  that correct?
4    A.  Yes, I think so.
5    Q.  So how much profit do you actually make from a
6  book sale for one book of *Winning Isn't Normal*?
7    A.  It depends on the shipping and handling.  Well,
8  with the shipping and handling I'm going to guess it's
9  pretty close to that 25 after production costs, and the
10  Kindle, yeah, the Kindle and the Apple are I think about
11  $7.
12    Q.  Are you saying hard copies you make about $25?
13    A.  I would think so, yeah.
14    Q.  I thought you said it was sold for $24.95?
15    A.  Yes, but there's a profit usually on the shipping
16  and handling too.
17    Q.  Got you.  So you are clearing about $25 on the
18  hard?
19    A.  That's my best guess, yeah.
20    Q.  Okay.  Do you keep track or do you know what your
21  total profit from sales of the *Winning Isn't Normal* book
22  is over the time that you've been selling it?
23    A.  No, I don't know.
24    Q.  Do you keep track of that?

61

1    A. I don't, no.
2    Q. Does your wife keep track of that?
3    A. I don't know.
4    Q. Okay. So I think that's something else we asked
5  in discovery, so when you check for the list of sales if
6  you could also check for, you know, numbers related to
7  what you're selling so the profit or the net or the
8  gross, however you would keep track from book sales of
9  *Winning Isn't Normal*.
10        And, again, I've got some documents we're going
11  to go through that you have produced, but I'm not sure
12  if they cover that or not, if there are other documents
13  or not. So I guess when we get there you can tell me.
14        You also claim in the complaint that you continue
15  to make meaningful efforts to create a market for the
16  book and to protect and enjoy the rights under the
17  Copyright Act. What do you mean you continue to make
18  meaningful efforts to create a market for the book?
19  What do you mean by that?
20    A. I offer it for sale.
21    Q. Are you doing anything else to create a market
22  for the book other than offering it for sale?
23    A. Well, I'm trying to stop theft of it.
24    Q. Okay. And I think that probably goes to your

62

1  claim in the complaint that you try to protect your
2  rights under the Copyright Act?
3    A. Yes. I --
4    Q. And when you say -- go ahead.
5    A. I think my reputation is important in that.
6    Q. Okay. When you say you try to stop the theft of
7  it, you're talking about the book itself or also the
8  passage?
9    A. Both.
10    Q. And how or what methods do you use to try to stop
11  the theft of the *Winning Isn't Normal* book or passage?
12    A. C and Ds.
13    Q. Did you say C and Ds?
14    A. C and Ds.
15    Q. Okay. What does that mean?
16    A. I send letters to cease and desist.
17    Q. Okay.
18    A. Lawsuits. I've encouraged and thanked people for
19  alerting people not to take my books without my
20  permission. I don't know what else offhand.
21    Q. Besides maybe in instances where somebody has
22  alerted you to someone using a book --
23    A. I'm not hearing you.
24    Q. Sure. You just mentioned that you'll thank

63

1  people who alert you to people who are using the book or
2  the passage.
3    A. Not alerting me to that.
4    Q. Okay.
5    A. When they alert people not to use my book -- not
6  to steal my book, to get permission.
7    Q. I see.
8    A. I write and thank them for that.
9    Q. Okay. So how are you becoming aware of people
10  using the book or the passage?
11    A. Usually through a search engine.
12    Q. So are you performing searches?
13    A. Yes.
14    Q. How often would you say you perform searches?
15    A. Fairly regularly.
16    Q. Is it weekly?
17    A. I don't know. Some weeks I don't. Some weeks
18  often I do.
19    Q. Okay. Are there any other methods or ways that
20  you are looking for people using the book or the
21  passage?
22    A. I have I think it's Google that sometimes sends
23  me alerts.
24    Q. Is that something you set up?

64

1    A. I think so.
2    Q. Okay. So if the search engine gets a hit on the
3  phrase, I'm assuming they send you a notification?
4    A. I have no idea how Google works, and they don't
5  want to tell anyone as far as I understand.
6    Q. No, they don't. Okay. But however it works,
7  you're getting -- you occasionally get alerts from
8  Google?
9    A. Yes.
10    Q. Okay. Any other ways that you are finding use of
11  your book or that passage?
12    A. I don't think so.
13    Q. Okay.
14    A. Well, occasionally someone will tell me, like my
15  son might notice it.
16    Q. Okay. You claim in your written discovery
17  responses that you have suffered thousands of
18  infringements.
19    A. No, I didn't claim that. I have.
20    Q. Okay. Do you know how many infringements or
21  alleged infringements?
22    A. I don't think they're alleged. I have a partial
23  tracking of one of the derivatives, so there's a
24  derivative that we call crumpled sheet, and it's been

65

1  what I call viral on the internet.  And as best we can
2  we've tracked a copy of it and how many people it was
3  sent out to in terms of followers.  That doesn't include
4  being displayed to the whole world, but one level down
5  we've done that, and the last total I saw was -- I
6  believe it was over 2 million.  It might have been over
7  1 million.  I can't remember.
8      Q.  You said it was over either 1 or 2 million?
9      A.  Yeah.  I can't remember right offhand.
10     Q.  And you said that's a tracking of one derivative?
11     A.  Yes.
12     Q.  And you call that derivative crumpled sheet?
13     A.  Yeah.
14     Q.  Okay.  Is that -- I just want to try to figure
15  out which derivative that is.  So there's a copy in your
16  complaint on page 8 of what we've been calling the
17  "Winning Isn't Normal" passage, I think.
18     A.  Uh-huh.
19     Q.  This is a copy of your complaint.  If you could
20  look at that.  Is that the derivative you're talking
21  about?
22     A.  No, I can't tell from this, looking at this.  I
23  don't know.
24     Q.  And when you say derivative, we're essentially

66

1  talking about that winning isn't normal passage?
2      A.  We're talking about the passage, yes.
3      Q.  But derivative means there are different versions
4  of that passage out in the world?
5      A.  Yes, some people have taken pictures of a poster
6  that they've produced with it.  There's some that are
7  with people's logos on them.  There's -- I can think of
8  one where it looks like it's something a football player
9  created to hand out and sign with his picture on it.  So
10  I'm just talking about that one, what we would call the
11  crumpled sheet.
12     Q.  Why is it called crumpled sheet?
13     A.  Because it's a little wavy.  It was -- it's not a
14  flat sheet.  You can see that it's wavy.
15     Q.  So there's a version online of this *Winning Isn't
16  Normal* passage that looks like it's like a scanned
17  version or something and that's what you've been
18  tracking?
19     A.  Well, my understanding is that someone has said
20  it was hung in a locker room of a national championship
21  team.  I don't know if that was the original one, where
22  it came from, I don't know for sure, but that particular
23  version is out there.
24     Q.  Okay.  And that's the one version that you've

67

1  kept track of?
2      A.  Yes.
3      Q.  But you haven't kept track of the other versions?
4      A.  I haven't traced the others, yes.
5      Q.  And then how are you actually keeping track of
6  that, just every time that you see that it's online you
7  add to the sheet that you're keeping track on?
8      A.  I put my son on it a while ago, and now when
9  more -- so like the other day I saw two new
10  infringements of that, at least two that it's online and
11  he hasn't had a chance to log them in yet or whatever.
12     Q.  So when you say that that version itself, there
13  was somewhere either over 1 million or 2 million
14  versions online, have you reached out to all those
15  people?  Have you --
16     A.  Not possible.
17     Q.  Okay.  And why do you say "not possible," just
18  because of the number?
19     A.  Because of the numbers, the time in the day,
20  there's just not time to do that.
21     Q.  So at some point you pick and choose which ones
22  you will reach out to?
23     A.  Yes.
24     Q.  And is there a way that you decide who you reach

68

1  out to or who you pursue?
2      A.  Yeah, there are various considerations, different
3  ones at different times.  Certainly I'm most likely to
4  reach out to someone who has infringed and then
5  infringed again after getting a notice or after settling
6  or --
7      Q.  Okay.  You claim in the complaint that you
8  create, market and sell derivative works featuring
9  *Winning Isn't Normal.*  And I think when we were talking
10  earlier those derivative works you mentioned were
11  T-shirts, mugs, and posters, is that correct, or do you
12  mean something else in your complaint about derivative
13  works?
14     A.  No, that's what I meant.
15     Q.  Okay.  How long --
16     A.  Go ahead.
17     Q.  How long have you been selling posters?
18     A.  How long have I been selling posters?
19     Q.  How long of the *Winning Isn't Normal* passage.
20     A.  I think since about 2013, but I'm not sure.
21     Q.  And besides selling posters on Keel Publications
22  or on your website, do you sell them anywhere else?
23     A.  I think we sold some to event participants.
24     Q.  So --

**69**

1    A.  But I don't remember.
2    Q.  You mean like if you're somewhere speaking or at
3  an event you might have posters there?
4    A.  Yes.
5    Q.  Okay.
6    A.  And even we've sold them through participants in
7  swimming events.
8    Q.  What size posters do you sell?
9    A.  I don't know what they are now.
10   Q.  Are they 12 by 18?
11   A.  I think we've sold various sizes, but I'm not
12  sure what's on now.
13   Q.  Do you keep track of how many posters you have
14  sold?
15   A.  I don't.  I don't know if my wife has.
16   Q.  Do you know an estimate of about how many posters
17  you have sold?
18   A.  I'd say my best guess is at least 100.
19   Q.  What's that guess based on?
20   A.  Well, I remember a sale for 63 of them.  I
21  remember a sale for 16 of them.  And I know there have
22  been more.
23   Q.  Okay.  I think on the website currently they're
24  for sale for $24; does that sound right?

**70**

1    A.  I think $24.95, but I'm not sure.
2    Q.  Have they been other prices over time?
3    A.  I think so.
4    Q.  Do you know how much profit you make from a sale
5  of a poster?
6    A.  Not exactly.
7    Q.  Is --
8    A.  Probably similar to a book.
9    Q.  So around 25?
10   A.  Yeah, it depends on shipping and handling.
11   Q.  Do you know as we sit here today what your total
12  profit has been from poster sales?
13   A.  No.
14   Q.  Do you keep track of profit from poster sales?
15   A.  I don't think so.
16   Q.  Okay.  And the same thing with T-shirts you sell,
17  those are available for sale on Keel Publications or on
18  your website?
19   A.  Right.
20   Q.  Do you know how long you've been doing T-shirts
21  or selling T-shirts?
22   A.  I don't remember.
23   Q.  Do you know how many T-shirts you have sold
24  total?

**71**

1    A.  No.
2    Q.  I think from your website it looks like they're
3  sold depending -- you have three versions; is that
4  correct?
5    A.  Of the T-shirts?
6    Q.  Yeah, the *Winning Isn't Normal* T-shirts.
7    A.  I don't know how many versions we have.
8    Q.  Online it looks like they range from $19.95 to
9  $30; is that correct?
10   A.  I don't know.
11   Q.  And do you keep track of the profit you make from
12  the sale of T-shirts?
13   A.  No.
14   Q.  Okay.  So if you can check on -- I know you said
15  your wife may keep track of poster or T-shirt sales, if
16  you can check on that and add that to the list if you do
17  keep track of whether it's number sold or profit or
18  anything like that.
19   A.  Did you ask for that in production?
20   Q.  We did.
21   A.  And you didn't get it?
22   Q.  Well, we'll get there eventually.  I don't know
23  if we did get it.  If you tell me later that we've
24  gotten it then I'm not asking you to produce it again.

**72**

1    A.  Okay.
2    Q.  Okay?
3    A.  Uh-huh.
4    Q.  All right.  You also claim that due to the
5  popularity of your *Winning Isn't Normal* work that you've
6  been able to increase your international --
7    A.  Wait.  Sorry.  I'm writing this down so I'm not
8  listening.
9    Q.  Go ahead.  Let me know when you're ready.
10   A.  Okay.
11   Q.  You also claim in the complaint that due to the
12  popularity of your original *Winning Isn't Normal* work
13  you've been able to increase your international
14  recognition as an authority in sports psychology and
15  performance and have then been asked to speak at
16  conferences, symposia, and other engagements.  How do
17  you know that that is specifically due to the *Winning
18  Isn't Normal* book?
19   A.  I've had a lot -- in the past a lot of
20  international orders.  I have -- one of the books was
21  translated into Japanese and sold.  One of them was -- I
22  sold a license for it to be published in Japanese.  I
23  can't remember if it was a sports journal or baseball
24  journal, and it was done serially over -- I forget how

73

1 many issues the entire book was.
2 I've been at least partially because of *Winning*
3 *Isn't Normal,* well, I definitely have gotten some
4 significant gigs in the Cayman Islands and that spread
5 like crazy getting all sorts of gigs for me, speaking
6 gigs and promotion and stuff like that.
7 Shoot, I've walked -- at a world swimming clinic
8 walked into an elevator and had someone see my --
9 someone I didn't know see my name tag and yell "*Winning*
10 *Isn't Normal,*" someone from another country, I've
11 actually had stuff like that a few times.
12 I was competing in Canada, and I had occasion to
13 talk to a woman from Japan as it went. And she was a
14 little uncomfortable talking to me, and then she looked
15 at my name tag and said "*Winning Isn't Normal,*" I have
16 your books. And she was really friendly after that.
17 I know I've had requests for translations from
18 Iceland. I'm pretty sure -- well, I know it's been
19 translated and published in -- without my permission in
20 South Korea, in Germany, in Spain, things like that.
21 Q. Okay. And all of that that you just told me is
22 specifically with regards to the *Winning Isn't Normal*
23 book?
24 A. Yes.

74

1 Q. Okay. So it sounds like from what you just went
2 through the only permitted translation was the one into
3 Japanese; is that correct?
4 A. A couple of ones in Japanese, yes.
5 Q. Okay. Have you looked at how this particular
6 book, the *Winning Isn't Normal* book, increased your
7 international recognition compared to your other books
8 or publications or other work that you were doing?
9 A. I don't think I've gotten any requests for
10 translations of any of my other books. I can't remember
11 for sure.
12 Q. Would you say that of the ten books you've
13 written and published the *Winning Isn't Normal* book is
14 the book that you've sold the most copies of?
15 A. Yes.
16 Q. So is there a way that you actually track how you
17 think the *Winning Isn't Normal* book has increased your
18 international recognition or how it has increased your
19 offers to speak at conferences or symposia, or is this
20 kind of just generally how you just described it to me
21 that there are certain things --
22 A. I can trace it from what I know to a certain
23 extent.
24 Q. Okay.

75

1 A. So, I mean, I can follow a trail. It goes much
2 wider than what I know, but I can follow a trail on a
3 number of things.
4 Q. When would you say you first noticed that
5 increase in recognition where people started associating
6 you with *Winning Isn't Normal?*
7 A. Well, I think partly after it was -- shortly
8 after it was published.
9 Q. And has that seemed to remain consistent over the
10 years, that increased recognition?
11 A. I think less so now.
12 Q. And why is that?
13 A. Because there are millions of copies out there of
14 that passage that don't give me attribution and people
15 are taking for free, and it doesn't say that it's
16 available or any of my products are available. There's
17 no way of them knowing and associating it with me.
18 Q. If someone does post the passage with your name
19 on it attached, do you have a problem with that, or do
20 you consider that increased recognition or advertising?
21 A. Yeah, I have a problem with that, a serious
22 problem with that.
23 Q. Okay. So even if somebody's posting it with your
24 name attached --

76

1 A. Yeah, that doesn't obviate the need for my
2 copyright management information or for my permission to
3 use it.
4 Q. Okay. Let's see, that actually leads into my
5 next question. So you have in the complaint that you
6 offer licenses for people who wish to use the *Winning*
7 *Isn't Normal* passage either on the internet or in
8 traditional publishing mediums.
9 A. Yes.
10 Q. What type of use do you offer licensing fees for,
11 or I guess stated another way why would someone or what
12 would someone need a licensing fee for?
13 A. To copy or distribute or display or perform my
14 works.
15 Q. So you offer licensing fees to do any of those
16 things?
17 A. Yes.
18 Q. Okay. And are the licensing fees only for
19 putting it on the internet or on social media or is it
20 for any type of use?
21 A. Any type of use.
22 Q. Okay. What do you charge for those licensing
23 fees?
24 A. It depends on how they want to use it.

77

1    **Q.** Okay. Is there a breakdown in fees? Do you have
2  kind of like a --
3    **A. I have a currently licensing schedule.**
4    **Q.** Okay. And I think we might have a copy of that
5  current schedule from discovery, so we'll get to that in
6  a minute.
7       You also have -- you produced a picture or a
8  screen shot from your website. I'll give you that.
9       (EXHIBIT MARKED FOR IDENTIFICATION.)
10   **Q.** So there's a notice, I guess, on the bottom of
11 this page that mentions "For licensing rights contact
12 Dr. Bell at Keel Publications." It says "License fees
13 for use of Dr. Bell's literary works are subject to the
14 nature and duration of the use as well as the terms and
15 conditions of the license agreement." Is that
16 current -- is that blurb currently on your website as
17 well?
18   **A. I don't know.**
19   **Q.** Okay.
20   **A. We've been changing that trying to make it as
21 clear as we possibly can.**
22   **Q.** Okay. To your knowledge, is it currently on your
23 website?
24   **A. There's something like it currently on my website**

78

1  to my knowledge, yes.
2    **Q.** Okay. Do you post that notice anywhere else
3  besides your website?
4    **A. I don't think so. I don't know.**
5    **Q.** Do you remember when you first put that licensing
6  notice on your website?
7    **A. I think -- well, the answer is, no, I don't know.**
8    **Q.** Do you have an estimate or an idea of when it was
9  first put on there?
10   **A. I would guess it was sometime around 2013.**
11   **Q.** Okay. Did you have a website before 2013 for
12 your books and items?
13   **A. I think so.**
14   **Q.** Okay. If someone doesn't visit your website or
15 is not aware of your website, is there any other way
16 they would know about your licensing fees?
17   **A. I don't think I understand the question.**
18   **Q.** Sure. So you said the only place you have this
19 notice is on your website.
20   **A. Yes.**
21   **Q.** So if somebody doesn't visit your website or is
22 not aware of your website, how else would they know
23 about your licensing fees?
24   **A. Well, they could search. They could call. They**

79

1  **might know from word of mouth. They certainly can
2  contact me and ask.**
3    **Q.** Okay. If someone wanted to read the passage, the
4  *Winning Isn't Normal* passage at an event, what would be
5  the licensing fee for that?
6    **A. It would depend on the number of people at the
7  event and whether it was public.**
8    **Q.** So the fee to read the passage at a public event
9  would depend on the number of people there?
10   **A. It might.**
11   **Q.** Okay.
12   **A. If it's public, if it's open to the public then,
13 well, it depends on if they were using it to read it or
14 perform it.**
15   **Q.** Let's say just like a sporting event.
16   **A. A sporting event?**
17   **Q.** Yeah, like a game, a football game or a
18 basketball game.
19   **A. So like the Super Bowl.**
20   **Q.** No, not the Super Bowl.
21   **A. It would be very expensive.**
22   **Q.** Something more like a high school or college
23 sporting event so a high school or football --
24   **A. So if it was OSU playing for the national**

80

1  championship it would probably be very expensive.
2    **Q.** Okay. Let's do a high school in central Ohio at
3  just a game.
4    **A. Just theoretically, right?**
5    **Q.** Yeah.
6    **A. I don't know.**
7    **Q.** You don't know what that would cost?
8    **A. No. It would certainly be negotiable.**
9    **Q.** Okay. Can you give me an idea of how much, about
10 how much it would cost per person at the event?
11   **A. No, not without knowing some things.**
12   **Q.** Okay. And what are the other things that matter
13 besides the number of people?
14   **A. Whether they're getting paid for people to attend
15 the event.**
16   **Q.** Okay.
17   **A. That's one type off the top of my head. I don't
18 know.**
19   **Q.** Okay. What about if someone wanted to post -- if
20 someone purchased the poster?
21   **A. Yes.**
22   **Q.** Would they also have to pay a licensing fee to
23 hang that poster up?
24   **A. Not in private.**

81

1    Q.  What does private mean to you?
2    A.  It means where it's not publicly displayed.  So
3  if one wants to hang one in his room which is what it's
4  meant for and I think currently I think it says that on
5  the website.
6    Q.  Okay.
7    A.  And then that's one price, but if it's somewhere
8  where it's displayed to the world it matters.
9    Q.  What about a place that's I guess maybe
10 semi-private like a locker room?
11   A.  A locker room is not semi private.
12   Q.  Well, not everybody can go into that locker room.
13   A.  That's not my experience.
14   Q.  If it's a closed group of people, what would be
15 the licensing fee to post that?
16   A.  Again, that's not been my experience, so I'd have
17 to see what the situation was where it is.  I've been in
18 many, many locker rooms in my day competing since I was
19 seven years old, and I don't remember ever being in a
20 locker room where no one else could get in there at some
21 point.
22   Q.  I didn't mean to say only one person can get in
23 there.  I meant just a smaller group of people.
24   A.  No, what I'm saying is not that -- just that

82

1  group.  If it's publicly available at that locker room,
2  if that locker room is open to other people at other
3  times matters.
4    Q.  Okay.  So you wouldn't be able to tell me today
5  what that licensing fee would cost?
6    A.  No, it would depend on other factors.  I'd be
7  able to negotiate with someone, yes.
8    Q.  Okay.  You mentioned in your complaint that
9  you've taken steps to provide notice of your copyright
10 on the Winning Isn't Normal book and passage, and you
11 say that that includes providing copyright notices on
12 actual physical or electronic copies; is that correct?
13   A.  I don't remember what I said.
14   Q.  Well, I meant not so much what you said as the
15 allegation, and if you want to see a copy of the
16 complaint, I'll just give you one, but I meant -- I'm
17 asking you the question that includes providing
18 copyright notices on physical and electronic copies of
19 the book or the items that you sell; is that correct?
20   A.  I still don't understand what you're saying.
21   Q.  Okay.  Where do you put copyright notices with
22 regards to the Winning Isn't Normal book or passage?
23   A.  Right now I think in Winning Isn't Normal it's on
24 every page.

83

1    Q.  The book itself?
2    A.  Uh-huh.
3    Q.  So if somebody buys a copy of the book there
4  would be a copyright notice on every single page?
5    A.  I think so.  I think that is now the case.  It's
6  certainly on the page that contains the passage.
7    Q.  Okay.  What about the derivative works that you
8  sell with the passage, the posters, the mugs, the
9  shirts, are there notices on those?
10   A.  Yes.  The posters have watermark additionally.
11   Q.  Besides the items that you are selling online, do
12 you post copies of the Winning Isn't Normal passage
13 online?
14   A.  I don't think so.
15   Q.  So the only versions of what you have posted
16 online with regards to that book or passage is on the
17 website where you're offering them for sale?
18   A.  I think so.
19   Q.  Okay.  Are the copies or versions that you have
20 seen that other people have posted, do those typically
21 have copyright information on them?
22   A.  That other people have posted?
23   Q.  Correct.
24   A.  Typically, no, as far as I remember.

84

1    Q.  So if somebody sees one of those versions
2  online --
3    A.  One of which versions?
4    Q.  One of the other versions that don't have your
5  name or copyright information, would you agree with me
6  that they might not have the information that there are
7  copyrights on that passage?
8    A.  I guess anybody could be ignorant, but they
9  should know, most people at least.
10   Q.  So if someone just sees one of these versions
11 that someone else has posted that doesn't have your name
12 or maybe does have your name but doesn't have any
13 copyright information, you still think that they should
14 know that there is a copyright or a trademark on that
15 item?
16   A.  Yes.
17   Q.  And how would they know that?
18   A.  Well, I think the vast majority of the people
19 that are doing this have been to school and they've been
20 taught about not copying other people's work, told not
21 to.  I think they have constructive knowledge.  All they
22 have to do is do a Google search for Winning Isn't
23 Normal, and immediately it comes up saying a sport
24 psychology book by Dr. Keith Bell.

85

1  Q. So you think --
2  A. And if they do a search of the government
3  copyright office for *Winning Isn't Normal* they'll find
4  that it's mine.
5  Q. Okay. So you think if somebody sees a version
6  online that doesn't have copyright information on it
7  that they then need to do some additional research to
8  eventually find the copyright and the trademark?
9  A. I don't understand the question. Obviously they
10 don't think they need to. Some people might not think
11 they need to, but they need to, yes.
12 Q. All right. You provide information on Keel
13 Publications' website regarding how to contact you to
14 obtain permission to use *Winning Isn't Normal,* the
15 passage or the book. Are there any other websites where
16 you provide that information?
17 A. I don't think so.
18 Q. Okay. So if somebody else posts a copy that
19 doesn't have that information on it would you agree that
20 someone else looking at it may not have that
21 information?
22 A. If someone else posts where?
23 Q. All right. So we just went through that you have
24 information on your website about how to contact you to

86

1  obtain permission to use.
2  A. I understand that.
3  Q. Yes. So if somebody else posts one of these
4  other copies that doesn't have that information.
5  A. Posts where?
6  Q. Online, anywhere, anywhere that people are
7  posting these.
8  A. Okay.
9  Q. Would you agree with me that that information,
10 how to contact you to obtain permission to use it, might
11 not be on those copies?
12 A. Yes.
13 Q. Okay. But then your position from there is that
14 somebody would then need to research and figure out who
15 wrote it and how to find you in order to use it?
16 A. Someone would need my permission to use it.
17 Q. Okay. So regardless of what they need to do to
18 figure it out, they would need to figure it out and then
19 get your permission?
20 A. Sure.
21 Q. Okay. There's also an allegation in the
22 complaint that you claim as a result of the distinctive
23 nature of the *Winning Isn't Normal* mark and your
24 continued commercial use of that mark that winning isn't

87

1  normal has become widely associated with your printed
2  material and related goods and services.
3  Is that something that you also track, or is that
4  kind of based on your experience as well?
5  A. Is what something that I also track?
6  Q. Whether or how it has become widely associated
7  with your other printed material and related goods and
8  services?
9  A. No.
10 Q. Okay. So then what exactly do you mean by that
11 then?
12 A. I think it was what I told you before, that I can
13 track -- starting with the purchase of one copy of
14 *Winning Isn't Normal* I can track all sorts of speaking
15 engagements and consulting engagements and book sales of
16 all of my books and stuff on and on and on.
17 Q. Okay.
18 A. And people entering events and joining my masters
19 team and all that kind of stuff.
20 Q. Okay. So it's essentially based on your
21 experience getting contacted to speak at events or
22 consult at events, work with teams?
23 A. Yeah, everything I do.
24 Q. Okay. And, again, have you kept track of how

88

1  *Winning Isn't Normal* has been different from your other
2  books or other publications or other work that you have
3  done?
4  A. Well, the *Winning Isn't Normal* trademark is for
5  the series of books. So, I mean, I can track some of
6  that as well on other books.
7  Q. Okay. Are your other books copyrighted and
8  trademarked?
9  A. Yes.
10 Q. So then I guess my question is how are you
11 keeping track of the distinction between *Winning Isn't
12 Normal* and your people seeking you out for speaking
13 engagements or coaching or consulting engagements versus
14 the other books or other articles you've written?
15 A. Well, the other books all have the passage in
16 them and copyright in them.
17 Q. So that passage is in all ten of your books?
18 A. Uh-huh. Yes. There are some old stock where
19 it's not in which case we include it as an errata in a
20 sticker.
21 Q. Okay. I want to talk a little bit about your
22 specific allegations with regards to Caught My Eye
23 Photography and the Worthington City School District in
24 this lawsuit.

89

1    **A.  And the what?**
2    Q.  The Worthington City School District in this
3  lawsuit.
4    **A.  Okay.**
5    Q.  So you claim that both Caught My Eye Photography
6  and the Worthington City School District has reproduced,
7  displayed, and distributed and/or caused to be
8  distributed a substantial portion of that winning isn't
9  normal passage in public on their websites and on social
10  media.  So I want to break that down a little bit.  What
11  do you claim that Worthington City School District
12  specifically has done?
13    **A.  Performed the work in public, copied the work,**
14  **displayed the work, disseminated the work.**
15    Q.  So let's break those down.  You say first
16  perform the work in public.  What do you mean by that or
17  what do you claim that they performed?
18    **A.  Apparently the coach read it which is how Caught**
19  **My Eye got it.**
20    Q.  And your understanding is the coach read it to
21  the basketball team, correct?
22    **A.  And the public.**
23    Q.  Did Caught My Eye Photography tell you that he
24  read it to the basketball team and the public?

90

1    **A.  Brenda Kerns who is Caught My Eye Photography was**
2  **there.**
3    Q.  And I guess I'm asking what specifically she said
4  happened?
5    **A.  Well, the best of my recollection what she said**
6  **happened was that she was there when they read it to the**
7  **basketball team and that then it got published on her**
8  **website with the coach's name on it.**
9    Q.  Did she tell you when it was read to the
10  basketball team that it was attributed to you?
11    **A.  No.**
12    Q.  Did you ask her about that?
13    **A.  I don't recall.**
14    Q.  Besides the basketball team who did she say was
15  also present?
16    **A.  Well, she was present.**
17    Q.  And besides Brenda?
18    **A.  I don't know.**
19    Q.  Okay.
20    **A.  At least not right offhand.**
21    Q.  You say that Worthington City School District
22  copied the work.  How did they copy it?
23    **A.  They read it from something and later copied it.**
24    Q.  Okay.  Well, and I'm asking specifically about

91

1  Worthington City School District for now.
2    **A.  About what?**
3    Q.  The school district.
4    **A.  Yeah, so their employee copied it.**
5    Q.  Is the only person that you're claiming copied it
6  Sean Luzader?
7    **A.  I have reason to believe that Souder did as well.**
8    Q.  And what do you think he did?
9    **A.  I think he made a copy and then read it.**
10    Q.  Okay.  And we're talking -- when you say read it,
11  we're talking about to the basketball team, correct?
12    **A.  And whoever else was there.**
13    Q.  You have or you mentioned just a little bit ago
14  the school district also displayed and disseminated the
15  work.
16    **A.  Yes.**
17    Q.  What do you claim that they did with respect to
18  displaying and disseminating?
19    **A.  It was published on social media.**
20    Q.  Is that what they're talking about there, Sean
21  Luzader's retweet?
22    **A.  Yes.**
23    Q.  Are you aware of the -- well, let me ask you
24  first.  In discovery and today you've said that it was

92

1  Sean Luzader who retweeted it on Twitter, correct?
2    **A.  That's my understanding.**
3    Q.  Okay.  And would you agree with me that
4  the -- let me give you this first.  We'll make this
5  Exhibit 5.
6    (EXHIBIT MARKED FOR IDENTIFICATION.)
7    Q.  Are you ready?
8    **A.  Yes.**
9    Q.  You've looked at it?
10    **A.  Yes.**
11    Q.  So this was attached as an exhibit to your
12  complaint, and you've also produced this in discovery.
13  It's marked Bell 31.  Is this a screen shot that you
14  took of Sean Luzader's retweet of the passage?
15    **A.  I think so.**
16    Q.  Okay.  Would you agree with me that he retweeted
17  from Five-Star Basketball?
18    **A.  It looks like it.**
19    Q.  Okay.  So it was already on Twitter when he
20  posted it, correct?
21    **A.  If it was retweeted from Twitter, yes.**
22    Q.  I think in discovery you had also noted that or
23  said that Worthington City School District also posted a
24  link to Caught My Eye Photography's use of the material.

93

1    What link are you claiming they posted?

2    **A. I don't recall.**

3    Q. Okay. Do you know who from Worthington City

4  School District would have posted a link to Caught My

5  Eye Photography's website?

6    **A. Not that I recall offhand.**

7    Q. But you are basically saying that the link was to

8  Caught My Eye Photography's website where they had

9  posted something?

10    **A. I don't recall.**

11    Q. Okay. What do you claim was posted on Caught My

12  Eye Photography's website?

13    **A. What do I claim was posted?**

14    Q. On Caught My Eye Photography's.

15    **A. A copy of my work with Souder's name on it which**

16  **appeared to be giving him credit for it and it was for**

17  **Kilbourne.**

18    Q. What do you mean for Kilbourne?

19    **A. As I recall it said something about Kilbourne**

20  **basketball.**

21    Q. And that was what was on Caught My Eye

22  Photography's website?

23    **A. As I recall right now.**

24    Q. Did Brenda tell you who posted it on her website?

---

94

1    **A. I don't recall.**

2    Q. Do you know who posted it on Caught My Eye

3  Photography's website?

4    **A. I assume she did.**

5    Q. Did she ever tell you that Worthington City

6  School District has anything to do with her business,

7  Caught My Eye Photography, or her website?

8    **A. My understanding is she's not employed by**

9  **Worthington.**

10    Q. Okay. And so then you have no reason to believe

11  that Worthington City School District has anything to do

12  with Caught My Eye Photography or the business's

13  website?

14    **A. No, that's not correct.**

15    Q. Okay. How does Worthington City School District

16  have anything to do with her business or her website?

17    **A. She was there when he read it, and --**

18    Q. I think you misunderstood my question. I'm

19  asking what Worthington City School District has to do

20  with Caught My Eye Photography as a business. Is it

21  involved with her business at all?

22    **A. Not to my knowledge.**

23    Q. Okay. Do you have any information that

24  Worthington City School District has anything to do with

---

95

1  her business's website, for example, that they run it,

2  control it, post on it?

3    **A. Not that I know of.**

4    Q. Okay. So besides you claiming that Coach Souder

5  read it to the basketball team and that Sean Luzader

6  posted the passage on Twitter, do you have any other

7  claims against the Worthington City School District in

8  this lawsuit?

9    MR. GERLING: Objection.

10    You can answer what you're aware of.

11    **A. Could you re -- will you repeat the question,**

12  **please.**

13    Q. Sure. I want to make sure I understand what

14  you're claiming the Worthington City School District

15  did. So I said besides Coach Souder reading the passage

16  to the team and besides Sean Luzader retweeting the

17  passage on Twitter, what else do you claim that the

18  Worthington City School District has done with the

19  passage?

20    **A. I claim that they published it after receiving a**

21  **cease and desist.**

22    Q. And where did they publish it?

23    **A. On Sean Luzader's Twitter.**

24    Q. Would you -- okay. Let's look at Exhibit 5. The

---

96

1  Twitter handle on this page is @SeanLuzader; is that

2  correct?

3    **A. It looks like it, yes.**

4    Q. Okay. And it looks like he describes himself

5  below that Twitter handle as husband, dad, business

6  teacher, basketball coach; is that correct?

7    **A. It looks like it.**

8    Q. Do you see anywhere on here anything about

9  Worthington City School District?

10    **A. No.**

11    Q. Okay. And, essentially, what you're claiming he

12  did is he retweeted this image on Exhibit 5 of the

13  *Winning Isn't Normal* passage?

14    **A. Yes.**

15    Q. Does this document, this screen shot that you

16  took, does that show us how long he had this retweet up

17  or the image up?

18    **A. No, I don't think so.**

19    Q. Do you know how long he had it up?

20    **A. I don't know offhand.**

21    Q. And also the screen shot the passage is cut off

22  so we can't exactly see the top or the bottom. Do you

23  know if any part of this document, the passage, had your

24  name or copyright information on it?

97

1    A.  I don't remember offhand.

2    Q.  Do you know whether the Worthington City

3  School District ever posted or retweeted the passage on

4  its Twitter account or any other social media page?

5    A.  I'm not sure how to answer that.

6    Q.  The school district and the schools have social

7  media pages under their names.  Do you know whether the

8  school district or any of the Worthington schools ever

9  posted a copy of your passage on their Twitter accounts

10  or on any social media page?

11    A.  I don't think so.  I know that one of their

12  employees did.

13    Q.  Okay.  We'll come back to that.  So we got there,

14  we went to those questions because you had mentioned

15  that the Worthington City School District published it

16  after you sent the cease and desist letter.  And with

17  regards to that you said it was Sean Luzader posting it

18  on his Twitter page.  Is there anything else that you

19  claim that the Worthington City School District did to

20  publish the passage?

21    A.  Not that I can think of right offhand.

22    Q.  Okay.  Is there any other way that you claim the

23  school district displayed or disseminated the passage

24  beside the reading it to the basketball team and then

98

1  posting it -- Sean Luzader posting it on Twitter?

2    A.  Not that I know of offhand.

3    Q.  Okay.  So we talked about the quote or the

4  passage on Caught My Eye Photography's website that

5  attributes the quote to coach Souder.

6        I think you also claim in the complaint that

7  Caught My Eye Photography posted -- was it an article or

8  something like that, is that what you were referencing?

9    A.  I don't recall, but I think so.

10    Q.  Okay.  Do you know who else besides -- does

11  anyone besides Caught My Eye -- or does anyone else

12  besides Brenda Kerns own Caught My Eye Photography?

13    A.  Not that I know of.  I don't know whether Ohio is

14  a community property state.

15    Q.  Do you know when it was posted to Caught My Eye

16  Photography's website who attributed it to Coach Souder?

17    A.  On information and belief I think it was Brenda

18  Kerns.

19    Q.  Do you have any information or documents that the

20  Worthington City School District attributed the passage

21  to Coach Souder or claimed that he was the author of the

22  passage?

23    A.  I don't think I know how to answer who the school

24  district is.

99

1    Q.  What do you mean by that?

2    A.  I mean, technically I don't know who consists of

3  the school district.

4    Q.  Okay.  Well, and that's fine.  I don't think we

5  need to get to that point for that question.  I'm just

6  asking if you have any information or documents that the

7  school district as an entity has ever attributed the

8  passage to Coach Souder or claimed that he was the

9  original author?

10    A.  I don't know who the school district consists of.

11    Q.  Okay.  Do you have any information that anybody

12  in administration with the school district or the Board

13  of Education has ever attributed the passage to Coach

14  Souder or claimed that he was the original author?

15    A.  I don't think so.

16    Q.  Okay.  Do you have any information or documents

17  that Coach Souder ever claimed that he was the original

18  author?

19    A.  Not that I can think of offhand.

20    Q.  And I might have asked you this already, but do

21  you know who actually posted that onto Caught My Eye

22  Photography's website?

23    A.  I think you asked that and I answered it.

24    Q.  You believe it was Brenda?

100

1    A.  My best guess.

2    Q.  Okay.  Do you know how she or anyone associated

3  with Caught My Eye Photography found the passage?

4    A.  I think she went online and found it.  I don't

5  remember exactly.

6    Q.  Okay.  Do you know which version she found

7  online?

8    A.  No, whatever it was that was posted there, I

9  don't recall.

10    Q.  Do you know if the version that she found online

11  included your name and copyright or trademark

12  information?

13    A.  No.

14    Q.  You don't know?

15    A.  No, I don't know.

16    Q.  Okay.  You also claim in the complaint that the

17  Worthington City School District added a link on a

18  Worthington Kilbourne high school boy's basketball page

19  and the link was to the Caught My Eye Photography page

20  with the article or a video or something.  Is that

21  correct?

22    A.  I don't remember.

23    Q.  Okay.  Do you remember any of your claims about

24  any kind of link on the Worthington Kilbourne high

101

1  school boy's basketball page?
2      A.  No, I don't remember.
3      Q.  Do you know anything about that website, the
4  Worthington Kilbourne high school boys' basketball
5  website?
6      A.  Anything about it?
7      Q.  Do you know how it's associated with the school
8  district?
9      A.  I don't recall, no.
10     Q.  Okay.  Do you know if it has any connection with
11 the school district?
12     A.  I don't know how to answer that.  I know that.
13     Q.  Well, let me ask you this.  Do you know who
14 created that Worthington Kilbourne high school boys'
15 basketball page?
16     A.  I don't think so.
17     Q.  Do you know who maintains the website?
18     A.  I don't think so.
19     Q.  You claim in the complaint or it might have been
20 discovery that the school district has control over this
21 particular website and that it has exercised control
22 over the website.  Do you have any basis for that claim?
23     A.  Information and belief.
24     Q.  Okay.  Has anyone told you that anyone with the

102

1  school district has control over that website?
2      A.  I don't recall.
3      Q.  Have you ever seen a link on one of the school
4  district's websites?
5      A.  A link?
6      Q.  A link on one of the school district's websites
7  to the Caught My Eye Photography website or any of the
8  infringing posts on Caught My Eye Photography's website?
9      A.  I don't recall.  I've seen pictures of Souder and
10 his family on there.
11     Q.  On where?
12     A.  On her website.
13     Q.  Okay.  Well, you agree she's a photographer,
14 correct?
15     A.  Apparently.
16     Q.  Okay.  She has put pictures of lots of people on
17 her website, correct?
18     A.  Correct.
19     Q.  Students, families, people in central Ohio?
20     A.  If you say so.
21     Q.  I'm asking.
22     A.  As far as I know.
23     Q.  Okay.  Was there ever a -- have you ever seen a
24 post on one of the school district's websites that

103

1  included the *Winning Isn't Normal* passage or that
2  attributed that passage to Coach Souder?
3      A.  I don't think.
4      Q.  Do you have any information or documents that the
5  school district has put a link on any website that it
6  controls that links to the Caught My Eye Photography
7  posts that have your passage on them?
8      A.  I got lost on that question.
9      Q.  Do you have any information that the school
10 district has put a link on any of its websites to the
11 Caught My Eye Photography website where she was posting
12 the passage?
13     A.  Not that I know of.
14     Q.  You claim in the complaint that the *Winning Isn't*
15 *Normal* passage was also established as a theme for the
16 2015-2016 boys basketball season; is that correct?
17     A.  I don't recall.
18     Q.  Are you claiming that they did that?
19     A.  I don't recall.
20     Q.  I'm asking you today as we sit here today do you
21 claim that it was a theme for the 2015-2016 boys
22 basketball season?
23     A.  I don't recall.
24     Q.  Okay.  Do you have any information about when

104

1  that season, the 2015-2016 boys basketball season began
2  or ended?
3      A.  Not that I recall.
4      Q.  Do you have any information about how the boys'
5  basketball team has themes or uses themes or establishes
6  themes?
7      A.  I don't recall.
8      Q.  So what's the basis for that claim that it was
9  the theme for that season?
10     A.  I don't recall.
11     Q.  You don't know where you got that information?
12     A.  No.
13     Q.  You just put it in your complaint?
14         MR. GERLING:  Objection.  The complaint was
15 prepared by counsel.
16     Q.  Did you ever tell your -- did you ever tell
17 somebody -- well, let me ask you this.  Has anyone ever
18 told you that it was the theme for the 2015-2016 boys'
19 basketball season?
20     A.  I don't recall.
21     Q.  Have you ever told somebody that it was the theme
22 for the 2015-2016 boys' basketball season?
23     A.  I can't answer what went on between me and my
24 counsel.

105

1    Q.  That's fine.  I'm not asking that.
2    A.  Other than that, I don't recall.
3    Q.  Okay.  Do you know who established the theme for
4  the 2015-2016 boys' basketball season?
5    A.  No.
6    Q.  Assuming it was used as a theme, do you know how
7  it was used as a theme for that season?
8    A.  No.
9    Q.  Do you have any documents indicating that it was
10  a theme for that basketball season?
11    A.  I don't recall.
12    Q.  We've talked a little bit earlier about your
13  claim that that passage was read by Coach Souder to the
14  basketball team.  Besides Coach Souder reading it do you
15  claim that anybody else associated with the school
16  district has read it out loud to either a team or in a
17  public setting?
18    A.  Not that I know of.
19    Q.  So that allegation is specifically regards to
20  Coach Souder reading it to the basketball team?
21    A.  I assume so.
22    Q.  Okay.  Do you know when it was read aloud to the
23  basketball team?
24    A.  I don't recall.

106

1    Q.  Do you know where it was read aloud to the
2  basketball team?
3    A.  I don't recall.
4    Q.  Do you know what setting it was read to the
5  basketball team?
6    A.  I don't recall.
7    Q.  When you say you don't recall, did you have that
8  information at some point and you just don't remember as
9  we sit here today?
10    A.  I might have.
11    Q.  Okay.  So what is the basis then for your claim
12  that it was read aloud in a more public setting?
13    A.  Well, at the very least Brenda Kerns was there.
14    Q.  And that setting was she said it was read to the
15  basketball team?
16    A.  Correct.
17    Q.  You claim that Worthington City School District
18  accessed either the *Winning Isn't Normal* book or the
19  *Winning Isn't Normal* passage through the internet.  How
20  do you know how the school district accessed either the
21  book or the passage?
22    A.  Because of Sean Luzader's post.
23    Q.  So the basis for that claim is we're back to Sean
24  Luzader's retweet?

107

1    A.  At least.
2    Q.  Okay.  When did the school district access the
3  book or the passage online?
4    A.  I have no idea.
5    Q.  Do you know what site it was accessed through?
6    A.  Well, it looks like Sean Luzader's post was
7  accessed through Five-Star Basketball.
8    Q.  Do you know whether the school district accessed
9  it online?
10    A.  Well, I think the school district has a
11  responsibility for Sean Luzader's post.
12    Q.  I understand that that's what you think.  I'm
13  just asking do you know how the school district --
14    A.  I don't know what the school district consists
15  of.
16    Q.  Okay.  Do you know if any of the
17  administrative --
18    A.  I think I've answered that already.
19    Q.  Okay.  I'm asking you about specifically whether
20  they have accessed it online either administrative
21  officers or the Board of Education?
22    A.  Right.  I don't know.
23    Q.  Okay.  Besides Sean Luzader, do you know anybody
24  else who has accessed either the book or the passage

108

1  online?
2    A.  Not that I recall, no.
3    Q.  And I think we already established this, but you
4  agree that some of the copies online don't have your
5  name and don't have your copyright information on them,
6  correct?
7    A.  Correct.
8    Q.  One of the things you produced in discovery is
9  Twitter's terms of service.
10    A.  Yes.
11    Q.  Why did you produce the Twitter terms of service?
12    A.  Because I thought it was relevant.
13    Q.  Okay.  I guess I'm asking what you think it has
14  to do with this lawsuit, is it strictly because Sean
15  Luzader posted or retweeted the image?
16    A.  Yeah, even though he was warned by Twitter that
17  he'd be liable for that.
18    Q.  Do you know if Twitter has any copyright
19  protection for its terms of service?
20    A.  No.
21    Q.  You don't know?
22    A.  Huh-uh.
23    Q.  How did you obtain Twitter's terms of service?
24    A.  They're online.

109

1     Q. Did you request permission to use them?

2     **A. No.**

3     Q. Have you read their terms of service?

4     **A. Yes.**

5     Q. There's a part in there that you produced that

6 says "If you believe that your content has been" -- and

7 I'm quoting, "If you believe that your content has been

8 copied in a way that constitutes copyright infringement,

9 please report this by visiting our copyright reporting

10 forum or contacting our designated copyright agent," and

11 then it gives you the information to do so. You're

12 aware of that section?

13     **A. Yes.**

14     Q. Did you report Five-Star Basketball to Twitter?

15     **A. No.**

16     Q. Did you report Sean Luzader's retweet to Twitter?

17     **A. No.**

18     Q. Why not?

19     **A. I find it to be the last time that I**

20 **reported -- did what they asked for a social media site**

21 **I had -- there were over 2,000 copies of my work there**

22 **that were noted as being -- Luzader copied from one of**

23 **those. I sent them a takedown notice for the one that**

24 **had the 2008, I believe, copies, reblogs or whatever it**

110

1 **was on that site and asked them to take all of them**

2 **down, and they wrote me back and told me that they were**

3 **taking that one down and I would have to give them the**

4 **URLs or, I forget, information on each of the others.**

5     **I went about trying to do that. I spent eight**

6 **hours doing that and found what I believe to be 50 of**

7 **them. I could not possibly take the time to find all**

8 **2,000. It was a useless waste of my time, and I'm not**

9 **required to do that, so I don't do it.**

10     Q. Okay. Did they -- the one that you mentioned

11 that you reached out, they did take that post down?

12     **A. That's my recollection, yes.**

13     Q. Okay. You claim that you contacted the high

14 school -- Worthington Kilbourne High School's athletic

15 director once you became aware of some use, you sent

16 essentially a cease and desist letter through the

17 athletic director; is that correct?

18     **A. I forget who I sent it to, but yes.**

19     Q. Okay. Do you remember what you told him in that

20 letter?

21     **A. No.**

22     Q. Do you remember when you sent that letter?

23     **A. No, not offhand.**

24     Q. The first letter I believe was July, mid July

111

1 2017; does that sound accurate?

2     **A. (Witness nods head.)**

3     Q. Did you ever contact Sean Luzader or Tom Souder?

4     **A. I don't recall.**

5     Q. Do you remember ever talking to either of them?

6     **A. No, I don't.**

7     Q. Do you believe that the school district was

8 involved with Caught My Eye Photography's reproduction,

9 display, and distribution of the passage on that

10 website, on Caught My Eye Photography's website?

11     **A. I think I answered that already.**

12     Q. I don't think you answered this specific

13 question.

14     **A. Okay. So repeat the question, please.**

15     Q. Do you believe that the school district was

16 involved with Caught My Eye Photography's reproduction,

17 display, and distribution of the passage?

18     **A. Yes.**

19     Q. Okay. Explain to me how it was involved.

20     **A. She was allowed to be there when it was read.**

21     Q. So the extent of the school district's

22 involvement with what Brenda and Caught My Eye

23 Photography did with their website is based on the fact

24 that Brenda was present when Coach Souder read the

112

1 passage to the team?

2     **A. At least that.**

3     Q. Okay. Are there any other ways that you know

4 that the school might be involved with her own or Caught

5 My Eye Photography's reproduction, display, and

6 distribution of the passage?

7     **A. Not that I can think of right now.**

8     Q. Okay. Is that also the basis for your claim that

9 the school district contributed to Caught My Eye

10 Photography's reproduction, display, and distribution of

11 the passage?

12     **A. I think so.**

13     Q. Okay. Did Brenda or anyone associated with

14 Caught My Eye Photography tell you that the school

15 district was involved with her reproduction, display, or

16 distribution of the passage?

17     **A. I think I have attorney/client privilege on that.**

18     Q. I'm asking you about Brenda or Caught My Eye

19 Photography. I didn't ask about your attorneys.

20     MR. GERLING: Objection. Direct conversations

21 between Brenda and Dr. Bell --

22     MS. PADGETT: Yes.

23     MR. GERLING: -- is that what you're asking?

24     MS. PADGETT: Correct.

113

1    **Q.** (By Ms. Padgett) I'm asking if Brenda or Caught
2 My Eye Photography has told you that the school district
3 was involved with its reproduction, display, and
4 distribution of the passage?
5    **A. Does me include my attorney then?**
6    **Q.** I'm asking -- we'll do you first.
7    **A. I don't know what that means, you'll do me first.**
8    **Q.** I'm not asking you -- if your attorneys have told
9 you something that she said, I'm not asking that. I'm
10 asking if you have been present when Brenda or someone
11 associated with Caught My Eye Photography has said that
12 the school district was involved with its reproduction,
13 display, and distribution of the passage?
14    **A. I don't think so, no.**
15    **Q.** Okay. So the only way that you have found out
16 about her involvement was communications that your
17 attorneys told you that she said?
18    MR. GERLING: Objection.
19    **A. I don't know how to answer that question.**
20    **Q.** You can answer that question. I'm not asking you
21 what was told. I'm asking if that's the only way that
22 you're aware of what she has said.
23    **A. I think I answered that. I haven't had any**
24 **conversations.**

114

1    **Q.** And I'm asking is the only way that you know what
2 she has said based on something your attorney has told
3 you?
4    MR. GERLING: Objection.
5    **A. I don't think -- I think what my attorney has**
6 **told me is confidential.**
7    **Q.** And I agree with you. I'm not asking you what
8 your attorney has told you. I'm trying to find out the
9 way that you have found out what Brenda has said.
10 That's all.
11    **A. My understanding is you just asked me if it was**
12 **based on what my attorney had told me, and I'm telling**
13 **you that --**
14    **Q.** How have you found out what Brenda has said with
15 regards to this lawsuit, anything related to this
16 lawsuit, how have you found out about it?
17    **A. I haven't found out anything directly from her**
18 **that I recall right now.**
19    **Q.** How have you found out about it?
20    **A. I think that's privileged.**
21    **Q.** I'm telling you that is not.
22    **A. You can tell me whatever you want. You're not**
23 **sworn to tell the truth, and you're not advising me as**
24 **an attorney.**

115

1    **Q.** You have an attorney here who will tell you if
2 it's attorney/client privileged. Asking you how have
3 you found out about it is not privileged. If you tell
4 me how you found out about it, we can determine if --
5    **A. I don't recall.**
6    **Q.** You don't recall how you found out about it?
7    **A. I don't recall.**
8    **Q.** Okay. You also know you're under oath, so if you
9 say you don't recall and that's not accurate, you are
10 breaking that oath to tell the truth.
11    **A. To the best of my knowledge, I don't recall right**
12 **now.**
13    **Q.** How you found out about it?
14    **A. To the best of my knowledge, I don't recall right**
15 **now.**
16    **Q.** Okay. Do you know whether the school district,
17 Worthington City School District, knew about whether or
18 not Caught My Eye Photography had authorization to use
19 the *Winning Isn't Normal* passage?
20    **A. I don't know.**
21    **Q.** Do you have any information or knowledge about
22 how Coach Souder or Sean Luzader first became aware of
23 the *Winning Isn't Normal* passage?
24    **A. I assume that Sean Luzader found it on a post by**

116

1 **Five-Star Basketball.**
2    **Q.** Okay. What about Coach Souder?
3    **A. I don't know.**
4    **Q.** What is the basis for your claim that the
5 Worthington City School District failed to attribute the
6 passage to you?
7    **A. Because Sean Luzader didn't attribute it to me as**
8 **far as I know.**
9    **Q.** Okay. Is there any other reason for that claim?
10    **A. Not that I can think of right now.**
11    **Q.** Do you have any information or evidence that the
12 school district didn't attribute the passage to you?
13    **A. I don't know what the school district is. I**
14 **don't recall.**
15    **Q.** Its administration or the Board of Education I'm
16 asking, do you have any information that anyone in
17 administration or the Board of Education did not
18 attribute -- used the passage and did not attribute it
19 to you?
20    **A. Not that I can think of.**
21    **Q.** Okay. You also claim that the Worthington City
22 School District knew that you authored the *Winning Isn't*
23 *Normal* passage.
24    **A. I think they had at least constructive knowledge,**

117

1   and also I'd sent a C and D.
2       Q.  Let me ask you, do you know when the first use
3   was whether it was Coach Souder reading to the team or
4   Sean Luzader posting it on Twitter?
5       A.  I don't recall exactly, but I would suspect that
6   it was Souder reading it to the team.
7       Q.  Do you know when he read it whether he attributed
8   it to you?
9       A.  As far as I know, I don't know.
10      Q.  Do you have any information that anyone
11  from the Worthington City School District falsely
12  attributed the *Winning Isn't Normal* passage to Coach
13  Souder and not you?
14      A.  Not that I know of right now.
15      Q.  Do you have any information or knowledge -- well,
16  let me ask you, you claim that they, the school
17  district, misled people into believing that Coach Souder
18  was the author.  How do you believe that the school
19  district misled people into believing that Coach Souder
20  was the author?
21      A.  I don't recall.
22      Q.  Okay.  Do you have any information that the
23  school district had actual or constructive knowledge
24  that the passage was subject to a copyright or trademark

118

1   owned by you?
2       A.  Yes.
3       Q.  Okay.  And how did it have that knowledge?
4       A.  I sent a C and D.
5       Q.  Let me ask you before you sent the letter, do you
6   have any information that the school district had actual
7   or constructive knowledge that the passage was subject
8   to a copyright or trademark owned by you?
9       A.  If they knew the passage existed, then they had
10  at least constructive knowledge.
11      Q.  And how would they have that knowledge?
12      A.  How would they have constructive knowledge?
13      Q.  Yeah, how would they know that you had a
14  copyright or trademark on it?
15      A.  If they knew it existed.
16      Q.  If they saw the copy of the passage?
17      A.  I can't read the minds of the --
18      Q.  That's fine.  I'm not asking you to read minds.
19  I'm asking if you have any information that the school
20  district had knowledge of your copyright or trademark
21  before you sent the letter?
22      A.  Well, at least one of their employees did.
23      Q.  Who did?
24      A.  Sean Luzader.

119

1       Q.  I'm asking before you sent the letter, do you
2   have any information that the school district had any
3   knowledge that the *Winning Isn't Normal* passage was
4   subject to a copyright or trademark?
5       A.  No, I don't.
6       Q.  You also claim that the school district removed
7   either authorship, trademark, or copyright information
8   from the *Winning Isn't Normal* passage.  Let me ask you
9   first specifically what information you believe the
10  school district removed?
11      A.  I believe the school district disseminated my
12  work knowing that my copyright management information
13  had been removed.
14      Q.  Okay.  When you say disseminated, again, we're
15  talking about Coach Souder reading it to the team and
16  Sean Luzader's retweet, correct?
17      A.  At least Sean Luzader's retweet.
18      Q.  Okay.  So you believe that when Sean Luzader
19  retweeted the passage somebody with the school district
20  knew that copyright information had been removed?
21      A.  I think that at least Sean Luzader, an employee
22  of the school district did, yes.
23      Q.  And how would Sean have known that copyright
24  information had been removed?

120

1       A.  Because he didn't write it and he distributed it,
2   displayed it to the world.
3       Q.  Is there any other basis, do you believe that
4   anyone else from the school district disseminated it
5   knowing that copyright information was removed?
6       A.  Not that I know of.
7       Q.  Do you believe that someone from the school
8   district actually removed that information, either
9   authorship, copyright, or trademark information from the
10  passage?
11      A.  Not that I know of.
12      Q.  Besides Sean Luzader retweeting the passage, I
13  just want to make sure I understand, that is the basis
14  for your claim that the school district disseminated or
15  distributed the *Winning Isn't Normal* passage; is that
16  correct?
17      A.  Correct.
18      Q.  So my understanding is the timeline is Sean
19  Luzader reads it to the team.  You send a cease and
20  desist letter, and then you believe that after that
21  cease and desist letter Sean Luzader retweeted it; is
22  that correct?
23      A.  I don't think so.
24      Q.  Okay.  I thought you said Sean Luzader retweeted

121

1  it after you sent the cease and desist letter?
2      THE WITNESS: Can you read back what she said the
3  first time?
4      MR. GERLING: I think part of the problem was you
5  said Sean Luzader read it to the team. You just
6  misspoke.
7      MS. PADGETT: I did misspeak. Thank you.
8      MR. GERLING: That's okay.
9  Q. (By Ms. Padgett) So my understanding of the
10 timeline as you have presented it is Coach Souder read
11 it to the team, you sent a cease and desist letter, and
12 then Sean Luzader retweeted it, correct?
13 A. That's my best guess right now.
14 Q. Okay. Do you have any information that Coach
15 Souder read it or used it after the cease and desist
16 letter?
17 A. Not that I know of.
18 Q. And I think you've claimed that Sean Luzader had
19 it up or had it posted for about three months or
20 something like that?
21 A. I don't recall.
22 Q. You don't know how long he had it up?
23 A. I don't remember right now, no.
24 Q. Okay. Did you send another cease and desist

122

1  letter once you saw his post on Twitter?
2  A. I don't recall. I don't think so.
3  Q. Okay. It's your understanding that the retweet
4  has been taken down, correct? Is it your understanding
5  that Sean Luzader's retweet --
6  A. I haven't seen it lately, yeah.
7  Q. So at this point you don't believe that the
8  school district has continued to use the passage since
9  those two incidents?
10 A. I don't have any reason to believe they have.
11 Q. Okay. Do you have any information that the
12 Worthington City School District has profited from any
13 alleged use of the *Winning Isn't Normal* passage?
14 A. At least potentially.
15 Q. Okay. Tell me what you think, how they profited.
16 A. Well, they decided to use it or Sean Luzader at
17 least decided to use it.
18 Q. So let me ask you before you go on from there,
19 how did the school district profit from Sean Luzader's
20 retweet?
21 A. I was trying to answer that.
22 Q. Okay. Go ahead.
23 A. At least potentially my work is used because
24 people find it useful and they think it's special enough

123

1  to use, and my understanding when -- my intent in
2  writing this was to improve performance and to help
3  people win and enjoy it more.
4      When coaches' teams improve or if they improve or
5  if they don't it affects their employment at least
6  potentially.
7      So, for example, Gerry Faust, who you might know
8  who Gerry Faust is, maybe not, Gerry Faust is a football
9  coach who had tremendous success in Ohio with his high
10 school prep team, and as a result of that, his success,
11 he got a job coaching at Notre Dame which paid a lot
12 more and got him a lot of endorsements and speaking
13 engagements, et cetera.
14     That's very common when coaches' teams do well.
15 When school districts' teams do well they get more
16 donations, sales improve of apparel and mugs and rings
17 and all sorts of stuff. More people want to be -- go to
18 that school, want to support the school. It's
19 tremendously impactful, all right, so I think at least
20 potentially that they have gained significant
21 opportunity financially where they can charge more for
22 ticket sales, they have more people show up for games,
23 et cetera.
24 Q. Do you know whether Sean Luzader or Tom Souder

124

1  have left the Worthington City School District to coach
2  elsewhere since their use?
3  A. I don't.
4  Q. Do you know that both are still with the
5  Worthington City School District?
6  A. I don't.
7  Q. Okay. Have you looked at or done an analysis of
8  the Worthington City School District's teams in the
9  years leading up to when the passage was used and the
10 years since to see whether performance improved, sales
11 tickets improved, anything like that that you just went
12 through?
13 A. No, I don't think so.
14 Q. Okay. So all of what you just told me is all
15 just hypothetical possibilities?
16 A. No, it's potentially true also based on the fact
17 that many of my teams, many of the teams I've worked
18 with have significantly improved and have attributed it
19 to my work with them.
20 Q. Are those teams that you're speaking to or
21 consulting with or working with regularly?
22 A. Some of them just once, some of them regularly.
23 Q. Okay. But those teams are teams that you've
24 shown up in person and worked with them?

125

1    A. Yes.
2    Q. So what I'm asking you and what I'm interested in
3  is do you have any actual information based in fact or
4  documents that any of the things that you just talked
5  about, those potential things happening, happened with
6  the Worthington City School District?
7    A. No.
8    Q. Okay. So do you have any evidence that the
9  Worthington City School District has profited from the
10  alleged use of the *Winning Isn't Normal* passage?
11    A. I have no information either way.
12    Q. Okay. You would agree that it's also equally as
13  potentially likely that ticket sales decreased after or
14  that they had less -- they had more losses in the
15  seasons after; you don't know either way, correct?
16    A. That's what I said.
17    MS. PADGETT: Okay. All right. Do you guys want
18  to take a quick break?
19    (Recess taken.)
20    MS. PADGETT: Back on.
21    Q. (By Ms. Padgett) So before I move on and talk
22  about your damages, I just want to close out some of the
23  allegations in the complaint that you're bringing
24  against the Worthington City School District

126

1  specifically.
2      So the one allegation with regards to copyright
3  infringement, have we covered -- so you've got -- you
4  claim Coach Souder read it to the basketball team and
5  Sean Luzader retweeted an image of the passage on
6  Twitter.
7      Are there any other acts of copyright
8  infringement that you claim with regards to the
9  Worthington City School District?
10    A. Not that I can think of right now.
11    Q. Okay. You do claim that the school district's
12  acts of infringement were willful, intentional, and
13  purposeful. What's the basis for your claim that those
14  acts of infringement were willful, intentional, and
15  purposeful?
16    A. First of all, they're volitional acts. Second of
17  all, they were warned by Twitter, they were warned with
18  C and D.
19    Q. Okay. So let's go break that down a little bit.
20  The cease and desist came after Coach Souder read it to
21  the team, correct?
22    A. Yes.
23    Q. Okay. Coach Souder -- you're not claiming Coach
24  Souder posted it on Twitter; he read it out loud to the

127

1  team?
2    A. That's my understanding.
3    Q. Okay. So the Twitter terms or warnings have
4  nothing to do with Coach Souder, correct?
5    A. Depending on what else he did.
6    Q. Okay. But as far as what we're talking about
7  today that you know he did --
8    A. As far as I know of what he did.
9    Q. Okay. So then for the purposes of Coach Souder's
10  reading it aloud to the team, the three things you just
11  listed, the only thing that would apply to him is the
12  fact that it was a volitional act for him to read it to
13  the team, correct, that he chose to read it to the team?
14    A. I'm now forgetting what the original question
15  was.
16    Q. Sure. I said what is the basis of your claim
17  that the Worthington City School District's acts of
18  infringement were willful, intentional, and purposeful,
19  so just with regards to Coach Souder.
20    A. Okay. So I also think he had constructive
21  knowledge.
22    Q. How did Coach Souder have constructive knowledge?
23    A. I think there's a big difference between innocent
24  infringement and ignorant infringement, and he may have

128

1  been ignorant, but that's not innocent. And he didn't
2  lift a finger, as far as I know, to find out whose work
3  it was, whether it was copyrighted.
4      And I can't recall right now, but I suspect that
5  the Worthington School District had some policies on
6  copyright, and also I believe that they punish students
7  for doing similar things, and I think the coach should
8  know better.
9    Q. So let me go through those with you. First, I
10  thought earlier you said you don't know whether Coach
11  Souder attributed it to you or not; is that correct?
12    A. Yes.
13    Q. Okay. So he --
14    A. I don't recall.
15    Q. So you don't know if he did read it and attribute
16  it to you?
17    A. Correct, I can't remember that now, yes.
18    Q. Okay. So based on what you just said then, do
19  you have any information about whether or not he did try
20  to figure out whether it was copyrighted?
21    A. He should have known it was copyrighted.
22  Everything's copyrighted. Whether it's registered or
23  not is a different issue.
24    Q. I'm just asking, do you have any information or

129

1 knowledge about whether he -- or what steps he took to
2 try to figure out whether it was copyrighted or
3 trademarked?
4    **A. No, I don't know whether he took any steps.**
5    **Q.** And then you mention the Worthington City School
6 District's policies on copyright and you believe they
7 punish students.
8       What's that based on? Are you just making
9 assumptions, or do you actually know that they have
10 policies addressing copyright and that they punish
11 students?
12    **A. I think I know that, but I can't remember for**
13 **sure.**
14    **Q.** Okay. Is there anything else that you claim
15 about Coach Souder's acts that were willful,
16 intentional, or purposeful other than what we've just
17 discussed?
18    **A. Not that I can think of right offhand.**
19    **Q.** Okay. And do you have any information that Coach
20 Souder continued to use the *Winning Isn't Normal* passage
21 after you sent or your attorney sent the cease and
22 desist letter?
23    **A. Not that I can think of.**
24    **Q.** Okay. So then with respect to Sean Luzader, your

130

1 claims with regards to his acts being willful,
2 intentional, or purposeful, you said that he was warned
3 by Twitter and that he was warned by a cease and desist
4 letter, correct?
5    **A. And he should have known better and policies.**
6    **Q.** So let me ask you first --
7    **A. And it was a volitional act.**
8    **Q.** And the warned by the cease an desist letter, my
9 understanding from when you were talking earlier is you
10 don't know who that letter was sent to, correct?
11    **A. I don't recall exactly who the letter was sent**
12 **to.**
13    **Q.** And you don't recall ever talking or sending a
14 letter specifically to Sean Luzader, correct?
15    **A. I don't recall that I did, correct.**
16    **Q.** And then as far as being warned by Twitter, are
17 you talking about their terms of use?
18    **A. Yes.**
19    **Q.** Okay. Do you know whether Sean Luzader read or
20 understood or knew the terms of use?
21    **A. I know that he attested that he did.**
22    **Q.** Okay. Anything else with regards to Sean
23 Luzader's acts that you claim were willful, intentional,
24 and purposeful other than what we've just discussed?

131

1    **A. I don't know what we just discussed.**
2    **Q.** The terms on Twitter, the cease and desist
3 letter, them being his volitional acts, the school
4 district's policies that you think they have and the
5 fact that the school district punishes students.
6    **A. As far as I know, he made no attempt to get**
7 **permission from Five-Star Basketball.**
8    **Q.** Did Five-Star Basketball have permission to post
9 it?
10    **A. No.**
11    **Q.** And I think I asked you this earlier. Did you
12 pursue any claims against Five-Star Basketball for
13 posting it?
14    **A. I did.**
15    **Q.** You did. That is in litigation?
16    **A. Huh?**
17    **Q.** Is that, your claims against Five-Star
18 Basketball, is that in litigation?
19    **A. No.**
20    **Q.** Okay. So you were able to resolve that with them
21 without filing a lawsuit?
22    **A. Well, the first time they did it, yes.**
23    **Q.** Okay. And they've used it since then?
24    **A. Yes.**

132

1    **Q.** And now they're in litigation?
2    **A. I haven't sued yet.**
3    **Q.** Okay. So your claim that Sean Luzader made no
4 attempt to get permission from Five-Star Basketball
5 isn't at issue in this litigation; what's at issue is
6 your claim that he should have gotten permission from
7 you?
8    **A. Yes.**
9    **Q.** Okay.
10    **A. But I also believe, it leads me to believe that**
11 **he made no attempt to get permission.**
12    **Q.** Okay. Do you have any evidence or proof of that,
13 of whether he reached out or what he did to try to get
14 permission?
15    **A. I have no evidence that he did anything to try**
16 **and get permission.**
17    **Q.** So you don't know what he did or whether he tried
18 to get permission?
19    **A. I have no evidence that he tried to get**
20 **permission.**
21    **Q.** Okay. With regards to the copyright infringement
22 claim, are you claiming actual damages or statutory
23 damages?
24    **A. I haven't decided yet.**

133

1    Q. Do you know when you plan on deciding?

2    **A. Sometime before trial.**

3    Q. Well, you understand that you have to -- there

4 are cutt-offs in the case. You can't wait until trial

5 to decide that.

6    **A. I understand.**

7    Q. Okay. You also have a claim for removal and

8 alteration of copyright management information. We've

9 talked a little bit about this today. My understanding

10 from what you said is the copyright management

11 information that you believe that the Worthington City

12 School District removed would have been your name and

13 whatever copyright information; is that correct?

14    **A. You'll have to ask me again.**

15    Q. Okay. Let me ask you this instead. What

16 copyright management information do you claim that

17 Worthington City School District removed?

18    **A. I don't remember saying that I claimed that they**

19 **removed information. I remember saying that I claim**

20 **that they distributed knowing that it had been removed**

21 **and knowing that they hadn't written it, that it wasn't**

22 **theirs.**

23    Q. Okay. What's the basis for your claim that the

24 Worthington City School District distributed it knowing

134

1 that it had been removed, that the copyright management

2 information had been removed?

3    **A. Because Luzader put it out to the world and he**

4 **didn't write it, and he knows he didn't write it.**

5    Q. But what's the basis for your claim that he knew

6 that somebody else had removed it, that information?

7    **A. Because he didn't write it, he knew it was**

8 **copyrighted or he should have known, he knew it was**

9 **trademarked or he should have known and he went ahead**

10 **and distributed it anyway.**

11    Q. And how did he know or should have known that it

12 was copyrighted and trademarked?

13    **A. He had constructive knowledge at least.**

14    Q. And that's what I'm asking, how did he have that

15 knowledge?

16    **A. All he had to do was to do a search for *Winning***

17 ***Isn't Normal.***

18    Q. Do you have any information that he actually knew

19 that it was copyrighted or trademarked?

20    **A. I can't possibly read his mind.**

21    Q. So then is that also -- Sean Luzader's retweet is

22 also the basis for your claim that the school district

23 distributed unauthorized copies of your work; is that

24 correct?

135

1    **A. Also meaning what, also beside what?**

2    Q. Besides the claim that they distributed it

3 knowing that information was removed?

4    **A. As far as I understand and remember, I think so.**

5    Q. Then what damages are you claiming with regards

6 to this claim, the claim about removing and altering

7 copyright management information? Are you claiming

8 actual or statutory damages or have you not decided yet?

9    **A. I haven't decided yet. I think both are**

10 **relevant.**

11    Q. The claim for contributory copyright

12 infringement, what do you believe that the school

13 district did with regards to that claim or have we

14 covered that already?

15    **A. I don't know.**

16    Q. Okay. Then what do you believe that the school

17 district did with regards to your claim about

18 contributory copyright infringement?

19    **A. Well, Sean Luzader invited other people to use**

20 **it.**

21    Q. And how did he invite others to use it?

22    **A. Because when he posted it there's a little thing**

23 **there that says to share, and he also inappropriately**

24 **gave Twitter permission to use it and to give it to**

136

1 other people to use.

2    Q. Okay. When you say he invited others to use it,

3 are you talking about just the fact that there's a

4 retweet button option on Twitter?

5    **A. Uh-huh. Yes.**

6    Q. So he didn't actually do anything to encourage or

7 make people retweet it; it's just the fact that he

8 retweeted it and you're saying others could also retweet

9 it, correct?

10    **A. I think he was inviting others to retweet it by**

11 **clicking on that.**

12    Q. Simply because Twitter has a feature to retweet

13 it, you believe that Sean Luzader was inviting others to

14 use it?

15    **A. Yes.**

16    Q. And then you say he gave Twitter permission to

17 use it?

18    **A. Yes.**

19    Q. Let me ask you first has Twitter used it, to your

20 knowledge?

21    **A. I don't know what that would mean.**

22    Q. You said he gave Twitter permission to use it.

23 I'm asking to your knowledge has Twitter used the

24 passage?

137

1    A.  I don't know what that means.  I don't know what
2  it means for Twitter to use the passage.
3    Q.  Okay.
4    A.  I know that they're going to have some
5  protection, but I don't know what that means.
6    Q.  So then what do you mean when you say Sean
7  Luzader gave Twitter permission to use the passage?
8    A.  Because in the rules it says by doing this you
9  give us permission to give it to other people and give
10 them permission to use it, et cetera.  I don't remember
11 the language word for word.
12   Q.  But you don't know what the terms and conditions
13 mean when they say that?
14   A.  What the terms and conditions mean?
15   Q.  You said --
16   A.  I know what I said.
17   Q.  Okay.  I'm asking you a question.  When I asked
18 you how has Twitter used it, you said you don't know
19 what that means.  So I'm asking you are you telling me
20 that you don't know what the terms and conditions mean
21 where they say that Twitter can use it or that Twitter
22 would have permission to use it?
23   A.  I think when someone does that that they think
24 they are giving Twitter permission and expect that

138

1  Twitter will use it and that Twitter -- they expect that
2  Twitter will give other people permission to use it for
3  all sorts of commercial uses.
4    Q.  Have you talked to Sean Luzader about his
5  understanding of Twitter's terms and conditions?
6    A.  I haven't talked to Sean Luzader.
7    Q.  So you don't know what Sean Luzader's
8  understanding of Twitter's terms of service are?
9    A.  I just know that he agreed to them.
10   Q.  But you agree with me that you don't know what
11 his --
12   A.  I don't know what's in his mind.
13   Q.  Okay.  All right.  Besides the retweet on
14 Twitter, is there any other basis for your claim that
15 the school district knowingly induced, caused, and
16 materially contributed to the unauthorized copying,
17 reproduction, publication, and/or distribution of the
18 *Winning Isn't Normal* passage?
19   A.  Not yet.
20   Q.  Okay.  So the basis for that is the retweet on
21 Twitter?
22   A.  So far.
23   Q.  Okay.  And then we've already covered, I think,
24 the basis for your claim that those actions were

139

1  willful, intentional, and purposeful, correct?
2    A.  I guess.
3    Q.  Okay.  Well, do you have any other reason to
4  claim -- other than what we discussed, do you have any
5  other reason to claim that those actions were willful,
6  intentional, or purposeful?
7    A.  Not that I can think of right now.
8    Q.  Are you pursuing actual --
9    A.  Well, no, let me -- I need to know the question
10 again explicitly.
11   Q.  Sure.  I asked you previously when we talked
12 about copyright infringement what your basis for the
13 claim that Coach Souder and Sean Luzader's actions were
14 willful, intentional, and purposeful, and we went
15 through several reasons.  I'm asking you now for your
16 claim for copyright or contributory copyright
17 infringement if there is any other basis for your claim
18 that these actions were willful, intentional, and
19 purposeful other than those reasons we already
20 discussed?
21   A.  Yes.
22   Q.  Okay.  What's additional here?
23   A.  I don't yet know for sure, but I don't believe
24 that the school district did any comprehensive copyright

140

1  training subsequent to getting the cease and desist.
2    Q.  And you believe that they needed to do training,
3  comprehensive copyright training after the cease and
4  desist letter?
5    A.  I do.
6    Q.  And why is that?
7    A.  Because they know that people are using my work
8  and being put on notice and their policies either
9  allowed that or people weren't following them.
10   Q.  Okay.  And I think you've already told me that
11 you don't know specifically as we sit here today what
12 the school district's policies are on copyrighting.
13   A.  Yeah, I don't remember.
14   Q.  Okay.  And I think you just told me that you
15 don't yet know for sure what, if anything, the school
16 district did after the cease and desist letter, correct?
17   A.  Correct.
18   Q.  Are you claiming actual or statutory damages with
19 regards to the contributory copyright infringement
20 claim?
21   A.  I don't know yet.
22   Q.  All right.  You've got a federal trademark
23 infringement claim as well, and in your complaint you
24 list three uses that you claim -- three uses of your

141

1 registered trademark. One was the article posted on the
2 Caught My Eye Photography website that we've already
3 discussed, and I think you've agreed that you have no
4 evidence that someone at the school district wrote or
5 posted -- actually posted that article, correct?
6    **A. I don't recall.**
7    **Q.** You don't recall what you said earlier?
8    **A. Possibly, yes.**
9    **Q.** Do you have any evidence that someone at
10 Worthington City School District wrote the article and
11 posted it on the Caught My Eye Photography website?
12    **A. No, I don't think so.**
13    **Q.** The second thing that you listed in your
14 complaint as far as your federal trademark infringement
15 claim is the title of the Worthington Kilbourne high
16 school boys' basketball team highlight video that was
17 posted on Caught My Eye Photography's website. Do you
18 know who created that video?
19    **A. I don't think so.**
20    **Q.** Do you know who posted it on the Caught My Eye
21 Photography website?
22    **A. I think I answered that question earlier.**
23    **Q.** We talked about the article, not the video. Do
24 you know who posted the video, the highlight video on

142

1 Caught My Eye Photography's website?
2    **A. I don't remember right now.**
3    **Q.** Do you have any evidence that someone at
4 Worthington City School District created the video or
5 posted it on the Caught My Eye Photography website?
6    **A. I don't recall.**
7    **Q.** You don't recall if you have any evidence?
8    **A. Correct.**
9    **Q.** The third claim in your complaint under federal
10 trademark infringement was for Sean Luzader's retweet of
11 the image of the passage, and I think we've already gone
12 over this, but you agree with me that you've never seen
13 that winning isn't normal passage on one of the school
14 district or any of the specific schools' websites or
15 Twitter accounts, correct?
16    **A. As I recall right now.**
17    **Q.** And you agree with me that you haven't seen it on
18 either the school district or one of the Worthington
19 Schools' other social media, correct?
20    **A. Correct, as I remember now.**
21    **Q.** Okay. Are there any other claims that you're
22 claiming, those are the three you list in the complaint,
23 for federal trademark infringement?
24    **A. Confusion.**

143

1    **Q.** Okay. Can you tell me what you mean by that?
2    **A. I think that since Luzader posted it seemingly**
3 **attributing it to Five-Star Basketball I think that it**
4 **creates confusion as to who actually wrote it.**
5    **Q.** You would agree with me that he doesn't actually
6 say on his Twitter page that Five-Star Basketball wrote
7 it, correct?
8    **A. I think it appears that way. I think most people**
9 **would infer that from this.**
10    **Q.** Have you done a study or talked to a group of
11 people about that?
12    **A. No, I just said I think it would. I also --**
13    **Q.** I'm asking you specifically with regards to the
14 tweet on Exhibit 5, does he say anywhere on that retweet
15 that Five-Star Basketball wrote it?
16    **A. No, it doesn't say Five-Star Basketball wrote**
17 **this and have copyrighted this.**
18    **Q.** Okay. Any other basis for that federal trademark
19 infringement claim?
20    **A. Not that I can think of at the moment.**
21    **Q.** Okay. And under this claim you also claim that
22 the school district's acts were willful and deliberate.
23 Have we already covered --
24    **A. I think so.**

144

1    **Q.** Okay. What damages are you claiming related to
2 this claim, actual or statutory?
3    **A. I haven't decided yet, but at the very least cost**
4 **savings.**
5    **Q.** I'm sorry, what?
6    **A. At the very least cost savings.**
7    **Q.** What does that mean?
8    **A. It means that they pirated my work and gave it**
9 **away instead of paying for it and by so they saved the**
10 **money they otherwise would have paid for a license or**
11 **for copies of the poster or the book.**
12    **Q.** We've already addressed that we know the school
13 district you said previously purchased copies of the
14 book back in the '80s, correct?
15    **A. I'm pretty sure, yes.**
16    **Q.** Okay. And we're going to talk about your
17 licensing fees in a little bit. So essentially you're
18 claiming at least the fees that they would have paid for
19 licensing fees had they reached out to you and asked you
20 for licensing fees?
21    **A. Or for the number of books that they distributed**
22 **by -- or poster by distributing it and displaying it.**
23    **Q.** So we have not talked about -- you've not made
24 any claims that they've purchased books and distributed

145

1  them to people.

2      A.  No, I've said that they did pay for it, that they

3  saved by pirating it instead of paying for it.

4      Q.  You also have no claims in the complaint that the

5  school district has pirated versions of your book.  Are

6  you claiming that the school district has pirated

7  versions of the *Winning Isn't Normal* book?

8      A.  I'm claiming that they distributed it without

9  paying for it.

10     Q.  The book?

11     A.  Yeah.

12     Q.  You have not made those claims in this lawsuit.

13 So tell me about that claim.  What do you claim that the

14 school district has distributed your -- you haven't

15 mentioned that today either until now.  What do you

16 claim that the school district is doing with your book?

17     A.  Sean Luzader had at least 323 followers that he

18 distributed it to.  He also displayed it to the world.

19     Q.  But we're talking about this passage, correct?

20     A.  Correct.

21     Q.  You were just telling me that the school district

22 has distributed and pirated your book.

23     A.  Part of my book.

24     Q.  By this passage?

146

1      A.  Yes.

2      Q.  Okay.  So we're only talking about the *Winning*

3  *Isn't Normal* passage?

4      A.  Okay.

5      Q.  Okay.  I'm asking you, correct?

6      A.  As far as I understand right now.

7      Q.  Okay.  And so by saying that they have pirated

8  the passage, you're talking about Sean Luzader's

9  retweet?

10     A.  Yes.

11     Q.  Okay.  Your last claim for cause of action is a

12 claim under Ohio common law trademark infringement and

13 unfair competition.  What is the basis for your claim

14 that the school district has engaged in unfair

15 competition and misled readers to believe that your work

16 belonged to Tom Souder?

17     A.  I can't remember about what the Ohio trademark --

18     Q.  Yeah, and I'm not asking you specifically for the

19 law or the requirements under the law.  I'm asking you

20 for the basis for your claim that the Worthington City

21 School District has engaged in unfair competition and

22 has misled readers to believe that your work belonged to

23 Tom Souder.

24     A.  I think that having seen his name under that that

147

1  most people would assume that he was responsible for

2  writing it.

3      Q.  And I understand that with regards to your claims

4  against Caught My Eye Photography, but we've already

5  addressed that you agree that the school district has

6  nothing to do with Caught My Eye Photography or her

7  website.  So I'm asking you specifically with regards to

8  the school district what you claim --

9      A.  I don't think that's what I said that the school

10 district has nothing to do with it.  The school district

11 allowed her to be in that room when Tom Souder read it.

12     Q.  Okay.  So is that the basis for your claim that

13 the school district engaged in unfair competition and

14 misled readers to believe that your work --

15     A.  At least that, yes.

16     Q.  By simply allowing Brenda Kerns to be in the room

17 when Coach Souder read it to the basketball team?

18     A.  Correct.

19     Q.  But you do agree with me that you did testify

20 earlier that the school district has nothing to do with

21 Caught My Eye Photography's website or with her

22 business, correct?

23     A.  It's my understanding that that's what they say,

24 yes, she's not an employee and they have no relationship

148

1  with her.

2      Q.  What damages are you claiming with regards to

3  that claim, the unfair competition claim?

4      A.  At least I think cost savings.

5      Q.  And we just talked about that with regards to the

6  other claim?

7      A.  Yes.

8      Q.  Okay.

9      A.  And that's license or purchase.  I also think

10 it's unfair that other schools, other teams, retailers

11 have purchased multiple times multiple copies and that

12 these were taken without any permission for free.

13     Q.  Well, but you agree with me that we're not

14 talking about books with these claims, just the passage,

15 correct?

16     A.  Well, the passage is the heart of the book.

17     Q.  Okay.  So there have been -- today's my

18 opportunity to talk to you before trial in this case.

19 There have been several claims as we've gone through

20 your complaint that I've asked you about and you've told

21 me that you don't remember the basis for them or you

22 don't remember, you know, the facts or the evidence to

23 support that.

24     So let me ask you then since this is my

149

1  opportunity to ask you these questions today, as we sit
2  here today for the claims that you've told me you don't
3  remember a basis for them, you're telling me you have no
4  facts or evidence to support those claims as we sit here
5  today; is that correct?
6  **A. I don't think so.**
7  **Q.** Okay. What does that mean?
8  **A. I don't know.**
9  **Q.** You don't know?
10 **A. No, I'm not sure exactly what you're asking me.**
11 **Q.** So the claims I have asked you about and you've
12 specifically told me you don't remember the basis for
13 them, what does that mean?
14 **A. It means that I didn't review this stuff and**
15 **memorize it before I came here.**
16 **Q.** Okay. And does it also mean as we sit here today
17 you can't remember whether you have any basis for those
18 claims?
19 **A. It means that I didn't review this and memorize**
20 **it before I came here today.**
21 **Q.** But I --
22 **A. So it means that when I say that I don't**
23 **remember, it means that I don't remember.**
24 **Q.** The problem with that, though, Mr. Bell, and what

150

1  I'm trying to explain to you --
2  **A. Dr. Bell, please.**
3  **Q.** -- is that this is my chance to ask you questions
4  about this lawsuit before we would be at trial.
5  **A. I'd appreciate it if you call me Dr. Bell instead**
6  **of Mr. Bell.**
7  **Q.** Okay.
8  **A. So would you repeat that question, please.**
9  **Q.** Sure. The problem with what you're telling me is
10 that this is my opportunity to ask you questions before
11 trial. So you telling me that you didn't review things
12 and you can't give me any basis for some of these claims
13 today is problematic because I don't have another
14 opportunity to ask you questions unless you go review
15 and we come back and we do your deposition again. Do
16 you understand what I'm saying?
17 **A. I think I understand what you're saying.**
18 **Q.** Okay. So I want to make sure that for the claims
19 that you've told me you don't remember there will be no
20 change in that testimony between now and trial.
21 **A. Was there a question?**
22 **Q.** Yeah. There will be no change in the testimony
23 that you don't remember for those specific claims that
24 you've told me today you don't remember between now and

151

1  trial?
2  **A. What's the question? That's a statement.**
3  **Q.** Do you agree to that?
4  **A. I don't know whether I agree to that or not.**
5  **Q.** If there is a change then we're going to
6  essentially need to do another deposition; do you
7  understand that?
8  **A. I don't, I don't understand that.**
9  **Q.** Okay. Well, there's no other way -- we can't
10 have a conversation outside of what we're doing today.
11 This is my chance to ask you these questions, so I'm
12 telling you that for the things that I've asked you
13 about that you've told me you don't remember, if between
14 now and trial you actually do remember and there is a
15 change in that testimony, you're going to need to let
16 your counsel know, and we're going to have to do another
17 deposition, okay?
18 **A. You're saying what you're saying. I hear what**
19 **you're saying.**
20 **Q.** Okay. You hear what I'm saying, okay. Have we
21 covered all of the claims that you have made against the
22 Worthington City School District with regards to what
23 you think the school district did wrong in this lawsuit?
24 **A. Probably not.**

152

1  **Q.** Probably not. Okay. Well, tell me what else
2  you're claiming that the Worthington City School
3  District has done wrong that we haven't addressed.
4  **A. I don't know right now.**
5  **Q.** Okay. Do you have any other facts or evidence
6  that the Worthington City School District has done
7  something wrong with regards to the claims you've made
8  in this lawsuit other than what we've already talked
9  about today?
10 **A. Not that I can remember right now.**
11 **Q.** Okay. Besides Brenda Kerns, Coach Souder, and
12 the basketball team it's my understanding that you don't
13 know whether anyone else was present when Coach Souder
14 read that passage to the team, correct?
15 **A. So far.**
16 **Q.** Okay. Do you have any recording of him reading
17 it?
18 **A. Do I have any recording?**
19 **Q.** Of Coach Souder reading the passage.
20 **A. I don't think so.**
21 **Q.** Do you have any pictures from that day?
22 **A. Not that I know of.**
23 **Q.** Okay. So in discovery, written discovery you
24 identified yourself as a witness who will be able to

153

1  testify about *Winning Isn't Normal* and its value. You
2  also claim several types of economic damages. You claim
3  in written discovery lost revenue from social media
4  licensing, reduced revenue from book sales, reduced
5  revenue from speaking engagements, reduced revenue in
6  poster sales, and then reduced revenue from other
7  revenue streams.
8       So I want to ask you, I'm going to go through
9  those kind of specifically, but I want to ask you first
10  generally how did Worthington City School District's use
11  affect your sales and lost revenue?
12      A. By displaying it to the world, the passage to the
13  world and not paying for it.
14      Q. So by displaying it without purchasing it or
15  paying for it?
16      A. Yeah.
17      Q. Okay. So then let's go through those
18  specifically. Let's talk about social media licensing.
19  That claim, lost revenue from social media licensing,
20  that is based on Sean Luzader retweeting an image of the
21  *Winning Isn't Normal* passage on Twitter, correct?
22      A. And Souder's reading it.
23      Q. Well, your claim is damages for lost revenue from
24  social media licensing, so we're talking about social

154

1  media licensing.
2      A. Okay.
3      Q. So the only claim that I'm aware of with regards
4  to the school district that that would be based on is
5  Sean Luzader retweeting it, correct?
6      A. I think so as far as I can recall right now.
7      Q. I might have already asked this, and if I did, I
8  apologize. Do you remember when you saw or first saw
9  his retweet?
10      A. Yes, you already asked that, and I answered it
11  that I don't remember.
12      Q. Okay. But according to that Exhibit 5, the
13  screen shot that you pulled, it looks like he retweeted
14  it on is it August 7th?
15      A. Yes.
16      Q. And do you know, was that 2017?
17      A. I would suspect that.
18      Q. What?
19      A. I suspect it was.
20      Q. Okay. So sometime after that you would have seen
21  it?
22      A. It looks like I saw it on August 9th.
23      Q. Okay. And then I think you also claim that the
24  post remained active and accessible for about three

155

1  months, correct?
2      A. You suggested that to me, and I said I didn't
3  know differently.
4      Q. The basis for your expert's calculations is that
5  it was posted for three months.
6      A. Okay.
7      Q. Do you know how he came to the conclusion that it
8  was posted for three months?
9      A. I don't know if that's confidential.
10      Q. I'm asking if your expert -- how your expert
11  became aware of it being posted for three months?
12      A. I'm -- my communications were not directly with
13  the expert.
14      Q. Okay. You told me that you don't know how long
15  it was posted, correct?
16      A. I can't remember at this moment, yes.
17      Q. Okay. So you don't know if it was posted --
18      A. I assume that's correct, but I don't know for
19  sure.
20      Q. And you don't know where that information about
21  it being posted for three months came from?
22      A. No, I didn't say that. I don't remember.
23      Q. Do you know where the information that it was
24  posted for three months came from?

156

1      A. I assume that -- actually, I probably do know.
2  Well, I'm not sure, but I think it may have come from
3  when Five-Star Basketball took it down.
4      Q. So you don't know if Sean Luzader actually took
5  his retweet down before that?
6      A. No, what I'm saying is that it probably came down
7  when -- automatically when Five-Star Basketball took it
8  down.
9      Q. Do you know whether Sean Luzader took it down
10  before Five-Star Basketball did?
11      A. I don't remember that I know that now.
12      Q. Do you know when Sean Luzader removed or took the
13  tweet down?
14      A. I don't know if he ever did it.
15      Q. Okay. Well, you know that it's not on there
16  currently?
17      A. It may be that it came down automatically when
18  Five-Star took it down.
19      Q. Okay. You claim through your expert that the
20  post was seen by a large number of followers. Are you
21  going -- is the sole basis for that the fact that on
22  Exhibit 5 it shows he has 323 followers?
23      A. No.
24      Q. Okay. Then tell me what the basis for the

157

1 claim that it was seen by a large number of followers.
2 **A. It was posted on social media. It was posted and**
3 **displayed to the world. There are over five billion**
4 **people in the world that have access to the internet and**
5 **potentially have seen that. If one in a million did**
6 **that even that's over 5,000.**
7 Q. Okay. How many people saw Sean Luzader's
8 retweet?
9 **A. I have no idea.**
10 Q. So the sole basis for that is just the fact that
11 it's on social media and people could have seen it?
12 **A. No, it's not the sole basis.**
13 Q. Okay. So then how many people saw it?
14 **A. I don't know how many people saw it. It was**
15 **displayed to over five billion people.**
16 Q. And I'm asking you --
17 **A. And also --**
18 Q. -- how many people actually saw it on Sean
19 Luzader's Twitter account?
20 **A. I'm saying that it was displayed to over five**
21 **billion people.**
22 Q. I understand. How many people saw it on Sean
23 Luzader's Twitter account?
24 **A. Potentially at least five billion.**

158

1 Q. How many people actually saw it on Sean Luzader's
2 Twitter account?
3 **A. I can't possibly know that.**
4 Q. Okay. Let's see. So you claim through your
5 expert the lost revenue from social media licensing for
6 that post was $29,923; is that correct?
7 **A. I think that's correct.**
8 Q. Okay. And that is based on a formula that you
9 have developed for licensing fees?
10 **A. Correct.**
11 **MS. PADGETT: I'll make this Exhibit 6.**
12 **(EXHIBIT MARKED FOR IDENTIFICATION.)**
13 Q. Go ahead and take a look at that and let me know
14 when you're ready.
15 Can you tell me what this Exhibit 6 is? It's
16 also stamped Bell 23.
17 **A. It's a copy of a licensing calendar calculator.**
18 Q. Okay. And is this something you've developed?
19 **A. Yes.**
20 Q. Okay. So I want to make sure how you're coming
21 up -- I understand how you're coming up with that 29,000
22 or how this calculator even works.
23 So you first determine the number of users that
24 the person has, which in this case you say was 373,

159

1 correct, or followers, sorry.
2 **A. Okay.**
3 Q. Well, let me ask you this. Your fees are
4 dependent on the number of followers somebody has,
5 correct?
6 **A. Somewhat.**
7 Q. Okay. So there's an initial initiation fee for
8 every social media post; is that correct?
9 **A. Yes.**
10 Q. And that initiation fee is based on the number of
11 followers that someone has, correct?
12 **A. No.**
13 **A. I'm going by this table.**
14 **A. Huh?**
15 Q. I'm going by this table, so tell me what's wrong
16 with what I just said.
17 **A. Oh, yes, for some of it, yes.**
18 Q. Okay. So like, for example, in Exhibit 6 if
19 somebody has a minimum of one follower or a maximum of
20 300 followers, they would have to pay an initiation fee
21 of $20,000, correct?
22 **A. Correct.**
23 Q. So for Sean Luzader who has 373 followers, he
24 falls into that second category of 301 to 750 followers,

160

1 correct?
2 **A. Correct.**
3 Q. So his initial initiation fee to put it on
4 Twitter would have been $22,500, correct?
5 **A. Yes.**
6 Q. And then you also charge the first month's rate
7 in addition to that initiation fee is a $5,000 fee for
8 one month, correct?
9 **A. Correct.**
10 Q. And then if they have it up a second month, the
11 second month fee is an additional $2,000, correct?
12 **A. Correct.**
13 Q. And then a third month, if they have up a third
14 month or beyond it then goes down to $100 per month?
15 **A. Correct.**
16 Q. And then on top of that you also have a rate of
17 $1 per follower, correct?
18 **A. I think so.**
19 Q. Okay. So then that plays into like, for example,
20 Sean Luzader who has 373 followers, he would then also
21 have to pay $373 because of that number of followers?
22 **A. I think it would have been based on the 323**
23 **followers.**
24 Q. Are you saying he has 323 followers? I'm sorry.

161

1   You're correct.  Yep.  Okay.  But he still falls into
2   that second level range --
3       **A.   Correct.**
4       **Q.   -- with 301 to 750 followers?**
5       **A.   Sorry.**
6       **Q.   Okay.  All right.  So these licensing fees --**
7   well, let me ask you first has anyone paid these
8   licensing fees for social media posts?
9       **A.   No.**
10      **Q.   I don't mean Sean.  I mean anyone.**
11      **A.   These particular fees, no.**
12      **Q.   Okay.  When did you develop these licensing fees?**
13      **A.   I don't recall.**
14      **Q.   Was it recent?**
15      **A.   Fairly recent, a few years ago maybe.**
16      **Q.   Okay.  So you're telling me --**
17      **A.   Or last year maybe.**
18      **Q.   When you tell me somebody has not paid these fees**
19  for social media licensing, have they paid other fees?
20      **A.   Have other people paid other fees?**
21      **Q.   Yeah, if not these fees then have people paid**
22  licensing fees other than these fees?
23      **A.   Since those fees were established?**
24      **Q.   My initial question for you was has anyone paid**

162

1   these licensing fees using this calculator for social
2   media posts?
3       **A.   I don't think so.**
4       **Q.   Have there been other fees or a different**
5   calculator that you have used to charge people social
6   media licensing fees?
7       **A.   Yes.**
8       **Q.   Okay.  So at some point sometime --**
9       **A.   I changed.**
10      **Q.   Okay.  But somebody at some point has paid social**
11  media licensing fees to you?
12      **A.   Yes.**
13      **Q.   Okay.  Do you remember when they changed from**
14  whatever they were before to this?
15      **A.   I'm not positive.  I think it might have been in**
16  2017 or 2018.
17      **Q.   Okay.  Are these -- is this the calculator or the**
18  fees that would have been in existence at the time of
19  Sean Luzader's tweet in August of 2017?
20      **A.   I don't remember.**
21      **Q.   Okay.  So you don't know if this fee schedule was**
22  in place when he posted that tweet?
23      **A.   I think it may not have been, but I don't know**
24  for sure.

163

1       **Q.   So then what was the fees in 2017 when he posted**
2   it?
3       **A.   Probably the fees you have right there.**
4           **MS. PADGETT:  Okay.  Let's mark that.  We'll make**
5   this one Exhibit 7.
6           **(EXHIBIT MARKED FOR IDENTIFICATION.)**
7       **Q.   Go ahead and take a look at that.  Are you ready?**
8       **A.   Uh-huh.**
9       **Q.   Before I ask you questions about that I want to**
10  make sure I understand.  You have not yet charged anyone
11  the licensing fees in Exhibit 6 --
12      **A.   No.**
13      **Q.   -- since they were created?**
14      **A.   No, I haven't.**
15      **Q.   Okay.  But it sounds like what you're telling me**
16  is you have charged people based on the licensing fees
17  in Exhibit 7?
18      **A.   I may have, yes.**
19      **Q.   Okay.  When did you start providing social media**
20  licensing fees?
21      **A.   I would guess around 20 -- somewhere between 2005**
22  maybe and 2013.
23      **Q.   Okay.  Were there fees before Exhibit -- what we**
24  have in Exhibit 7?

164

1       **A.   I don't think so.**
2       **Q.   Okay.  So this would have been your initial set**
3   of licensing fees?
4       **A.   I think so.**
5       **Q.   Okay.  And you believe that this Exhibit 7 is**
6   what would have been in existence in August of 2017?
7       **A.   Possibly, yes.**
8       **Q.   Okay.  Then can you explain, let's kind of go**
9   through and explain this to me how this document works
10  because I understand the table, but I don't know what
11  this is.
12      **A.   Okay.**
13      **Q.   So let's start at -- let me ask you what would**
14  Sean Luzader's tweet have fallen under under this?
15      **A.   What would it have fallen under?**
16      **Q.   Yeah, on this document would it be the social**
17  media share per URL?
18      **A.   Yes.**
19      **Q.   Okay.  So then we'll go to that part that looks**
20  like it's on Bell 24 and goes on to Bell 25.  What is
21  the -- you've got an initiation fee.  We've got -- you
22  have 5,000, 7,000, 5,600 and 3,000 listed.
23      **A.   Uh-huh.**
24      **Q.   Explain that to me.  What does that mean?  Why**

165

1 are we in whichever category of fees?
2 **A. Standard passage.**
3 **Q.** What does that mean?
4 **A. *Winning Isn't Normal.***
5 **Q.** So if someone were to post the standard passage
6 you're telling me the initiation fee would have been
7 $5,000?
8 **A. Correct.**
9 **Q.** What are the other three columns then, two
10 sections standard plus one, two sections neither
11 standard, one section other than standard, what does
12 that mean?
13 **A. It means other sections from the book *Winning***
14 ***Isn't Normal.***
15 **Q.** Okay.
16 **A. In addition or other than *Winning Isn't Normal*,**
17 **the *Winning Isn't Normal* passage.**
18 **Q.** So since the retweet was of the *Winning Isn't*
19 *Normal* passage, the standard passage, it would have been
20 a $5,000 initiation fee?
21 **A. Correct.**
22 **Q.** And then you've got on here a fee per month, and
23 again it looks like on the standard passage it would be
24 $700, correct?

166

1 **A. Correct.**
2 **Q.** Okay. And then so basically someone would be
3 paying to post that standard passage $700 per month
4 unless we got into 6 or 12 months?
5 **A. Right.**
6 **Q.** Okay. So if we assume that there's some basis
7 for your claim that Sean had it up for three months, he
8 would be $700 times three, correct?
9 **A. I'm still thinking about something else. So,**
10 **yes, repeat that, please.**
11 **Q.** Sure. I said assuming that Sean Luzader had the
12 post up for three months --
13 **A. Yeah.**
14 **Q.** -- his fee per month, it would have been the $700
15 times the three months, correct?
16 **A. Correct.**
17 **Q.** So under the fees that you had at the time of his
18 post, I calculate it would be the 5,000 initiation fee
19 plus 2,100 for three months is 7,100; is that correct,
20 again, assuming he had it up for three months?
21 **A. I didn't follow that.**
22 **Q.** Sure. I'm trying to calculate since you're
23 telling me these are the fees in existence at the time
24 of his tweet --

167

1 **A. Yeah.**
2 **A.** -- I'm saying he would have had to have paid the
3 $5,000 initiation fee?
4 **A. Uh-huh.**
5 **Q.** Yes?
6 **A. Yes.**
7 **Q.** Plus $700 for each month he has it up?
8 **A. Right.**
9 **Q.** Which if he has it up for three months that's
10 $2,100, correct?
11 **A. Correct.**
12 **Q.** So 5,000 plus 2,100 would get us 7,100, correct?
13 **A. Right.**
14 **Q.** So --
15 **A. Times, go ahead.**
16 **Q.** -- at the old fees there wasn't any per user part
17 of the formula, correct?
18 **A. Well, not exactly.**
19 **Q.** What do you mean by that?
20 **A. Well, first of all, if you look at Bell 26 it**
21 **says "All uses must include the following legend," and**
22 **then if you look at Bell 27 it says "Excerpted with**
23 **permission from *Winning Isn't Normal.* Purchase**
24 *Winning Isn't Normal* or license at

168

1 www.KeelPublications.com."
2 **Q.** So my question was --
3 **A. And -- go ahead.**
4 **Q.** My question was at the time that these fees were
5 in existence --
6 **A. Yep.**
7 **Q.** -- in Exhibit 7 under social media share per URL
8 because that's what you told me Sean Luzader would have
9 fallen under --
10 **A. Correct.**
11 **Q.** -- there's no part on this document that
12 addresses a cost or a fee that would be per user of
13 the -- or per follower, I apologize, per follower?
14 **A. Correct.**
15 **Q.** Okay. So the total as of August 2017, the total
16 that Sean Luzader would have been expected to pay
17 assuming he had it up for three months would have been
18 $7,100?
19 **A. No.**
20 **Q.** Why is that wrong?
21 **A. Because what I just told you, this only applies**
22 **if the following legend was used.**
23 **Q.** I understand what you're saying. I'm just trying
24 to figure out if Sean would have gone through this

169

1   process with you --
2       A.  He did not.
3       Q.  I understand.  If he would have gone through the
4   process, followed all of your rules, I'm trying to
5   figure out what he would have had to have paid.  And I'm
6   asking you is it the $7,100?
7       A.  And I'm saying no.
8       Q.  Why?
9       A.  Because his -- he wouldn't have used the legend
10  and also because it was willful because he had been
11  noticed before.
12      Q.  You're misunderstanding my question.
13      A.  I don't think so.
14      Q.  If he had gone through this process, contacted
15  you.
16      A.  That's a hypothetical.
17      Q.  It is a hypothetical, and I can ask a
18  hypothetical.
19      A.  Okay.
20      Q.  If he had gone through the process and contacted
21  you ahead of time and said I want to put this on social
22  media for three months in August of 2017 and you would
23  have sent him his fees and what he would have had to
24  have done and we assume he followed all that, the total

170

1   he would have had to pay you is the $7,100 based on this
2   formula, correct?
3       A.  No, I don't think so.
4       Q.  Okay.  What am I missing from the formula for
5   what he posted that he would have also had to pay?
6       A.  He would have had to pay for not having that
7   legend on it and he would have had to pay for it being
8   willful.
9       Q.  Okay.  Assuming all of that wasn't at issue, he
10  reached out to you ahead of time.
11      A.  He did not.
12      Q.  I'm asking you to make an assumption.  Assume he
13  did.  Assume that it is currently August, 2017, and I
14  have -- I have 323 social media followers on Twitter and
15  I want to post your *Winning Isn't Normal* passage on
16  Twitter and I reach out to you and I follow all of your
17  rules and I say how much do I owe you for posting it for
18  three months, you would have told me in August of 2017
19  that I would owe you $7,100, correct?
20      A.  No.
21      Q.  Okay.  Tell me then how this formula, what I did
22  wrong coming to that number because you were right there
23  with me as we were going through it.
24      A.  Because, first of all, I don't think I can answer

171

1   a hypothetical question other than with a hypothetical
2   answer, all right.  So, I mean, there's no answer to
3   that.  There's no answer to that.  He did not and he
4   does not have the right to use it and then go back and
5   say, oh, gee, I would have paid for it if I would have
6   known I was going to get caught.
7       Q.  So let me just tell you this process today is
8   going to take a lot longer if this keeps happening.
9       A.  I answered your question.
10      Q.  You did not answer my question.
11      A.  You asked me a hypothetical.
12      Q.  Tell me what in August of 2017 for somebody to
13  post a tweet for three months what it would have cost
14  based on your formula in Exhibit 7.
15      A.  I can't tell you that with only that information.
16      Q.  What more do you need?  What more information do
17  you need?
18      A.  I can't answer that hypothetical question.
19      Q.  I'm not asking.  I'm asking you to tell me --
20  we're just looking at the formula.  It's August 2017.
21      A.  It's not August 2017.
22      Q.  This was in place you told me in August of 2017.
23      A.  Okay.
24      Q.  Tell me what the initiation fee to post your

172

1   passage on Twitter would have been in August of 2017
2   based on Exhibit 7, what initiation fee?
3       A.  I think I've answered that question already.
4       Q.  I'm asking because I seem to have misunderstood.
5       A.  I cannot give you a definitive hypothetical
6   answer to a hypothetical question.
7       Q.  I'm not asking you a hypothetical.  I'm asking
8   what was the initiation fee to post the standard *Winning
9   Isn't Normal* passage on Twitter in 2017 based on
10  Exhibit 7, what was the initiation fee?
11      A.  The initiation fee that it says on this piece of
12  paper is $5,000.
13      Q.  Thank you.  And then for three months in August
14  of 2017 what would have been the fee to have that
15  winning isn't normal passage on Twitter?
16      A.  That's a different question.
17      Q.  What would have been the fee for three months?
18      A.  The fee would have been whatever we negotiated.
19      Q.  We're following this exhibit.
20      A.  It says on this piece of paper that a social
21  media share per URL at this time would have been $700,
22  but --
23      Q.  Per month?
24      A.  Per month.

173

1 Q. Okay.

2 A. But it doesn't --

3 Q. Okay. But it doesn't what?

4 A. It's not relevant to the question you asked me.

5 Q. Which question?

6 A. What would it have been in 2017 without any other

7 issues.

8 Q. So --

9 A. There's nothing in here that says what it would

10 be if it was after already getting a C and D. There's

11 nothing in here that says what it would be if it didn't

12 include the following legend.

13 Q. Yeah, none of that was my question. I wasn't

14 asking any of that, so I'm not concerned with any of

15 that.

16 A. But I'm answering that.

17 Q. Was there -- in 2017 based on this Exhibit 7 was

18 there a fee associated with posting it on social media

19 based on a number of followers?

20 A. Partially based on the number of followers.

21 Q. Okay. Where is that on this paper?

22 A. Where is what on this paper?

23 Q. The part that addresses the fee per number of

24 followers?

174

1 A. It's under social media share per URL.

2 Q. And can you point to me exactly where it tells me

3 the fee per number of followers?

4 A. No.

5 Q. Okay. You would agree that it doesn't actually

6 say on here that there's a fee per number of followers?

7 A. Correct.

8 Q. Okay. Let's see -- so you told me that you may

9 have charged people in the past based on this social

10 media licensing form, correct?

11 MR. GERLING: Exhibit 7?

12 Q. Exhibit 7.

13 A. I'm not sure, but I think partially as a starting

14 point to negotiations.

15 Q. Did you keep records of that?

16 A. Of what?

17 Q. When you were charging people based on these

18 social media licensing fees?

19 A. I have records of what people paid for a license.

20 Q. And I think we also requested that in discovery,

21 but I don't think we received that. Can you add that to

22 your list, so any records of what people have paid you

23 for social media licensing fees of the *Winning Isn't*

24 *Normal* passage. Do you know how much revenue you've

175

1 received from social media licensing fees?

2 A. I know on a truncated version of the passage in

3 one case I received $40,000.

4 Q. Do you remember any other case?

5 A. I remember one where I received $5,000, one where

6 I received I believe it was $9,500.

7 Q. Do you remember the circumstances of what, like

8 so which social media that was, who it was posting, the

9 number of followers, any of those details?

10 A. Let me see. One of them, the $40,000 one was on

11 a blog. I know prior to the posting he had about 200

12 followers, I think. Following the posting he had -- in

13 the first three days he had, let me see if I get this

14 right, 10,000, I think about 10,000 followers and --

15 Q. Followers or views?

16 A. Followers, I think.

17 Q. I thought you said he had two hundred followers.

18 A. Prior to the posting for the year. The posting

19 was in December. In the next three days he had 10,000,

20 I think, and in a few weeks he had 30,000, I believe.

21 Q. And that's the person you charged $40,000?

22 A. That's the person where we settled for $40,000.

23 Q. Settled, okay . So what I meant when I asked you

24 what you've received from licensing fees is people --

176

1 A. It was all licensing fees.

2 Q. Okay. But people who have -- not settlements,

3 people who have reached out to you and said I want to

4 post, what are the fees, and then you charged them

5 something. Have you kept track of that revenue that

6 you've received from licensing fees? Do you see the

7 distinction, not settlements because you sent letters or

8 filed a lawsuit or something. I'm asking revenue that

9 you've received from people properly reaching out to you

10 getting licensing fees and then posting stuff, do you

11 keep track of how much revenue you've gotten from that?

12 A. I don't know the exact amount.

13 Q. Okay. So that might be -- I requested it when we

14 were talking about this a little bit ago, but that would

15 be helpful to have the social media licensing fee

16 documentation that you have.

17 A. Okay.

18 Q. Okay. Did you provide -- I'm assuming you would

19 have provided your expert, Marcus Reading, with

20 information about social media licensing fees for him to

21 do a report and formulate his opinions, correct?

22 A. No.

23 Q. No. Does that mean you personally did not

24 provide him with information?

177

1    **A. Yes.**
2    **Q.** Okay. Have we covered everything about what you
3 charge as far as social media licensing fees currently
4 and in the past between Exhibit 6 and 7?
5    **A. I don't think so.**
6    **Q.** Okay. What are we missing?
7    **A. We're missing the fees changed because of the**
8 **damages. So, for example, this crumpled paper post has**
9 **led to millions, been distributed and displayed to**
10 **millions. I don't know which particular copy of it led**
11 **to which other particular copy of it, et cetera.**
12    **Q.** So what fees --
13    **A. But I do know that it's been hugely damaging.**
14    **Q.** What fees or income have you derived because
15 people have posted without contacting you first? So
16 where you were telling me about --
17    **A. A very small percentage of what they owe me.**
18    **Q.** Okay. About how much have you gotten in
19 settlement from pursuing people who have posted stuff on
20 social media without getting --
21    **A. I don't know the exact amount.**
22    **Q.** Okay. Do you have records of that?
23    **A. I don't think I do after expenses.**
24    **Q.** You don't think you do what?

178

1    **A. After expenses.**
2    **Q.** What does that mean?
3    **A. Attorneys' fees, other filing fees.**
4    **Q.** Okay. So you don't keep somewhere a list of what
5 you've gotten in settlements from those?
6    **A. Not as profits I don't think.**
7    **Q.** Okay. We did ask in discovery for a list of --
8 like a breakdown of settlements, basically, related to
9 these lawsuits. And I understand you're saying you
10 don't have it separated out from net profit versus
11 attorneys' fees, but if you can add that to your list,
12 that would be helpful.
13    You also claim reduced revenue from book sales as
14 a result of Worthington City School District's -- as a
15 result of the allegations you have against the
16 Worthington City School District.
17    Can you tell me what the basis of that claim is
18 or how you claim that you've lost revenue from book
19 sales based on Worthington City School District's
20 alleged use of the passage? I think that's a bad
21 question. Let me rephrase.
22    **A. I do too. I agree with you.**
23    **Q.** How did your revenue from the *Winning Isn't*
24 *Normal* book decrease from Worthington City School

179

1 District's alleged use of the passage?
2    **A. I think that there's no motivation for anyone to**
3 **purchase my work when they can get it for free.**
4    **Q.** Well, you've already agreed with me that you're
5 not claiming that your entire book has been posted by
6 the Worthington City School District, correct?
7    **A. I'm claiming that the heart of the work of the**
8 **book has.**
9    **Q.** But not the whole book, correct?
10    **A. The heart of the book.**
11    **Q.** I understand what you're saying. My question is
12 different. I'm saying you're not claiming that the
13 Worthington City School District has posted the entire
14 book, correct?
15    **A. Not that I know of.**
16    **Q.** Okay. So essentially your claim for reduced
17 revenue from book sales is based on the fact that you
18 believe people don't have motivation to purchase the
19 book if they can get just the passage for free?
20    **A. Yes, I think that's largely the case.**
21    **Q.** Okay. What were the sales for the *Winning Isn't*
22 *Normal* book in the five years leading up to 2015 and
23 2016?
24    **A. I don't know. I don't remember.**

180

1    **Q.** Do you know the number of copies or the profit in
2 those years?
3    **A. No.**
4    **Q.** What have the sales been for the *Winning Isn't*
5 *Normal* book since 2015, 2016?
6    **A. I don't know. I don't remember the exact number.**
7    **Q.** Do you have records of that?
8    **A. I think so.**
9    **Q.** Okay. And, again, I'm getting to some of these
10 records that may be what you're talking about, but if
11 not, that would be something to add to your list, so
12 records of sales of the *Winning Isn't Normal* book both
13 before and after 2015 to 2016.
14    **A. Before and after what?**
15    **Q.** 2015 and 2016. And as we sit here today, I think
16 I already --
17    **A. I don't understand that question, before 2015 and**
18 **2016?**
19    **Q.** I said both before and after.
20    **A. Both before 2015 and after 2016?**
21    **Q.** Correct, a continual timeline, I'm saying I want
22 both -- I want years leading up to 2015, 2015, 2016 and
23 the years since 2016, whatever time frame that you go
24 back to in your recordkeeping to the present.

181

1       Without that documentation in front of you, is it
2 fair to say that you don't know the total number of
3 copies of this book that you've sold or the total
4 revenue you've received from those book sales?
5    **A. I know a pretty good range.**
6    **Q.** Tell me those ranges.
7    **A. I think I already told you it's somewhere between**
8 **40,000 and 50,000 -- 40,000 and 50,000 books and**
9 **possibly as many as 80,000 before 2015.**
10    **Q.** And then what about the revenue that you've
11 received from those book sales, just *Winning Isn't*
12 *Normal*?
13    **A. I don't know if I have an exact number. The**
14 **price on the book changed over the years.**
15    **Q.** Yeah. Do you have an approximate number?
16    **A. I'd say it averaged at least $10 per book, at**
17 **least, probably higher.**
18    **Q.** Okay. I'm going to start -- I know I've been
19 telling you this for a while. I'm going to start giving
20 you some documents that you produced in discovery that I
21 just -- I don't know what they're telling me or what
22 they have to do with, so I want to go through some of
23 these with you.
24       Let me give you -- actually before we mark this

182

1 I'll give it to you to look at. This is one you've
2 produced. Take your time, look through it, let me know
3 when you're ready.
4    **A. I think they're pretty self-explanatory.**
5    **Q.** Let me ask you this first. What is this
6 document?
7    **A. It looks like order payments from Amazon.**
8    **Q.** Okay. And the date range on the top says January
9 1st, 2019, through August 4th, 2019; is that correct?
10    **A. That's what it looks like.**
11    **Q.** Okay. Are these order payments for book sales?
12    **A. It looks like it.**
13    **Q.** Okay. From my count and I did it starting on
14 Bell 448 through the end, I went through and counted the
15 numbers that were printed next to the title *Winning*
16 *Isn't Normal* and I came up with a total of 17 copies.
17    **A. They're all *Winning Isn't Normal* series books.**
18    **Q.** I understand. I'm talking about just
19 specifically *Winning Isn't Normal*.
20    **A. Okay.**
21    **Q.** I counted 17 copies.
22    **A. Okay.**
23    **Q.** Am I understanding this document correctly?
24    **A. I don't know. I assume so.**

183

1    **Q.** Okay. And since you've distinguished the
2 difference, I count two sales for *The Nuts and Bolts of*
3 *Psychology for Swimmers* separate from *Winning Isn't*
4 *Normal* -- or, sorry, three and two sales for *76 Rules*
5 *for Outperforming the Competition.* Am I understanding
6 that document correctly?
7    **A. I don't know. I don't know what you understand.**
8    **Q.** Okay. What I just explained, is that correct?
9    **A. I'll assume it is.**
10    **Q.** Do you keep this documentation?
11    **A. No.**
12    **Q.** Who does?
13    **A. My wife.**
14    **Q.** Okay. So if I really want to understand this
15 document, I would have to depose her?
16    **A. Good luck.**
17    **Q.** Okay.
18    **A. No, I'm sorry, my wife has been in a really bad**
19 **car accident and has sustained a serious brain injury.**
20 **She has difficulty remembering ten minutes ago.**
21    **Q.** Okay. So who is keeping track of your records
22 since then?
23    **A. Amazon is.**
24    **Q.** Okay. Let me ask you first, and I don't want to

184

1 go into the details of that too much, but when did that
2 accident happen?
3    **A. A couple years ago.**
4    **Q.** So she was doing your recordkeeping up to that
5 point?
6    **A. Yes, and I don't want to go into all the details**
7 **of it.**
8    **Q.** Right. I don't think we need to.
9    **A. But her brain injury has gotten worse.**
10    **Q.** I just want to make sure I understand who is
11 doing the recordkeeping for this stuff. So your wife
12 had been doing it. She was in an accident a couple
13 years ago.
14    **A. Yeah.**
15    **Q.** Has someone been doing it since then?
16    **A. Well, Amazon has been doing it and PayPal and --**
17    **Q.** Okay.
18    **A. -- whatever. She generally can still get a**
19 **printout from them.**
20    **Q.** Okay. So this document you're telling me is a
21 printout from Amazon?
22    **A. Or PayPal. I think this is from Amazon.**
23    **Q.** Okay. So you didn't actually create this
24 document?

185

1    A.  I didn't actually create this document.
2    Q.  Then let me ask you since you're not completely
3  sure if what I'm saying is correct, it's the current
4  year, 2019, do you think that it sounds correct that you
5  have sold about 17 copies of the *Winning Isn't Normal*
6  book this year?
7    A.  I think that's probably correct.  We had some
8  bigger sales, but I think those might have been in 2018.
9    Q.  Okay.
10   A.  Or '17.
11   Q.  And then does it sound correct that in that same
12 time frame this year up through August 4th, 2019, you
13 sold about three copies of *The Nuts and Bolts of*
14 *Psychology For Swimmers* and about two copies of *76 Rules*
15 *for Outperforming the Competition*?
16   A.  Could be, yeah.
17   Q.  And it looks like from this document that Amazon
18 charges or whoever, if this is Amazon or PayPal, charges
19 a closing fee, a per item fee, a referral fee, and a
20 shipping fee; is that correct?
21   A.  I don't know.
22   Q.  Okay.  You don't know what they charge you to
23 sell your book on there?
24   A.  Yeah, I think these are fees for -- I don't know.

186

1    Q.  Okay.  That's all right.
2    MS. PADGETT:  Let's mark that as Exhibit 8.
3    (EXHIBIT MARKED FOR IDENTIFICATION.)
4    Q.  All right.  I'll give you another document.  This
5  one is marked Bell 456 through 457.  I'm not sure if
6  I'll mark it yet but go ahead and take a look at that
7  and let me know when you're ready.
8    A.  Okay.
9    Q.  Can you tell me what this document is?
10   A.  No.  It looks like from PayPal.
11   Q.  And it does say *Winning Isn't Normal* kind of at
12 the top of the first page; do you see that?
13   A.  Yep.
14   Q.  So is this an account, a PayPal account
15 specifically related to *Winning Isn't Normal*?
16   A.  I don't know.
17   Q.  You don't know.  Is this document related to
18 social media licensing?
19   A.  I don't know.
20   Q.  Is it related to book sales?
21   A.  I don't think it's related to social media
22 licensing.
23   Q.  Okay.  Is it related to book sales?
24   A.  I don't know.

187

1    Q.  I didn't hear you.
2    A.  I don't know.
3    Q.  Oh, okay.  You don't know if this is related to
4  book sales?
5    A.  (Witness shakes head.)
6    Q.  No?
7    A.  I don't know.
8    Q.  Is it related to some of the like posters,
9  T-shirt, mug sales?
10   A.  I don't know for sure.  Some of it could have
11 been.  Some of it could have been events.
12   Q.  Could have been what?
13   A.  Event stuff.
14   Q.  So this is just a general account?
15   A.  I'm guessing.
16   Q.  Okay.  So this doesn't necessarily tell us about
17 any books or *Winning Isn't Normal* items that you would
18 have sold in the time frame of 2017?
19   A.  I don't know.
20   Q.  Okay.  I don't think we need to mark it as an
21 exhibit.  All right.  Skip that one.  I'm going to give
22 you another one.  This is pretty much PayPal *Winning*
23 *Isn't Normal* but it's for the year 2018, so go ahead and
24 take a look at that.

188

1    A.  The same.
2    Q.  The same thing, we don't know what this is for?
3    A.  No.
4    Q.  Okay.  Is that no?
5    A.  That's correct.
6    Q.  Okay.
7    A.  I don't know what it's for.
8    Q.  We'll skip that one.  And I have a feeling you're
9  going to tell me the same thing for this one, but I'll
10 ask you.  This is again PayPal it says *Winning Isn't*
11 *Normal* but it's a report from January 1st, 2019, to
12 September 12th, 2019, so let me know once you've looked
13 at that.
14   A.  Do you want to show me the other one again?
15   Q.  Do I what?
16   A.  The other -- wasn't there a similar one for 2019?
17 I don't know.
18   Q.  There was one we talked about from I think you
19 told me it was Amazon.
20   A.  Oh, I don't know.
21   Q.  Do you want --
22   A.  I don't know.
23   Q.  Same thing with this one, you don't know what
24 this is showing?

189

1     **A. Yeah. Correct.**
2     **Q.** Okay. I just couldn't hear you. All right.
3 Here's another one. This one is different. So you
4 produced a PDF that's labeled Bell 462 through Bell 467,
5 and then you also produced a spreadsheet that was
6 stamped Bell 473 that I think are the same so I'm going
7 to give you both at the same time. Go ahead and look at
8 those.
9     **A. I don't know what some of this stuff means.**
10     **Q.** Okay.
11     **A. But it looks like a report on eBook sales.**
12     **Q.** That was kind of what I thought too just because
13 there's a couple of columns that say or are labeled
14 eBook, correct?
15     **A. Yes.**
16     **Q.** Okay. So we believe that this is telling us
17 eBook sales, and the date range on these goes from, let
18 me look, July 2013 monthly through June 2019, correct?
19     **A. Okay.**
20     **Q.** Okay. Is this a document that you would have
21 created or that someone else created?
22     **A. It would have come from -- we would have gotten**
23 **it from Kindle or iBooks, I guess.**
24     **Q.** Is this exactly how it would have come to you, or

190

1 would there have been some kind of information that then
2 you or someone else created these sheets?
3     **A. No, that's how it would have come to us.**
4     **Q.** So it comes from either Kindle or Apple to you
5 like this?
6     **A. That's my understanding, yes.**
7     **Q.** Okay. And so it sounds like these two sheets are
8 specifically related to eBook sales?
9     **A. It looks like that.**
10     **Q.** Okay.
11     **A. As far as I know.**
12     **Q.** Does it tell us anything about which books are
13 your *Winning Isn't Normal* book versus the other books?
14     **A. I don't think so.**
15     **Q.** Okay.
16     **A. But I think we only have three of the books on**
17 **Kindle and iBook right now.**
18     **Q.** Okay. Which books are those?
19     **A. *Psychology for Swimmers, Winning Isn't Normal*,**
20 **and I think the parents' guide.**
21     **Q.** So we can assume that this tells us about sales
22 of those three eBooks?
23     **A. I would guess that would be a good assumption.**
24     **Q.** Okay. So I added up the category with the

191

1 numbers of eBooks --
2     **A. Uh-huh.**
3     **Q.** -- and I came up with a total number of 179.
4 Does that sound accurate to you as far as book sales for
5 those three types of eBooks from July 2013 through June
6 2019?
7     **A. Probably.**
8     **Q.** Okay. And then I kind of took it by year
9 breakdown.
10     **A. Uh-huh.**
11     **Q.** And since it ends in June 2019 I did July 2013
12 through June 2014 and I counted zero on there; does that
13 sound about correct?
14     **A. I don't know.**
15     **Q.** You can look.
16     **A. Assuming you did that correctly, yes.**
17     **Q.** Okay. And then July 2014 through June 2015 I
18 counted 35; does that sound about correct?
19     **A. Okay. I believe that.**
20     **Q.** Okay. And then July 2015 through June 2016 I
21 counted about 62; does that sound correct?
22     **A. eBooks?**
23     **Q.** Yeah, from this list.
24     **A. Could be.**

192

1     **Q.** And July 2016 through June 2017 I count 28; does
2 that sound correct?
3     **A. Okay.**
4     **Q.** Okay. I mean, tell me if you think it sounds far
5 off.
6     **A. I don't think it sounds terribly far off.**
7     **Q.** Okay. And then July 2017 through June 2018 I
8 counted 33; does that sound about right?
9     **A. Okay.**
10     **Q.** And then July 2018 through June 2019, which is
11 the last month on here, I count 21; does that sound
12 about correct?
13     **A. Okay.**
14     **Q.** About correct?
15     **A. Uh-huh.**
16     **Q.** Is that yes?
17     **A. I think so, yes.**
18     **Q.** Okay. Do you know what some of these columns
19 like KOLL Borrows, do you know what that --
20     **A. No, that's what I said, I don't know some of**
21 **those.**
22     **Q.** Do you know what -- and I'm just trying to find
23 out which ones you know and which ones you don't.
24 There's also one that says KENP Read. Do you know what

193

1 that means?
2 **A. No.**
3 **Q.** And then the royalty columns I'm assuming are
4 based on where you're selling the books because --
5 **A. It says those are royalties, yeah.**
6 **Q.** Okay. All right. And then I think at the bottom
7 you tallied and I'll tell you what page it's on, Bell
8 463 or at the bottom of the spreadsheet, whichever one,
9 you've got a number there 1,133.74?
10 **A. Okay.**
11 **Q.** Do you know what that number is?
12 **A. No.**
13 **Q.** No?
14 **A. No.**
15 **Q.** Okay. All right. Besides eBook sales from this
16 time frame are you aware of anything else these
17 documents show?
18 **A. I don't think so.**
19 **MS. PADGETT: Okay. Let's mark those -- since**
20 **they do have to do with eBook sales let's mark those**
21 **Exhibit 9.**
22 **(EXHIBIT MARKED FOR IDENTIFICATION.)**
23 **Q.** You also produced a document labeled Bell 468.
24 Take a look at that and let me know once you're ready.

194

1 **A. Uh-huh.**
2 **Q.** Do you know what this is?
3 **A. I think so.**
4 **Q.** Okay. What is it?
5 **A. Sales of *Winning Isn't Normal* books.**
6 **Q.** Okay. And at the top it says "Hello, Keel
7 Publications"?
8 **A. Yes.**
9 **Q.** Am I correct in inferring that that means this is
10 based on sales through Keel Publications' website?
11 **A. Yes.**
12 **Q.** Okay. Do you know what time frame those sales
13 would have covered?
14 **A. I think it would have been this year.**
15 **Q.** 2019?
16 **A. Yes.**
17 **Q.** Okay. And you believe that it would be only for
18 the *Winning Isn't Normal* book?
19 **A. Yes.**
20 **MS. PADGETT: Okay. And let's mark this one**
21 **Exhibit 10.**
22 **(EXHIBIT MARKED FOR IDENTIFICATION.)**
23 **Q.** Then I'm going to give you what was marked as
24 Bell 469 if you could take a look at that.

195

1 **A. Yes.**
2 **Q.** All right. So this to me looks like a
3 November 29, 2018, invoice, correct?
4 **A. Correct.**
5 **Q.** And it looks like it's a sale of several things
6 including the *Winning Isn't Normal* book.
7 **A. No, two things including the *Winning Isn't Normal***
8 **Book.**
9 **Q.** What else -- oh, I see what you --
10 **A. Relaxation training.**
11 **Q.** Okay. So you sold 15 copies of the *Winning Isn't*
12 *Normal* book?
13 **A. Yes.**
14 **Q.** Is this to one specific person?
15 **A. Yes.**
16 **Q.** Okay. So this would have been related to *Winning*
17 *Isn't Normal* book sales in 2018?
18 **A. Yes.**
19 **MS. PADGETT: Okay. We'll mark that one Exhibit**
20 **11.**
21 **(EXHIBIT MARKED FOR IDENTIFICATION.)**
22 **Q.** Would you have copies of other invoices like this
23 for book sales in 2019 and 2018?
24 **A. I don't think so.**

196

1 **Q.** So these are the only sets of invoices that you
2 have for 2019 and 2018?
3 **A. I think so.**
4 **MS. PADGETT: Okay. I've got a few spreadsheets**
5 **I want to go through with you that you also produced.**
6 **Can we take a quick break before we do that.**
7 **(EXHIBITS MARKED FOR IDENTIFICATION.)**
8 **MS. PADGETT: So we're back on the record.**
9 **Q.** (By Ms. Padgett) We're going to start with what
10 we've marked as Exhibit 12. The Post-its on these,
11 since they're spreadsheets when you guys Bates numbered
12 them it's not on the actual document, so the Post-it was
13 what you produced as Bell 474, but it is now marked as
14 Exhibit 12. So go ahead and take a look at that
15 spreadsheet. Let me know when you're ready.
16 **A. Okay.**
17 **Q.** Okay. So can you tell me what this is?
18 **A. No.**
19 **Q.** What's that?
20 **A. I think it looks like sales that were directly**
21 **through Keel Publications, but I'm not sure.**
22 **Q.** Sales directly through Keel Publications?
23 **A. Uh-huh.**
24 **Q.** Okay. And the date range that I see on this

197

1 spreadsheet looks like December 14th, 2017, through June
2 11th, 2019. Do you see the date range I'm talking
3 about?
4    A. No, I'm looking at this stuff, and I'm concerned
5 about people's privacy.
6    Q. Okay.
7    A. The names should have been blacked out.
8    Q. Okay.
9    A. And I don't know why that was sent without the
10 names being blacked out.
11    Q. Give me one second. This one -- some of them I
12 think were marked confidential. This one is not. But I
13 guess at any rate let's kind of go through it. The date
14 range that I'm seeing is December 14th, 2017, through
15 June 11th, 2019; is that correct?
16    A. It looks like it.
17    Q. Okay. I know you said they're sales through Keel
18 Publications. Would this be a comprehensive of list of
19 sales through Keel Publications?
20    A. It could be.
21    Q. Okay. Would it only be book sales or would it
22 also be some of those other items that you also sell?
23    A. I see at least one that I know would be a poster,
24 some T-shirts.

198

1    Q. Okay. Can you explain to me how -- I guess how
2 can I tell the difference looking at it of what's a
3 book, what's a poster, what's -- well, obviously
4 T-shirts I'm assuming are the ones with sizes?
5    A. The sixth from the right column.
6    Q. Okay.
7    A. The ones that say *Winning Isn't Normal* probably
8 are *Winning Isn't Normal*. The one that says team
9 policy, that's definitely a poster. The one that says
10 *Target on Goal* would be a *Target on Goal*. If you go
11 down there's another team policy one which would be a
12 poster, and I think the 10 Rules would be posters.
13    Q. Okay. How would I --
14    A. And then you can see ones that say short-sleeved,
15 those are T-shirts.
16    Q. Are shirts, yeah. How would I know on this
17 list -- so I can see which might be T-shirts. How would
18 I know if it was a *Winning Isn't Normal* book or a
19 *Winning Isn't Normal* poster?
20    A. I don't know the answer to that.
21    Q. Okay. So some of these that say *Winning Isn't*
22 *Normal*, we don't necessarily know if it was a book sale
23 or a poster sale?
24    A. Correct.

199

1    Q. Okay. Do you offer shirts in anything other than
2 that winning isn't normal shirt?
3    A. No.
4    Q. So if we see shirt, we know it was a *Winning*
5 *Isn't Normal* shirt?
6    A. Correct.
7    Q. Do you have any records like this from before
8 December of 2017?
9    A. I don't think so.
10    Q. Okay. So you would have started keeping this
11 type of record in December of 2017?
12    A. Probably.
13    Q. Okay. So if I want to figure out the total sales
14 that you made from books by year, I would -- essentially
15 is it the column that's labeled -- there's a column
16 that's product P, I don't know what it says after that,
17 and one that says product T. Which one would tell me
18 your total sales? Or maybe they're the same. I don't
19 know.
20    A. I don't think there's a total line here.
21    Q. Okay. But I guess that's what I'm asking, if I
22 added up the columns to figure out the total, which
23 column would I need to add to figure out your total
24 revenue from sales?

200

1    A. I don't know the answer to that.
2    Q. Okay. Is the numbers in the column labeled
3 product P, is that the cost for each of those items?
4    A. Product P, I think so.
5    Q. Okay. Do you know who kept this record?
6    A. Sandy.
7    Q. So was she still keeping it up through June 2019?
8    A. Perhaps.
9    Q. Okay. You don't know of anyone else who would
10 have been keeping it after that or in that time frame?
11    A. No.
12    Q. Then let's go to -- you can put that one or give
13 that one to Connie. We'll go to the next one which is
14 Exhibit 13. This was marked produced confidential under
15 the protective order.
16    A. Okay.
17    Q. So I don't know if --
18        MR. GERLING: We'll just note it on the record.
19    Q. Okay. So this was a spreadsheet that you
20 produced labeled Bell 476. We've marked it Exhibit 13.
21    A. I'm concerned about privacy again.
22    Q. Like I said, this one was marked confidential
23 under the protective order that we have.
24    A. This is -- yeah. Okay.

201

1    Q. So this spreadsheet appears to me looking at the
2  dates to only address the year 2014.  Do you know what
3  this spreadsheet is showing?
4    A. I think so.
5    Q. What's that?
6    A. I think it shows -- I don't know why this was
7  produced.  I think it shows --
8        MR. GERLING: I don't either.
9    A. -- the one thing that my wife does that I'm not
10  involved in.
11    Q. Okay.
12    A. It looks like she coaches a summer league team,
13  and it looks like this is stuff from that summer league
14  team.
15    Q. So this has to do with something your wife does?
16    A. Yeah.
17    Q. Okay. So can you just --
18    A. I help her with it, and I -- but she does
19  all -- she and actually each of my kids at one time or
20  another helped coach this stuff too.  I helped get
21  this -- I consult on it sometimes, and I helped to get
22  the contract in the first place.
23    Q. Some of the spreadsheets that we're going to be
24  going through, although this one I don't see it, it

202

1  looks like there's noted sales of *Winning Isn't Normal*
2  the book, shirts, or posters.  I didn't see any of that
3  noted on here.  Do you know just by looking at it if
4  this spreadsheet addresses any sales of the *Winning
5  Isn't Normal* book, T-shirts, or posters?
6    A. No, but some of these people joined because of
7  the *Winning Isn't Normal* books.
8    Q. Okay.
9    A. Or have been to one of my seminars.
10    Q. All right.
11    A. Are we done with this one?
12    Q. I think we are, yep.  I'm going to note that
13  one's confidential.  And then --
14    A. This looks like the same, 14.
15    Q. This one looks similar, but it's for the year
16  2015 now and it was produced as Bell 477.  It was also
17  produced confidential under the protective order.  So go
18  ahead and look at that and tell me if this shows -- if
19  you see anything on here that has to do with the *Winning
20  Isn't Normal* book?
21    A. I don't think, so just the same, it has to do
22  with it the same way as the others did.
23    Q. I do actually on this one, I did see some what I
24  thought looked like T-shirt sales and poster sales.

203

1    A. Where's that?
2    Q. So let me point them out to you.
3    A. This is on No. 14?
4    Q. Yeah, Exhibit 14.  So, for example, if you look
5  at the very first line, I mean, below date so I guess
6  the second row under item title and item ID --
7    A. Yeah.  It looks like there's nothing there,
8  though.
9    Q. That it wasn't sold?
10    A. Oh, maybe it was.
11    Q. So it looks like that was maybe six T-shirts on
12  that line for *Winning Isn't Normal?*
13    A. I don't see sizes or color choice.
14    Q. If you keep going across you'll see option one,
15  size large, option two, color choice, black shirt with
16  white print.
17    A. Okay.
18    Q. Let me ask you this.  You didn't create this
19  spreadsheet?
20    A. No.
21    Q. If there's a notation in here that a shirt --
22  that something is a size or a color, I'm assuming we're
23  talking about a shirt, correct?
24    A. Probably if it's the *Winning Isn't Normal* shirt.

204

1    Q. And then I did find a few notations on here that
2  have notations of poster sales.
3    A. Okay.
4    Q. Would those be *Winning Isn't Normal* posters or it
5  could be any other type of poster you sell?
6    A. It looks like on the last page there's payments
7  to Keel Publications for Ts and a poster.
8    Q. Yeah.  So for me to -- for someone to look
9  through this spreadsheet, if it says *Winning Isn't
10  Normal* and has sizes and colors, that's a shirt?
11    A. Yes.
12    Q. If it says poster like the page that you just
13  mentioned, the last page, there's a notation about
14  *Winning Isn't Normal* poster, that would obviously have
15  to do -- that would be a sale of the *Winning Isn't
16  Normal* poster?
17    A. Probably.
18    Q. Okay.  How would I know if one of these -- if it
19  was a book on this spreadsheet because I didn't see any
20  that indicated that it was a book.
21    A. I don't know.
22    Q. Okay.  And then I'll tell you that based on what
23  we just discussed I went through and counted, and I
24  didn't see any books but I counted nine *Winning Isn't*

205

1  *Normal* T-shirts and five *Winning Isn't Normal* posters.
2  Does that sound correct to you for 2015 as far as the
3  number of sales?
4  **A. I don't know.**
5  Q. You don't know, okay. Would this be a
6  comprehensive list for all of the sales of books,
7  T-shirts, and posters from that year?
8  **A. I don't know.**
9  Q. Okay.
10  **A. I think it's more likely that the summer league**
11  **team and maybe our masters team.**
12  Q. So sales from the summer league or masters team?
13  **A. Most likely.**
14  Q. Got you. Okay. Would you have any kind of
15  spreadsheet or record for these years outside of the
16  summer league or the masters teams?
17  **A. The years outside of that?**
18  Q. I said would you have any other records for those
19  sales, the books, the posters, the T-shirts for the
20  years that we just went through, so 2014, 2015 based on
21  total sales, not just related to the summer league or
22  the masters league?
23  **A. I don't think so.**
24  Q. Okay. Do you know why you just kept track for

206

1  the summer and master leagues?
2  **A. I think Sandy kept track for those because she**
3  **was mostly handling those.**
4  Q. Okay. The next one then -- you can put that one
5  aside. The next one is Exhibit 15.
6  (EXHIBIT MARKED FOR IDENTIFICATION.)
7  **A. How long have we been going? I don't know. Who**
8  **is keeping track of that?**
9  Q. What?
10  **A. How much time we've been doing this.**
11  MS. PADGETT: She's keeping track.
12  MR. GERLING: Let's see if we can get done.
13  THE WITNESS: Seven hours is the limit.
14  MS. PADGETT: Not counting breaks.
15  THE WITNESS: I'm just wondering where we are.
16  MR. VALENTINE: We're at 20 after 3:00, so at
17  least you've got another --
18  MS. PADGETT: We're under five hours with breaks
19  so far.
20  Q. (By Ms. Padgett) Exhibit 15 was produced as Bell
21  478. Again, it was marked confidential pursuant to the
22  protective order. This appears to be a similar
23  spreadsheet but for the year 2016; is that correct?
24  **A. I think so.**

207

1  Q. Okay. So same thing as we kind of discussed
2  unless there's a notation of a book, poster, or T-shirt
3  it would have to do with the summer league or the master
4  league you were talking about?
5  **A. Yes.**
6  (EXHIBIT MARKED FOR IDENTIFICATION.)
7  Q. Okay. And then Exhibit 16, which was produced as
8  Bell 479, also confidential under the protective order
9  this looks similar to me except it's labeled 2017; is
10  that correct?
11  **A. I think so, yes.**
12  Q. Okay. And then would the recordkeeping here be
13  the same that unless it's labeled as a book, poster, or
14  shirt it would have to do with the summer league or the
15  masters league?
16  **A. My best guess that's correct.**
17  Q. Okay. And actually for this year I just want to
18  ask if you remember it looked like from my count that
19  you sold about 17 or 18 *Winning Isn't Normal* -- copies
20  of the *Winning Isn't Normal* book; does that sound about
21  correct to you?
22  **A. It could be.**
23  Q. Okay. All right. And again for the years 2016
24  and '17 would you have any other record that would be a

208

1  comprehensive record of your book, poster, T-shirt
2  sales?
3  **A. I don't know.**
4  (EXHIBIT MARKED FOR IDENTIFICATION.)
5  Q. Okay. Let's do Exhibit 17, I think. This was
6  produced as Bell 480 and to me it looks the same but for
7  2018.
8  **A. Yes.**
9  Q. Okay. And so same things that we talked about
10  before?
11  **A. Yes.**
12  Q. It would be labeled as a book, T-shirt, or
13  poster.
14  **A. Yes.**
15  Q. Okay. And do you know whether you have a record
16  of all sales from 2018 for books, posters, T-shirts
17  other than this?
18  **A. I don't.**
19  Q. You don't know?
20  **A. I don't know.**
21  (EXHIBIT MARKED FOR IDENTIFICATION.)
22  Q. Okay. And then Exhibit --
23  **A. 18.**
24  Q. -- 18 which was produced as Bell 481 also marked

209

1  confidential under the protective order, this looks to
2  be the same to me except for January -- I'm sorry, the
3  year 2019?
4      A.  Is this confidential also?
5          MR. GERLING:  Yes.
6      Q.  Yes.
7      A.  I'm sorry, what's the question?
8      Q.  I asked if that's a similar spreadsheet to the
9  others except for the year 2019?
10     A.  It looks like it.
11     Q.  Okay.  And, again, would you have any other
12 separate record for 2019 that would be a comprehensive
13 record of your book, poster, and T-shirt sales?
14     A.  I don't know.
15     Q.  Okay.  So in discovery we did request all
16 documents related to book sales and income from book
17 sales.  Do you know if you have produced -- we've gone
18 through kind of what I had in discovery.  Do you know if
19 you have other records that would be related to book
20 sales and income from book sales?
21     A.  I don't know.
22     Q.  So I would just ask that you add that to the
23 list.  If you do have other records related to book
24 sales or income from book sales other than what we've

210

1  gone through today I would ask that you provide them to
2  your attorneys so that they can produce them, okay?
3      A.  Okay.
4      Q.  Do you want to add it?
5      A.  Huh?
6      Q.  Do you want to add it to your list?
7          MR. GERLING:  I'm keeping a list.  I'll send you
8  an email that you can confirm if there's more.
9          MS. PADGETT:  Okay.
10     Q.  (By Ms. Padgett) You also claimed in written
11 discovery that you have reduced revenue, that as a
12 result of your claims in this lawsuit that you have
13 experienced reduced revenue from speaking engagements.
14     A.  Yes.
15     Q.  Are we talking only about speaking engagements
16 related to Winning Isn't Normal book or passage, or are
17 you talking about any speaking engagement that you would
18 have been asked to do?
19     A.  I don't know how to separate that.
20     Q.  Okay.
21     A.  They're all interrelated.
22     Q.  All right.  How did your revenue from speaking
23 engagements decrease from the Worthington City School
24 District's alleged use of the Winning Isn't Normal

211

1  passage?
2      A.  I'm trying to figure out how to answer that.
3      Q.  That's fine.
4      A.  I don't have any direct evidence, I don't think,
5  but I think that they've just decreased, and I believe
6  if people don't buy my books because they can get it for
7  free then that's the large part of how I got speaking
8  engagements before.
9          If people have any doubts about whether I was the
10 author of that, then I think that a lot of people get
11 uncomfortable with that and just go away.  I think that
12 there are similar issues that are tied in to the
13 reputation that I have that generates or generated
14 speaking engagements and the other stuff that it
15 generates and they're all interactive.
16     Q.  When did you first notice the number of speaking
17 engagements that people were asking you to come do, when
18 did you first notice that decreasing?
19     A.  Decreasing?
20     Q.  Yeah, the number of speaking engagements.
21     A.  I don't know.
22     Q.  Was it before the year 2000?
23     A.  Before the year 2000, no.
24     Q.  Before the year 2005?

212

1      A.  No, I don't think so.
2      Q.  Before year 2010?
3      A.  Perhaps.
4      Q.  So maybe sometime around 2010 or at least between
5  2005 and 2010 you noticed it starting to decrease?
6      A.  Probably.
7      Q.  Okay.  And then have you noticed it continue to
8  decrease since that time frame as well?
9      A.  I think so.
10     Q.  At a faster rate or a similar rate since 2005,
11 2010?
12     A.  I don't know right now.
13     Q.  Okay.  Do you keep track of the number of
14 speaking engagements that you do in a year?
15     A.  No.
16     Q.  Have you ever kept track?
17     A.  Well, you know I produced that partial list.
18     Q.  Yeah, so that's fair.  Besides that partial list
19 have you ever kept a comprehensive list of your --
20     A.  I don't think so.
21     Q.  Okay.  Of your speaking engagements.  Did you
22 ever keep track of the revenue that you received from
23 speaking engagements?
24     A.  I don't think so.

Deposition of Keith Bell, Ph.D.

213

1 Q. Okay. So you wouldn't have any documents related
2 to speaking engagements or your income from speaking
3 engagements from any time period?
4 A. Probably not.
5 Q. Okay.
6 A. It all gets mixed together.
7 Q. Okay. You also claimed in written discovery that
8 you've experienced reduced revenue from poster sales as
9 a result of your allegations against the Worthington
10 City School District. Let me ask you first, is the only
11 poster that you sell the *Winning Isn't Normal* poster or
12 do you sell others as well?
13 A. I sell others as well.
14 Q. Okay. So are you for this claim about reduced
15 revenue from poster sales, are you only talking about
16 poster sales related to the *Winning Isn't Normal*
17 passage?
18 A. I think so.
19 Q. Okay. Are the only posters that you sell with
20 the *Winning Isn't Normal* passage for sale on your
21 website or are they sold elsewhere?
22 A. Well, they've been sold in person. I don't know.
23 Q. I saw currently only two poster options on your
24 website. Are there more that are available?

214

1 A. There were. I don't know if there still are now.
2 I'm not sure what's on there now.
3 Q. Okay.
4 A. We've sold parenting posters and the lacrosse
5 posters for *Winning Isn't Normal* and team policy
6 posters.
7 Q. When did you first start selling posters?
8 A. I think around 2013. I'm not sure.
9 Q. Has the cost of those changed over time?
10 A. Yes, I think so and I think partially depending
11 on the size.
12 Q. Okay. How did your revenue from poster sales
13 decrease from Worthington City School District's alleged
14 use of the passage?
15 A. I don't know for sure.
16 Q. You don't know how your revenue has decreased
17 from their use, correct?
18 A. I just answered that, correct.
19 Q. I just want to make sure I understood what your
20 answer was. Do you know what revenue you received from
21 poster sales over like from year to year?
22 A. No, it's not been huge.
23 Q. It's not what?
24 A. Been huge.

215

1 Q. Okay. Do you know about how much it usually is?
2 A. No.
3 Q. Have you ever kept track of the number of poster
4 sales or revenue from poster sales?
5 A. I don't think so.
6 Q. Okay. You also claim reduced revenue from other
7 revenue streams and it's classified as other revenue
8 streams.
9 A. Yep.
10 Q. What other revenue streams are you referring to?
11 So just to go back over what we've discussed, we
12 discussed specifically social media licensing revenue?
13 A. Yep.
14 Q. Book sale revenue?
15 A. Uh-huh.
16 Q. Speaking engagements?
17 A. Uh-huh.
18 Q. Poster sales and then you had a kind of catchall
19 and other revenue streams. So besides those that we've
20 just discussed, what other revenue streams?
21 A. My consulting stuff is -- sometimes it's
22 individual telephone counseling. Sometimes it's in
23 person. Sometimes it's taken various forms.
24 Q. When you're consulting or doing the speaking

216

1 engagements, are you showing up just reading the passage
2 and leaving, or are you doing other stuff?
3 A. I'm doing other stuff as well most of the time.
4 Q. Okay. So where you're saying now consulting
5 stuff with individuals, I want to make sure I
6 understand. You're claiming that you've lost revenue
7 for consulting with individuals as a result of
8 Worthington City School District's alleged use of the
9 passage?
10 A. I think so, yes.
11 Q. Okay. How did your revenue from consulting with
12 individuals decrease from Worthington City School
13 District's alleged use of the passage?
14 A. I think that when people can get it for free via
15 illegal posts and it doesn't have the information that
16 products exist or consultations exist that that damages
17 my revenue stream because that's how I often get those
18 benefits from that, and when everyone does it, it's a
19 huge problem.
20 Q. How do people find you for consulting jobs?
21 A. How do they find me for consulting jobs?
22 Q. Yeah.
23 A. From my speaking engagements, from sales of my
24 books, from my competitive stuff, from my coaching, from

217

1  other consultations, word of mouth and sometimes I just
2  plain don't know how they got to me.
3     Q.  Okay.
4     A.  Some of them are really strange from people I've
5  never heard of or know nothing about.
6     Q.  So I just want to try to understand how you think
7  that your -- how Coach Souder reading the passage and
8  Sean Luzader posting the tweet, how specifically do you
9  think those two things have resulted in a decrease of
10 revenue from consulting?
11    A.  I think I just said that, but, for example, when
12 someone contributes to my work being available for free
13 without proper CMI, without telling people where they
14 can get these books and services exist, that they exist
15 or where they can get them then I've lost a tremendous
16 amount of opportunity, and the more people that do that,
17 the more damaging it is.
18    Q.  Have you looked into the possibility of whether
19 it has actually helped and has essentially been
20 advertising that maybe reaches someone that wouldn't
21 have known otherwise?
22    A.  Well, I've asked people, when they've suggested
23 that I've asked them to give me a list of who has come
24 to me because of their posts, and I don't ever get it.

218

1     Q.  Well, and I'm not -- you're the one keeping track
2  of what you're doing as far as consulting or speaking or
3  selling, so I'm asking have you looked into that, have
4  you looked into whether sales have actually increased
5  when people have read or used a copy, particularly when
6  they are attributing it to you so that maybe it reaches
7  someone who wouldn't have otherwise known about you or
8  the passage?
9     A.  I think it's unbelievably unlikely.
10    Q.  Have you kept track of that?
11    A.  Do I have data on it, no.
12    Q.  Okay.  Have you kept track of your revenue from
13 consulting engagements over the course of years?
14    A.  I don't think so.
15    Q.  Okay.  So do you have any evidence or
16 documentation that shows that you have had reduced
17 revenue for consulting based on people's use of the
18 passage?
19    A.  I don't think I could possibly have that.  I
20 don't know.
21    Q.  Okay.  Similar to your speaking engagements I
22 asked you when you first started noticing those
23 decreasing.  When did you first notice your consulting
24 work start to decrease, would it have been that same

219

1  time frame, about 2005 to 2010?
2     A.  Could be.  I think it's also -- I stopped writing
3  because people were stealing from my books.  My writing
4  really helped all of my businesses.
5     Q.  Okay.  When did you stop -- your last book was?
6     A.  2005.
7     Q.  2005.  Okay.  So you stopped writing at that
8  point because people had started posting and using the
9  passage?
10    A.  (Witness nods head.)
11    Q.  Is that yes?
12    A.  Yes, illegally.
13    Q.  Besides those reduced revenue streams that we
14 just went through, are you claiming any other alleged
15 damages or loss of revenue as a result of the claims
16 that you have against Worthington City School District?
17    A.  Potential damages, yeah, I think they're huge.  I
18 have children and a wife who will inherit my copyright
19 when I die and who are interested in the business
20 presently, and after I die they have 70 years worth of
21 the rights to my work, and I think judging by how much
22 has been stolen that there's a huge potential market for
23 my work and which is certainly relevant for statutory
24 damages.

220

1     Q.  I'm asking specifically with regard to the claims
2  you have against Worthington City School District, are
3  there any other alleged damages you have or are making
4  against Worthington City School District for the claims
5  that you have against the school district, not all the
6  others, just the school district, Worthington City
7  School District?
8     A.  They've contributed to that.
9     Q.  And you have agreed that to your knowledge
10 they're not currently posting or using the work?
11    A.  To my knowledge.
12    Q.  Okay.  And to your knowledge, Coach Souder read
13 it to a basketball team one time, to your knowledge,
14 correct?
15    A.  As far as I can recall right now.
16    Q.  And to your knowledge and based on your claims
17 Sean Luzader had a retweet posted for potentially up to
18 three months, correct?
19    A.  I think so.
20    Q.  Okay.  To your knowledge, has there been any
21 other use by Worthington City School District, any of
22 its administration, its board of education or any other
23 employee, to your knowledge?
24    A.  I don't think so.

221

1    Q.  Okay.
2    A.  Yet.
3    Q.  So as far as alleged damages for your claims
4  against Worthington City School District at this time
5  we've talked about all of your alleged damages; is that
6  correct?
7    A.  I don't know.
8    Q.  We've talked about social media licensing.  We've
9  talked about book sales, poster sales, speaking
10  engagements, consulting engagements, I think that might
11  be all, and then your claim about your family's
12  inheritance, book sales, poster sales, I think I said
13  that, any other claimed damages or lost revenue?
14    A.  Not that I'm thinking of right now.
15    Q.  Okay.  You have settled -- you originally named
16  Worthington City School District and Caught My Eye
17  Photography in this lawsuit, correct?
18    A.  Yes.
19    Q.  And you have settled with Caught My Eye
20  Photography?
21    A.  Yes.
22    Q.  And we've already discussed and covered what you
23  believe Caught My Eye Photography did with regards to
24  your *Winning Isn't Normal* passage, correct?

222

1    A.  Some of it, yeah.
2    Q.  Okay.  Do you claim that they did -- Caught My
3  Eye Photography did other stuff other than what we've
4  talked about?
5    A.  I don't know.
6    Q.  Okay.  Do you have written communications with
7  Caught My Eye Photography and/or Brenda Kerns?
8    A.  Me being me?
9    Q.  You.
10    A.  I don't think so.
11    Q.  Would any of the communication with Caught My Eye
12  Photography or Brenda Kerns have been through your
13  attorneys?
14    A.  I think that's confidential.
15    Q.  It's not.  I'm not asking you what they
16  communicated.  I'm asking has all of the communication
17  between Caught My Eye Photography and/or Brenda Kerns
18  been with your attorneys?
19    A.  I think so.
20    Q.  Okay.  Earlier and in discovery you have
21  indicated that Brenda Kerns will testify that she heard
22  Coach Souder read it to the basketball team, correct?
23    A.  Say that again.
24    Q.  Earlier today and in your written discovery

223

1  responses you have indicated that Brenda Kerns will
2  testify that she was present and heard Coach Souder read
3  it to the basketball team, correct?
4    A.  I think that's correct.
5    Q.  You have not talked to her yourself specifically
6  about anything that she knows with regards to the
7  Worthington City School District?
8    A.  I don't think so --
9    Q.  Okay.
10    A.  -- to the best of my memory right now.
11    Q.  Do you know of any other information that she has
12  claimed about Coach Souder using it other than that she
13  heard him read it?
14    A.  Not that I recall right now.
15    Q.  Okay.  And you settled your claims against Caught
16  My Eye Photography in this lawsuit for $6,000, correct?
17    A.  I think that's correct, yes.
18    Q.  Okay.  And as part of that -- so you've produced
19  that settlement agreement in discovery.  As part of that
20  settlement Caught My Eye Photography and Brenda Kerns
21  agreed to cooperate with you in this lawsuit; is that
22  correct?
23    A.  That's my understanding, correct.
24    Q.  And she agreed to participate in an interview

224

1  with your attorneys and provide information related to
2  the lawsuit; is that correct?
3    A.  That's my understanding.
4    Q.  Do you know if she has done that?
5    A.  I don't know.
6    Q.  Okay.  Do you know if --
7      MR. GERLING:  I don't know that either.
8    Q.  Do you know if that interview was recorded
9  somehow?
10    A.  I don't know.
11    Q.  As part of that settlement Caught My Eye
12  Photography and Brenda Kerns agreed to preserve and
13  produce documents to you related to your claims against
14  the Worthington City School District; is that correct as
15  well?
16    A.  I don't know.
17    Q.  Okay.  Has she provided you with any documents
18  related to your claims against the Worthington City
19  School District?
20    A.  I don't know.
21    Q.  As part of that settlement agreement Caught My
22  Eye Photography and Brenda Kerns agreed to prepare and
23  execute a sworn declaration related to your allegations
24  in this lawsuit; is that correct as well?

225

1  A. I don't know.
2  Q. Has she done that?
3  A. I don't know or don't remember.
4  Q. Both?
5  A. Yes.
6  Q. Don't know, don't remember. As part of the
7  settlement Caught My Eye Photography and Brenda Kerns
8  also agreed to participate and testify either during a
9  deposition or at trial; is that your understanding as
10 well?
11 A. I think so, but I'm not sure.
12 Q. Okay. Have you requested her testimony yet?
13 A. I don't know.
14 Q. Okay. I think we talked a little bit earlier
15 about the cases or the number of cases you have pursued
16 either pre-suit or in court. We talked about the ones
17 you pursued in court. Do you keep track of the cases
18 you pursue pre-suit?
19 A. Do I keep track of them?
20 Q. Yes.
21 A. Meaning what?
22 Q. Who it involves, the outcome of those attempts at
23 communicating with them and resolving an issue,
24 settlement agreements?

226

1  A. Most of the settlement agreements as I recall are
2  confidential.
3  Q. So to the extent that any involved public
4  entities, like schools, public schools, other public
5  entities they wouldn't be because those would be public
6  record. So my question was do you keep track of the
7  entities you pursue pre-suit and the outcome of those?
8  A. I think so.
9  Q. Okay. So in discovery we had requested not just
10 the list of current and past lawsuits but also the
11 people, at least to the extent that they're public, the
12 entities that you've settled with pre-suit or as a
13 result of a lawsuit. And we have not yet gotten that,
14 so if you could add that to your list since you do keep
15 track and provide that information or documentation to
16 your attorney then he can produce it. Okay?
17 A. Yes.
18 Q. Okay.
19 A. I don't think you're correct about
20 confidentiality.
21 Q. Okay. Did you go to law school?
22 A. No.
23 Q. Are you an attorney?
24 A. No.

227

1  Q. Okay. Have you gone to trial in any of the cases
2  that you filed in court?
3  A. No.
4  Q. So none of your cases that you have filed have
5  resulted in a verdict through trial?
6  A. No, I've had -- yeah, that's correct, no.
7  Q. Okay. And my understanding from earlier is as we
8  sit here today you don't know the total amount that you
9  have received through settlements either pre-suit or in
10 litigation?
11 A. That's correct.
12 Q. Do you know like a range, an approximate range of
13 settlement?
14 A. I wouldn't want to venture a guess.
15 Q. Is it under 1 million?
16 A. I wouldn't want to venture a guess.
17 Q. Okay. But you do have documentation of that?
18 A. I think probably.
19 Q. Okay. So when you get home and have a chance to
20 look for it, if you find it, provide it to your attorney
21 so he can produce it, okay? Yes?
22 A. What's the it?
23 Q. Documentation of settlements.
24 A. Okay.

228

1  Q. What percentage of your income for the *Winning*
2  *Isn't Normal* book and the related products is from sales
3  versus the percentage from litigation?
4  A. I don't know.
5  Q. You don't know the breakdown between actual sales
6  versus settlements or litigation?
7  A. No.
8  Q. Okay. Let me show you, you produced -- these
9  were attached to a pre-suit letter that you sent to the
10 Worthington School District or your attorneys sent to
11 Worthington School District. We'll mark this as 19.
12     (EXHIBIT MARKED FOR IDENTIFICATION.)
13 Q. Go ahead and take a look at that. It was
14 attached to a letter that your attorney sent to the
15 school district pre-suit.
16 A. Okay.
17 Q. Did you create these lists?
18 A. I'm sorry?
19 Q. Did you create these list?
20 A. Did I what, create these lists, I don't think so,
21 certainly not in that form, but I'm not positive.
22 Q. Would you agree with me at least for the one
23 that's marked Exhibit A, which is on page 2 of this
24 document, that's not a complete list of complaints you

229

1  have filed to enforce your intellectual property rights;
2  is that correct?
3      A.  Yes, it's not up to date, that's correct.
4      Q.  And then what about Exhibit B is a list of
5  settlements resulting from enforcement of intellectual
6  property rights.  Would you agree that that's also not a
7  complete list of settlements that you have obtained?
8      A.  Yes, that's not up to date.
9      Q.  Okay.  So this list I totaled comes to $272,706.
10  Does this list and that total help you figure out any
11  more as we sit here today what total you've received in
12  settlements?
13      A.  No.
14      Q.  Okay.  But we know it's at least more than
15  $272,706?
16      A.  I guess so.
17      Q.  Okay.  You've identified some witnesses --
18  actually, let me ask you this.  The records, we talked a
19  little bit about your wife keeping track of your record.
20  Does she keep electronic or paper copies of those
21  records?
22      A.  I think -- I don't think she does either.
23      Q.  How are the records kept?
24      A.  The records are kept by -- records of what?

230

1      Q.  Your sales, your income from --
2      A.  Income?
3      Q.  Yeah.
4      A.  We keep track of income.
5      Q.  What did you say?
6      A.  We keep track of income, not necessarily where it
7  came from.
8      Q.  Okay.
9      A.  Our many sources of income.
10      Q.  Do you keep track -- we've gone through several
11  documents where you were keeping track of sales of
12  books, posters, T-shirts, speaking engagements, that
13  kind of thing.  How do you keep those records?  How do
14  you preserve those records?
15      A.  We keep track of deposits.
16      Q.  How do you keep track of sales?
17      A.  We keep track of deposits, how much income we
18  have.
19      Q.  When you say deposits, are you talking about bank
20  deposits?
21      A.  Uh-huh.
22      Q.  The types of records that you have produced in
23  this case that we have gone through today, where do you
24  keep those types of records?  How do you keep them?

231

1      A.  I think I have a list on my computer of those.
2      Q.  Okay.  So you keep electronic copies of those
3  records?
4      A.  Yes.
5      Q.  Which was my original question.
6      A.  Okay.
7      Q.  Do you have paper copies of records somewhere as
8  well?
9      A.  I don't know.
10      Q.  Okay.  We provided and we've talked about some of
11  the discovery requests that we provided in this lawsuit.
12  Did you review your records to respond to those
13  discovery requests?
14      A.  I think so.
15      Q.  Okay.  Are there some records that you have that
16  you did not review in gathering documents to respond to
17  those requests?
18      A.  I don't think so.
19      Q.  Okay.  So there are just certain records that we
20  requested that we've gone through and we've got a list
21  today that we requested and you have but have not yet
22  produced?
23      A.  I don't know.
24      Q.  Okay.  But you've got the list and you're going

232

1  to go home and try to find those records, correct?
2      A.  Yes.
3      Q.  Okay.  You identified some witnesses in
4  discovery.  You're one of them.  Is there anything else
5  other than what we've talked about today that you know
6  related to your claims against the Worthington City
7  School District or that you plan to testify to about
8  those claims that we haven't covered today?
9      A.  Can you tell me who the witnesses were?
10      Q.  I'm asking you specifically.  You have identified
11  yourself as a witness.  I'm asking if there is anything
12  you know that you plan -- that you know or plan to
13  testify about as far as your claims against the
14  Worthington City School District that we have not
15  discussed?
16          MR. GERLING:  Objection.
17          You can answer.
18      A.  I don't recall.
19      Q.  Is there anything else that you know with regards
20  to your claims against the Worthington City School
21  District that we haven't covered today?
22          MR. GERLING:  Same objection.
23          You can answer.
24      A.  I think so, but I think it's attorney privilege,

233

1 client privilege.
2 Q. So we've talked about everything that you know
3 with regards to your claims against the Worthington City
4 School District except for things that you think are
5 privileged?
6 A. I think so.
7 Q. Okay. You've identified Brenda Kerns as a
8 witness. Have we discussed everything that you know
9 that she knows with regards to the claims against the
10 Worthington City School District?
11 A. I think so.
12 Q. You identified Coach Souder and Sean Luzader as
13 witnesses.
14 A. Yes.
15 Q. I know you haven't talked to them personally, but
16 I'm assuming that you expect them to testify about their
17 use of the passage?
18 A. Yet to be determined, but I think so.
19 Q. Okay. You identified Marcus Reading, is it
20 Reading or Reading?
21 A. Reading.
22 Q. Reading as an expert witness in this lawsuit.
23 A. Yes.
24 Q. Okay. And from his report it looks like he's

234

1 conducted or done a damages calculation with regards to
2 the licensing fees, correct?
3 A. I think so from his general report.
4 Q. Have you worked with Marcus Reading in other
5 lawsuits?
6 A. No.
7 Q. Just this one?
8 A. So far I think.
9 Q. Do you know if any of your attorneys that you've
10 had through the course of this lawsuit have worked with
11 him on other cases?
12 A. I don't know.
13 Q. Okay. Have you used other damages experts in
14 litigation besides Marcus Reading?
15 A. No.
16 Q. And do you know how he got the information to do
17 his calculations or his report?
18 A. Through my attorney.
19 Q. Okay. Did you directly provide him any
20 information?
21 A. I don't think so.
22 Q. Okay. You also identified James Callahan as on
23 expert or not as an expert, as a witness?
24 A. Yes.

235

1 Q. And you have identified that he'll be able to
2 testify regarding your reputation in the Worthington
3 School District.
4 A. Okay.
5 Q. Is there anything else that you expect him to
6 testify about?
7 A. I think about my general reputation in Ohio
8 specifically and in the swimming world.
9 Q. He was the or a former swimming coach for
10 Worthington School District; is that correct?
11 A. That's my understanding.
12 Q. Have you talked to him about your claims in this
13 lawsuit?
14 A. No.
15 Q. Do you know what information, if any, that he has
16 about your claims in this lawsuit?
17 A. Do I know about any information that he has what?
18 Q. Related to your claims in this lawsuit?
19 A. Yeah, I think he has information about my
20 reputation and about clinics he's attended that I spoke
21 at and things like that.
22 Q. Okay. You produced some other documents. There
23 were Facebook posts or blog posts that mentioned you or
24 mentioned the *Winning Isn't Normal* quote. Do you know

236

1 why you produced those?
2 A. I don't know what exactly they were right now.
3 Q. Okay.
4 A. But it may have been having to do with my
5 reputation.
6 Q. Okay. Did you produce any posts where you
7 believe that somebody was infringing on the posts and
8 you went after them for that infringement?
9 A. I don't know. I don't remember.
10 Q. Okay. I don't think I'm going to make these, but
11 I just want to go through these quickly. Here is one
12 post that you produced, and it's marked Bell 335 if you
13 can take a look at that.
14 A. Okay.
15 Q. Are you claiming that this post is related to
16 your claims against Worthington City School District or
17 this lawsuit?
18 A. I don't know. I don't recall why this was
19 produced.
20 Q. Did you pursue a claim for copyright or trademark
21 infringement against this person?
22 A. No.
23 Q. Did this person pay a licensing fee to post this
24 quote?

237

1    A.  No.

2    MS. PADGETT:  I think I'm going to change my

3 mind.  We'll mark that as Exhibit 20.

4    (EXHIBIT MARKED FOR IDENTIFICATION.)

5    Q.  And then here is a blog post.  Take a look at

6 that.  The first page is marked Bell 354.

7    A.  Yes.

8    Q.  All right.  Are you claiming that this blog post

9 is related to this lawsuit or the claims you have

10 against Worthington City School District?

11    A.  Yes.

12    Q.  How?

13    A.  I think the issue of whether I was

14 internationally known.

15    Q.  Okay.  So this blog post from when, 2014, is the

16 only date I see on it, nope, 2007 you're claiming that

17 that goes to your claim that you are internationally

18 known?

19    A.  Correct.

20    Q.  Does it have anything else to do with this

21 lawsuit or your claims against the Worthington City

22 School District?

23    A.  It has to do with the fact that the people are

24 using *Winning Isn't Normal.*

238

1    Q.  Did this person pay a licensing fee to post this

2 quote?

3    A.  No.

4    Q.  Did you pursue a claim against this person?

5    A.  No.

6    MS. PADGETT:  All right.  Let's mark this as

7 Exhibit 21.

8    (EXHIBIT MARKED FOR IDENTIFICATION.)

9    Q.  You produced this, and the first page is labeled

10 Bell 364.  Go ahead and take a look at that.

11    A.  Yes.

12    Q.  Are you claiming that this Facebook post is

13 related to your claims in this lawsuit against the

14 Worthington City School District?

15    A.  Yes.

16    Q.  How?

17    A.  Same way as the last one.

18    Q.  That it shows that you're internationally known?

19    A.  Yes.

20    Q.  Is it related in any other way to this lawsuit?

21    A.  Yes, I think it reflects the important -- the

22 value of my work.

23    Q.  Okay.  Simply because somebody posted it on

24 Facebook that represents the value of your work?

239

1    A.  It represents that there's some value to it where

2 he says "I saw a fantastic quote on the way back *Winning*

3 *Isn't Normal.*"

4    Q.  Okay.  Did this person pay a licensing fee to

5 post this?

6    A.  No.

7    Q.  Did you pursue a claim against this person?

8    A.  No.

9    Q.  Okay.  So the way that this Facebook post

10 provided value is that he specifically said that it was

11 a fantastic quote; is that correct?

12    A.  That's one of the ways, yeah.

13    Q.  How else did it provide value?

14    A.  That it's known, I'm known internationally and

15 that people pick it up without getting it from me.

16    Q.  So what's the distinction between this Facebook

17 post and the Five-Star Basketball tweet or Sean

18 Luzader's retweet?

19    A.  I don't understand.  There's lots of differences.

20 What do you mean?

21    Q.  How do you think that this shows you're

22 internationally known and adds value to your work but

23 those other two don't?

24    A.  This one is a Canadian, and the other one is New

240

1 Zealand.

2    Q.  So --

3    A.  The ones on this particular case support the fact

4 that I'm known nationally.

5    Q.  Okay.  And then how does this Facebook post

6 represent the value of your work but the posts by

7 Five-Star Basketball or Sean Luzader does not?

8    A.  They represent that my work is valuable, valuable

9 enough for them to take it and its credit.

10    MS. PADGETT:  We'll mark this one as Exhibit 22.

11    (EXHIBIT MARKED FOR IDENTIFICATION.)

12    MS. PADGETT:  And this will be Exhibit 23.

13    (EXHIBIT MARKED FOR IDENTIFICATION.)

14    Q.  (By Ms. Padgett) This was produced by you in

15 discovery.  It's marked Bell 351.  What is this from,

16 this quote?

17    A.  I think it's from some settlement agreements.

18    Q.  Okay.  You're not claiming that it's from any

19 agreement between you and the Worthington City School

20 District, are you?

21    A.  We don't have any agreement.

22    Q.  Okay.  I just wanted to make sure.  You also

23 produced this document that's labeled Bell 353, and it

24 will be Exhibit 24.

241

1     (EXHIBIT MARKED FOR IDENTIFICATION.)
2    **Q.** Take a look at that. What is this quote from?
3    **A. The same.**
4    **Q.** The same what?
5    **A. Been used in settlement agreements.**
6    **Q.** So, again, you're not claiming this from any
7 agreement between you and the Worthington City School
8 District, are you?
9    **A. No. I'm not sure why those have been produced.**
10    **Q.** Okay. You produced -- sorry, it's Bates stamped
11 starting at 378. We'll mark it as Exhibit 25.
12    (EXHIBIT MARKED FOR IDENTIFICATION.)
13    **Q.** It's a letter from your pre-suit attorneys to
14 Brenda Kerns. Have you seen this letter before?
15    **A. Yes.**
16    **Q.** There's a reference in here to a telephone
17 conference with her on February 2nd, 2017. Were you
18 present on that telephone conference?
19    **A. No.**
20    **Q.** So you don't know what was discussed during that
21 conference?
22    **A. No. I don't know why this was produced either.**
23    **Q.** When Brenda Kerns told you that Coach Souder had
24 read it to the basketball team, was that the first time

242

1 you became aware that Coach Souder had read it to the
2 basketball team?
3    **A. I don't recall.**
4    **Q.** Okay. In this letter it notes that after that
5 she searched the internet and found numerous results
6 showing the passage, some that attributed it to you and
7 some that did not. Did you work with her at all to
8 determine which results didn't attribute it to you?
9    **A. No.**
10    **Q.** But then at least as early as February 2017 you
11 knew that there were copies online that didn't attribute
12 the Winning Isn't Normal passage to you?
13    **A. Correct.**
14    **Q.** And you knew before February 2017 that there were
15 copies online that didn't attribute the passage to you?
16    **A. Is that the same question?**
17    **Q.** No, it's different. The one was February 2017.
18 I'm asking before February 2017 you were also aware that
19 there were copies online that didn't attribute it to
20 you?
21    **A. That did not?**
22    **Q.** Correct.
23    **A. Yes.**
24    **Q.** Okay. In this letter your attorneys indicate

243

1 that they did not find any copies online that attributed
2 it to Coach Souder. To date up to the present have you
3 found any copies online of the Winning Isn't Normal
4 passage that attributes it to Coach Souder?
5    **A. I don't think so.**
6    **Q.** Okay. Besides the one that was originally on
7 Brenda's website?
8    **A. Yes.**
9    **Q.** Did Brenda ever explain why she attributed it to
10 Tom Souder on her website?
11    **A. I don't think so, but I don't know.**
12    **MS. PADGETT:** Okay. All right. We'll make this
13 one Exhibit 26.
14    **(EXHIBIT MARKED FOR IDENTIFICATION.)**
15    **Q.** This was produced and Bates stamped Bell 442. Go
16 ahead and take a look at that.
17    **A. Okay.**
18    **Q.** How is this email -- and it's dated January 21st,
19 2019. How is that email related to this lawsuit and
20 your claims against the Worthington City School
21 District?
22    **A. Well, it supports that reading Winning Isn't**
23 **Normal has contributed to someone's belief that it's**
24 **contributed to his success and enough that he wanted to**

244

1 **share it with his children.**
2    **Q.** And I see where he says in the email, and I don't
3 know who sent this email because it's redacted, but he
4 says that he has enjoyed sharing Dr. Bell's knowledge
5 with his kids.
6    **A. Yes.**
7    **Q.** He also talks about their program that's quickly
8 growing with excellent leadership and that he looks
9 forward to sharing your, Dr. Bell's, experience with the
10 kids as they progress and grow. Do you know what
11 program he's talking about?
12    **A. No, I know a lot of Johns.**
13    **Q.** Did you assume he's talking about some sports or
14 swimming program?
15    **A. Yeah, I assume it's a swimming program or I**
16 **assume that it's one they work with and they purchase**
17 **books.**
18    **Q.** Besides the note in here that he purchased books,
19 do you know of any other work or involvement you've had
20 with this particular person who sent the email?
21    **A. I don't know who it was.**
22    **Q.** Okay. So all we know from this email is that he
23 purchased some books?
24    **A. I don't know.**

245

1    Q. Is there anything else you know that this person
2 has purchased from you or paid you to do?
3    A. Well, I would guess that it's someone that I did
4 a seminar for.
5    Q. And what's that based on?
6    A. I don't know for sure.
7    Q. Why do you think you did a seminar?
8    A. Just where it says he looks forward to sharing my
9 expertise with the kids.
10   Q. So you read into that line that you may have done
11 a seminar?
12   A. Yeah, I probably did.
13   Q. Or that maybe in the future after this email you
14 were going to do a seminar?
15   A. I think it's the former, but I don't know for
16 sure.
17   Q. Okay. Did you have any problems with him
18 purchasing copies of the book and sharing it with others
19 or sharing your knowledge in the books with others?
20   A. Well, I think it's more likely that he shared
21 something from a seminar.
22   Q. So the sentence is "I did receive the books and I
23 have enjoyed sharing Dr. Bell's knowledge with my kids."
24 Assuming he's sharing books or information in the books,

246

1 do you have any issues with that, with him sharing it
2 with kids or his team, whatever team he coaches?
3    A. Apparently not, I don't think so.
4    Q. Okay. Would you have any problem with someone
5 purchasing the *Winning Isn't Normal* book and then
6 sharing it with others to read?
7    A. Performing it in public, yes.
8    Q. Not performing, just sharing a copy to read?
9    A. Oh, no, if they bought the book and they want to
10 lend it to somebody to read, I don't have a problem with
11 that.
12   Q. Okay. I talked a little bit earlier about how
13 you keep products that you sell, books, shirts, posters,
14 and you said some of it you actually have a supply, some
15 of it you order on demand. When you have a supply, do
16 you keep it at your home/business address or do you keep
17 it somewhere else?
18   A. Home/business address.
19   Q. Okay. Do you keep an inventory of the items that
20 you have in stock?
21   A. I don't think so.
22   Q. Okay. So that's not something you could produce?
23   A. No.
24   Q. Have you reviewed -- so the Worthington City

247

1 School District provided discovery responses in this
2 case. Have you reviewed those responses?
3    A. Not recently.
4    Q. But at some point?
5    A. I think I may have.
6    Q. Okay. Do you have any relevant recordings,
7 videos, or pictures related to your claims against the
8 Worthington City School District in this lawsuit?
9    A. Recordings, pictures or what?
10   Q. Videos.
11   A. Yes.
12   Q. What do you have?
13   A. I have pictures of the posting.
14   Q. The retweet?
15   A. Yeah.
16   Q. Okay. Besides that picture, do you have any
17 recordings, videos, or pictures related to your claims
18 against the school district in this lawsuit?
19   A. The same kind of thing as the ones that were
20 taken of Caught My Eye's post.
21   Q. On her website?
22   A. Yeah.
23   Q. Okay. Anything else?
24   A. Not that I can think of.

248

1    Q. Have you kept any notes or a timeline or a diary
2 of events related to your claims in this lawsuit against
3 the school district?
4    A. No.
5    Q. Besides the witnesses that we just went through
6 and that you've previously identified, do you know of
7 any other witnesses who would have information related
8 to your claims against the school district in this
9 lawsuit?
10   A. Not that I know of right now.
11   Q. And I think I asked this already, but you do not
12 know the percentage of income from your books, T-shirts,
13 and posters versus percentage of your income from
14 lawsuits, litigation, and settlements?
15   A. No, I don't know.
16   Q. Are there any other documents besides I know the
17 list you've got that you're going to look for, any other
18 documents that you know that you have that are related
19 to your claims against the Worthington City School
20 District that you haven't produced and we haven't
21 discussed today?
22   A. I don't know.
23     MS. PADGETT: Okay. Do you want to take a quick
24 break?

249

1    MR. GERLING: Sure.
2    (Recess taken.)
3    MS. PADGETT: Back on.
4    Q. (By Ms. Padgett) I have just a few follow-up
5    questions that I want to make sure I understand your
6    earlier testimony.
7        My understanding is that with regards to your
8    claim about lost book sales related to the tweet or
9    Coach Souder's reading of the passage that you do not
10   have any facts or documents to support that claim of
11   lost book sales, correct, as a direct result?
12   A. I don't think so as I recall right now.
13   Q. Okay.
14   A. Other than what I said before.
15   Q. Other than what you thought?
16   A. Other than what I said before.
17   Q. Okay. And you don't have any facts or documents
18   to support your claim that either the Sean Luzader's
19   tweet or the reading by Coach Souder resulted in lost
20   sales of posters, mugs, shirts as well, correct?
21   A. Not that I can recall right now.
22   Q. So what you're saying is as you sit here today
23   you cannot think of any facts or documents to support
24   that claim?

250

1    A. I can't think of any that I remember right now.
2    Q. And then as we sit here today, with regards to
3    your claim about a decrease in revenue for speaking or
4    consulting engagements you do not have any facts or
5    documents to support that claim with regards to the
6    tweet or the reading by Coach Souder, correct?
7    A. As I recall today, that's correct.
8    Q. When you went through to provide documents to
9    respond to your discovery requests did you review all of
10   the documents that you thought you had that would be
11   responsive to those requests?
12   A. I don't recall. I think so.
13   Q. And as you were reviewing those you did not see
14   any documents that would support your claim of lost
15   revenue from book sales, posters, mugs, T-shirts,
16   speaking engagements or consulting engagements related
17   to the Sean Luzader's tweet or Coach Souder's reading of
18   the passage?
19   A. As I recall, I don't think I had any that I
20   recognized as immediately relevant.
21   Q. Okay. So we've kind of --
22   A. Sorry.
23   Q. Go ahead.
24   A. Or that I hadn't provided.

251

1    Q. And we've gone through all those documents that
2    you've provided that would be related to sales or income
3    today, correct?
4    A. I think there are issues of attorney/client
5    privilege.
6    Q. With the documents that we've gone through today
7    or you think there are other documents you've produced
8    to your attorneys that you think are privileged?
9    A. Perhaps.
10   Q. Is it related to lost revenue from book sales,
11   posters, mugs, T-shirts, speaking engagements or
12   consulting engagements?
13   A. I don't know.
14   Q. Okay. If you have documents related to your
15   alleged damages that are relevant to this lawsuit --
16   A. Yes.
17   Q. -- we've requested those and they should have
18   been produced.
19   A. Yes.
20   Q. Okay.
21   A. I understand that.
22   Q. Okay. And there's not any documents that you
23   know that you have that's related to those types of
24   claims for lost revenue that you believe has not been

252

1    produced, correct?
2    A. I have the same issue with attorney/client
3    privilege.
4    Q. How do you think documents that you keep related
5    to your revenue from these sales and related to your
6    claims in this lawsuit are attorney/client privileged?
7    A. I don't think that's what I meant.
8    Q. Okay. What did you mean so that I understand?
9    A. I don't have -- I don't have direct knowledge
10   that everything I produced to my attorney has been
11   produced to you.
12   Q. Okay. We went through a bunch of documents today
13   related to your revenue and sales of different items.
14   Is there anything that you remember providing to your
15   attorney that would address your claims for a decrease
16   in revenue from book sales, poster sales, mug sales,
17   T-shirt sales, speaking engagements, or consulting
18   engagements that we did not go through today?
19   A. I don't know. I can't remember.
20   Q. Is there anything that stands out in your mind
21   that you remember having that we haven't gone through?
22   A. No.
23   Q. Okay.
24   A. I don't think so. I don't remember right now.

253

1    Q.  So then I'll just say to close it out we've kind
2  of gone through a list of things as we've talked that
3  we've requested that you think you may have that you're
4  going to go home, look for, if you have it produce it to
5  your attorneys and they'll produce it to us.
6    A.  I would hope so.
7        MS. PADGETT:  Okay.  And then, Joe, you'll send
8  an email?
9        MS. GERLING:  I'll send you an email, and you can
10 supplement it, and once we get that together I'll send
11 it to Dr. Bell.
12       MS. PADGETT:  Okay.  I think that's all I have.
13 Thank you.
14       MR. GERLING:  Thank you.  If ordered he'll read.
15       MS. PADGETT:  We're ordering.
16       (Deposition concluded at 4:40 p.m.)
17                  - - -

254

1              A F F I D A V I T
2                   - - -
3  State of _____  )
                        )  SS:
4  County of_____  )
5      I, Keith Bell, Ph.D., do hereby certify that I
6  have read the foregoing transcript of my deposition
7  given on December 19, 2019; that together with the
8  correction page(s) attached hereto noting changes in
9  form or substance, if any, is true and correct.
10
11 _____
       Keith Bell, Ph.D.
12
13     I do hereby certify that the foregoing transcript
14 of the deposition of Keith Bell, Ph.D., was submitted to
15 the witness for reading and signing; that after he had
16 stated to the undersigned Notary Public that he had read
17 and examined his deposition, he signed the same in my
18 presence on the _____ day of_____, 2020.
19 _____
       NOTARY PUBLIC
20
21 My commission expires_____
22
23
24

255

1              C E R T I F I C A T E
2  State of Ohio      )
                      )  SS:
3  County of Franklin )
4      I, Connie M. Willman, Notary Public in and for
5  the State of Ohio, duly commissioned and qualified,
6  certify that the within named Keith Bell, Ph.D., was by
7  me duly sworn or affirmed to testify to the whole truth
8  in the cause aforesaid; that the testimony was taken
9  down by me in stenotypy in the presence of said witness;
10 afterwards transcribed upon a computer; that the
11 foregoing is a true and correct transcript of the
12 testimony given by said witness taken at the time and
13 place in the foregoing caption specified.
14     I certify that I am not a relative, employee, or
15 attorney of any of the parties hereto, or financially
16 interested in the action.
17     IN WITNESS WHEREOF, I have hereunto set my hand
18 and affixed my seal of office at Columbus, Ohio, on this
19 6th day of January, 2020.
20
21 _____
22              Connie M. Willman, Notary Public in
              and for the State of Ohio and
              Registered Professional Reporter.
23
24 My commission expires January 17, 2023.

# CONNIE M. WILLMAN, RPR, INC.

**570 D'Lyn Street, Columbus, Ohio 43228**
**(614) 870-0998**

February 10, 2020

Keona R. Padgett, Esq.
Reminger Co., LPA
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215

> ### Re: *Keith F. Bell, Ph.D. vs. Caught My Eye Photography of Columbus, et al.*

Dear Keona:

I do hereby certify that the witness, Keith F. Bell, Ph.D., failed to read and sign his deposition transcript; that he was notified by letter dated January 6, 2020, informing him of the Ohio Rules of Federal Civil Court Procedure which provide 30 days within which to read and sign his deposition or his deposition may be used without signature, and the witness failed to exercise his right to read and sign his deposition.

A copy of the unsigned affidavit is enclosed to be incorporated into your copy of the transcript.

Sincerely,

*Connie M. Willman*

Connie M. Willman

Enclosure

1                   A F F I D A V I T

2                      - - -

3 State of _____ )
                      )   SS:
4 County of_____ )

5      I, Keith Bell, Ph.D., do hereby certify that I

6 have read the foregoing transcript of my deposition

7 given on December 19, 2019; that together with the

8 correction page(s) attached hereto noting changes in

9 form or substance, if any, is true and correct.

10

11      _____
      Keith Bell, Ph.D.
12

13      I do hereby certify that the foregoing transcript

14 of the deposition of Keith Bell, Ph.D., was submitted to

15 the witness for reading and signing; that after he had

16 stated to the undersigned Notary Public that he had read

17 and examined his deposition, he signed the same in my

18 presence on the ____ day of_____, 2020.

19      _____
      NOTARY PUBLIC
20

21 My commission expires_____

22 2-10-2020 Keith Bell failed to read and sign his

23 deposition transcript.

24