# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KEITH BELL,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No. 2:18-cv-961** |
|  | **JUDGE EDMUND A. SARGUS, JR.** |
|  | **Magistrate Judge Kimberly A. Jolson** |
| **v.** |  |

**WORTHINGTON CITY**
**SCHOOL DISTRICT,**

**Defendant.**

## OPINION AND ORDER

The matters before the Court are Plaintiff Keith Bell's ("Plaintiff" or "Dr. Bell") Motion for Summary Judgment (ECF Nos. 49, 50)[1] and Defendant Worthington City School District's ("Defendant" or "Worthington") Motion for Summary Judgment (ECF No. 47). The parties have responded and replied (ECF Nos. 51, 52, 55, 56). The motions are ripe for review. For the following reasons, Plaintiff's motion (ECF Nos. 49, 50) is **DENIED** and Defendant's Motion (ECF No. 47) is **GRANTED**.

Additionally, Plaintiff filed a Motion for Leave to File an Amended Complaint (ECF No. 53), and Request for Judicial Notice (ECF No. 58), and Defendant filed a Motion to Strike (ECF No. 63). The parties have responded and replied (ECF Nos. 62, 65, 68, 69, 72, 73). The motions are ripe for review. For the following reasons, Plaintiff's Motion for Leave to File an Amended Complaint (ECF No. 53) is **GRANTED**, Plaintiff's Request for Judicial Notice (ECF No. 58) is **DENIED as moot,** and Defendant's Motion to Strike (ECF No. 63) is **DENIED as moot.**

---

[1] Plaintiff filed the same motion for summary judgment and supporting memorandum on two separate dates. The only difference, as far as the Court can tell, is the second filing included additional exhibits not included in the first filing. The second filing was after the dispositive motion deadline had passed. The Court will treat this as one motion filed on time because, as explained throughout this Opinion, the exhibits filed late, even if considered, do not change the Court's Opinion.

## I.

Defendant is an Ohio public school-district. (Def.'s Resp. Pl.'s First Set Interrogs. at 2, ECF No. 47-1.) Plaintiff has been a sports performance psychologist since 2007, the president of the American Swimming Association since 2002, a swimming coach since 1996, and, together with his wife, the owner of Keel Publications ("Keel") since the early 1980s. (Bell Dep. 13:6–11, 14:21–15:2, 16:20–17:11, 19:21–20:6, Ex. 1, ECF No. 44-1.) Plaintiff writes and sells books and articles, performs speaking engagements, and consults with athletic teams. (*Id.* 24:5–12, 40:18–22.) Additionally, Plaintiff previously had a private sports psychology practice from 1975 through 2007. (*Id.* 22:5–13.)

Plaintiff wrote a series of ten books that Keel published. (*Id.* 28:5–8.) All ten books are copyrighted. (*Id.* 29:12–13.) The third book in the series is titled *Winning Isn't Normal* ("WIN" or "the WIN book"). (*See* Compl. ¶¶ 28–49, ECF No. 1.) WIN was published in 1982 and copyrighted on September 21, 1989. (Bell Dep. 52:1–49.) In addition, Plaintiff obtained a copyright for WIN's derivative work on November 6, 2017. (*Id.* 52:14–17.) Plaintiff obtained a trademark for WIN on November 4, 2014. (*Id.* 53:13–54:17.) Plaintiff asserts that somewhere between 40,000 and 80,000 copies of WIN have been sold. (*Id.* 57:11–13.)

WIN contains a passage which Plaintiff refers to as the heart of the book (the "WIN passage"). (Compl. ¶ 34.) The WIN passage states:

> Winning isn't normal. That doesn't mean there's anything wrong with winning. It just isn't the norm. It's highly unusual.
> Every race only has one winner. No matter how many people are entered (mot to mention all those who tried and failed to make cuts), only one person (or one relay) wins each event.
> Winning is unusual. As such, it requires unusual action.
> In order to win, you must do extraordinary things. You cannot just be one of the crowd. The crowd doesn't win. You have to be willing to stand out and act differently.
> Your actions need to reflect unusual values and priorities. You have to

value success more than others do.  You have to want it more.  (Now, take note! Wanting it more is a decision you make and act upon—not some inherent quality or burning inner drive or inspiration!) And you have to make that value a priority.

You can't train like everyone else.  You have to train more and train better. You can't talk like everyone else.  You can't think like everyone else.  You can't be too willing to join the crowd, to do what's "in."  You need to be willing to stand out in the crowd and consistently take exceptional action.  If you want to win, you need to accept the risks and perhaps the loneliness . . . because *winning isn't normal!!!*

(Compl. ¶ 34.)

WIN sells as a hardcopy for $24.95, plus shipping and handling, on Amazon.com or Keel's website and as an audiobook for $9.99 on Apple or Kindle.  (Bell Dep. 58:24–59:5.)  The profit per book depends on the shipping and handling costs, but Plaintiff believes he makes about $25 on each book sold.  (*Id.* 60:7–13.)  Plaintiff also sells posters, t-shirts, and mugs relating to WIN and licenses for people who want to use, display, or perform WIN or related products.  (*Id.* 67:19–22, 76:6–17, Ex. 4.)  Plaintiff does not track his profit from the sales of WIN.  (*Id.* 60:20–70:16.)

Plaintiff believes that "there are millions of copies [of the WIN passage] out there that [do not] give [him] attribution."  (*Id.* 64:16–19.)  Plaintiff keeps track of some of these uses, for example, the "crumpled paper," which is a copy of the WIN passage which was posted in a locker room of a national-champion team.  (*Id.* 64:22–65:13.)  Plaintiff states the crumpled paper was shared on the internet over two million times.  (*Id.* 66:15–67:20.)  Other infringements, however, Plaintiff does not track because "there [is] just not time to do that."  (*Id.* 67:12–20.)  Plaintiff picks and chooses whom he will send cease and desist letters to for using the WIN passage without his permission.  (*Id.* 62:10–16, 67:21–23.)

On December 3, 2015, Worthington Kilbourne High School's ("Kilbourne") basketball coach, Tom Souder ("Coach Souder") read the WIN passage to the Kilbourne basketball team. (*Id.* 89:18–19; Souter Aff. ¶ 7, ECF No. 47-1.)  Coach Souder attributed the passage to "Dr. Keith

Bell."[2]  (Souter Aff. ¶ 7.)  Coach Souder found the WIN passage online, where it contained no intellectual property information.  (*Id.* ¶ 8.)  Coach Souder also hung a copy of the WIN passage in his athletes' locker room.  (*Id.* ¶ 9.)  The copy attributed the passage to Dr. Bell. [3]  (*Id.*)  Coach Souder never attributed the WIN passage to himself.  (*Id.* ¶ 10; Bell Dep. 99:11–19, 117:10–15, 242:24–243:5.)

When Coach Souder read the WIN passage only the Kilbourne basketball team and Brenda Kerns were present.  (Bell Dep. 90:1–2.)  Ms. Kerns owns a photography service called Caught My Eye Photography ("CME").  (Compl. ¶ 2.)  Worthington does not employ Ms. Kerns or CME.  (Bell Dep. 94:5–22.)  After Coach Souder read the WIN passage to the team, Ms. Kerns posted a photo of the team on CME's website and captioned the photo with the WIN passage.  (*Id.* 90:5–8, 93:13–23.)  Under the passage, Ms. Kerns wrote "…Coach Souder."  (*Id.* 98:15–18.)

Plaintiff alleges that Kilbourne's Basketball team has a website, www.wolvesboysbasketball.com ("the basketball website").  (Compl. ¶ 34.)  Coach Souder states this website is not owned or operated by Defendant.  (Souder Aff. ¶ 5.)  Plaintiff contends that after Ms. Kerns posted the WIN passage on CME's website, the basketball website included a link to the passage on CME's website.  (Compl. ¶ 34.)  Dr. Bell could not recall any facts behind this allegation at his deposition.  (*See* Bell Dep. 92:21–93:10, 102:3–9, 102:23–103:13.)

On July 14, 2017, Plaintiff sent Defendant a letter to cease and desist using the WIN passage.  (*Id.* 121:10–13.)  On August 7, 2017, Thomas Worthington High School's basketball

---

[2] At the time, Coach Souder believed his friend Dr. Keith Bell, from Ohio, wrote the passage.  (Souder Aff. ¶ 7.)
[3] The Complaint alleges that Coach Souder also used the WIN passage as a theme for the 2015–16 basketball season.  (Compl. ¶ 37.)  Plaintiff, however, could not recall any basis for this allegation at his deposition.  (Bell Dep. 104:4–105:11.)  Coach Souder stated he did not use any theme for the 2015–16 season.  (Souter Aff. ¶ 6.)  Instead, Coach Souder used multiple lessons throughout the season to help his athletes grow, develop, and learn about competition, good sportsmanship, fair play, and more.  (*Id.*)  Plaintiff appears to have abandoned this allegation because he does not mention it in his motions or supporting briefs.

coach, Sean Luzador ("Coach Luzador"), retweeted[4] Five-Star Basketball's tweet (the "retweet"), which was the WIN passage without attribution to an author.  (*Id.* 92:1, 16–17.)  According to Plaintiff, Coach Luzador's Twitter username is "@SeanLuzader" and his description is "husband, dad, business teacher, basketball coach."  (*Id.* 89:1–7.)  As far as Plaintiff is aware, Coach Luzador's Twitter account does not include information about Defendant. (*Id.* 96:8–10.)  Plaintiff knows that he can report infringements to Twitter.  (*Id.* 108:8–17.)  Plaintiff did not report the retweet, however, believing it would have been "a useless waste of [his] time." (*Id.* 109:16–110:9.)

On August 28, 2018, Dr. Bell sued Worthington and CME.  (*See* Compl.)  Dr. Bell and CME settled.  (Bell Dep. 221:19–21.)  Dr. Bell and Worthington filed cross motions for summary judgment, Dr. Bell filed a motion for leave to file an amended complaint, and a request for judicial notice, and Worthington filed a motion to strike.  The Court will begin with the cross motions for summary judgment and will address the other motions within this discussion if they become relevant to the Court's decision.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which

---

[4]  Twitter defines a "retweet" as the re-posting of a tweet originally posted by someone else. https://help.twitter.com/en/using-twitter/retweet-faqs.  The Court will use the word retweet to describe Coach Luzador's reposting of Five-Star Basketball's tweet.

demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.

The Court will begin with whether Defendant is an entity capable of being sued and then move to the parties' arguments as to each count in the Complaint.

### A. An Entity Capable of Being Sued

Defendant argues it is entitled to judgment on all counts because it is not an entity capable of being sued under Ohio law. (Def.'s Mot. Summ. J. at 12 (citing Ohio Rev. Code § 3313.7), ECF No. 47.) In Plaintiff's response, he states "[a]ssuming this is true" he will concurrently file a motion for leave to amend. (Pl.'s Resp. Def.'s Mot. Summ. J. at 3–4, ECF No. 51.) Ten days later, Plaintiff filed a motion seeking "the Court's leave to amend his complaint to substitute the Board of Education for the Worthington City School District [(the Board")] for the Worthington

City School District as the defendant."  (Pl.'s Mot. Leave Am. Compl. at 1, ECF No. 53.)

### 1.  Plaintiff's Motion for Leave to File an Amended Complaint

Federal Rule of Civil Procedure 15 provides that when 21 days after a complaint is served, service of a responsive pleading, or service of a Rule 12(b), (e), or (f) motion, has passed, a plaintiff may amend his or her complaint only with "the court's leave."  Fed. R. Civ. Pro. 15(a)(2).  "The court should freely give leave when justice so requires."  *Id.*  Rule 15 maintains a "liberal standard of permitting amendments to ensure the determination of claims on their merits."  *Id.* (citing *Marks v. Shell Oil Co.*, 830 F.3d 68, 69 (6th Cir. 1987)).  "To deny a motion to amend, a court must find at least some significant showing of prejudice to the opponent."  *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (internal citations omitted).

Defendant argues it is not an entity capable of being sued and Plaintiff provides no argument to the contrary.  The Court agrees.  Defendant is not an entity that can be sued because "under Ohio law, a school district does not exist and is not sui juris."  *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.,* 341 F. Supp. 3d 793, 799 (S.D. Ohio 2018) (internal citations omitted); *Getachew v. Columbus City Schs.*, No. 2:11-cv-861, 2012 U.S. Dist. LEXIS 30663, at *4–5 (S.D. Ohio Mar. 8, 2012) (holding Columbus City School District is not *sui juris*).  "Instead, it is the board of education of the school district that is the body politic and corporate which is capable of suing and being sued."  *Id.* (citing Ohio Rev. Code § 3313.17 ("The board of education of each school district shall be a body politic and corporate, and, as such, capable of suing and being sued."));  *see also Thompson v. Bd. of Educ.*, No. 3:12-cv-287, 2013 WL 6001626, at *3 (S.D. Ohio Nov. 12, 2013).  Thus, Defendant, the Worthington City School District, is not capable of being sued.  *Id.* at 799; *Getachew*, 2012 U.S. Dist. LEXIS 30663 at *4–5.

Plaintiff argues he should be given leave to amend his Complaint because: he did not act

with bad faith or undue delay as he sought amendment upon Defendant bringing it to his attention; he has not previously amended his Complaint; Defendant will not be prejudiced because the amendment is only a name change; and the amendment is not futile because Ohio law permits suits against boards of education.  (Pl.'s Mot. Leave Am. Compl. at 2 (citing *Getachew*, 2012 U.S. Dist. LEXIS 30663 at *5–6).)

Defendant argues there has been both an undue delay and a dilatory motive because Plaintiff has given no explanation as to why he failed to name the correct defendant, despite having counsel, and the deadline to amend has long passed.  (Def.'s Resp. Pl.'s Mot. Leave Am. Compl. at 3, ECF No. 62.)   Additionally, Defendant argues it is prejudiced because the deadline for discovery and dispositive motions has passed.  (*Id.* at 4.)

In this case there has been a significant delay in seeking this amendment.  The deadline the parties were given to amend their pleadings was nine months ago and Plaintiff has had plenty of time to discover it sued the incorrect entity.  Further, the motion for leave to amend was filed over a month after the issue was first brought to Plaintiff's attention in Defendant's motion for summary judgment.  Additionally, the time for discovery and dispositive motions has closed.  The prejudice in this case, however, is slight.  The amendment sought is essentially to the name of the defendant only.  The facts of this case will not change.

Thus, the Court will allow the amendment.  While there has been a significant delay, the prejudice is so slight that the Court will adhere to the policy of liberally allowing amendments in order to reach a decision based on the merits.  *See Moore v. Paduch*, 790 F.2d 557, 562 (6th Cir. 1986) (reversing the district court's denial of a motion for leave to amend, concluding that while there was undue delay, the prejudice was so slight that "rejection of the amendment would preclude [the] plaintiff's opportunity to be heard on the merits on facts which are well known to the parties

and which were pleaded at the outset"); *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 830 (6th Cir. 2015) ("In the context of a motion to amend a complaint, delay alone, . . . without any specifically resulting prejudice, or any obvious design by dilatoriness to harass the opponent, should not suffice as reason for denial." (internal citations omitted)).

The motion for leave to file an amended complaint is **GRANTED**. The Court will continue as if Plaintiff sued the Board. Defendant's motion for summary judgment on the ground that is not sui juris is **DENIED**.

## B. Count I: Copyright Infringement

Plaintiff alleges in Count I that Defendant infringed his registered copyright in violation of 17 U.S.C. §§ 105, 501. (Compl. ¶¶ 50–56.) Under the Copyright Act, "anyone who violates the exclusive rights of a copyright owner is an infringer of the copyright and the owner is entitled to institute an action in federal court." *Superhype Publ'g v. Vasiliou*, 838 F. Supp. 1220, 1224 (S.D. Ohio 1993) (citing 17 U.S.C. § 501(a), (b)). The owner of a copyright has exclusive rights to reproduce the work, prepare derivative works, distribute copies of the work, perform the work publicly, and display the work publicly. 17 U.S.C. § 106. A claim for copyright infringement requires: (1) "ownership of a valid copyright" and (2) "copying of the constituent elements of the work that are original." *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004) (citing *Fiest Publ'ns, Inc. v. Rural Television Serv. Co.*, 499 U.S. 340. 361 (1991)).

### 1. Valid Copyright

A valid copyright is presumptively established by a copyright registration. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 533–34 (6th Cir. 2004). Plaintiff asserts that he has a valid copyright for the WIN book and the WIN passage. (Pl.'s Mot. Summ J. at 4, ECF No. 47.) As evidence of such, Plaintiff provides Certificates of Copyright Registration. (Pl.'s

Mot. Summ. J. at Exs 2, 3, ECF No. 49-3, 49-4.)  Defendant asserts that for purposes of its motion

it assumes Plaintiff has a valid copyright.  (Def.'s Mot. Summ. J. at 13 n.5.)  Thus, Plaintiff has

satisfied the first element of copyright infringement.

### 2.  Violation of an Exclusive Right

A plaintiff must show the defendant violated at least one of the exclusive rights granted to

the copyright holder.  17 U.S.C. § 106; *Calibrated Success, Inc. v. Chartes*, 72 F. Supp. 3d 763,

769 (E.D. Mich. 2014).  Plaintiff argues that Defendant violated his right to display his work

publicly two times.  (Pl.'s Mot. Summ. J. at 4–5 (citing 17 U.S.C. § 106(5)).)  First, when Coach

Luzador displayed an almost identical copy of the WIN passage on his twitter feed.  (Def.'s Mot.

Summ. J. at 5.)  Second, when Couch Souder read the WIN passage to his basketball team and

hung a copy of the passage in the team's locker room.  (Pl.'s Mot. Summ. J. at 6.)  In response,

Defendant does not argue that Plaintiff has not satisfied this element.  Instead, Defendant contends

it cannot be held liable for several reasons, including the affirmative defense the fair use doctrine.

### 3.  The Fair Use Doctrine

The rights granted to copyright owners in the Copyright Act are qualified by "[l]imitations

on exclusive rights" such as the fair use doctrine.  *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S.

519, 523 (2013) (citing 17 U.S.C. §§ 107–22).  "The fair use doctrine, which creates an exception

to the copyright monopoly, 'permits [and requires] courts to avoid rigid application of the

copyright statute when, on occasion, it would stifle the very creativity which that law is designed

to foster.'"  *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1384, 1385 (6th Cir. 1996)

(quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 579, 577 (1994)).  The fair use doctrine,

developed through common law, is now codified, providing:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies
> or phonographic records or by any other means specified by that section, for

purposes such as . . . teaching . . . is not an infringement of copyright.  In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Whether the fair use defense applies is a mixed question of law and fact.  *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 560 (1985).  When a court finds "facts sufficient to evaluate each of the statutory factors" the court may make the fair use determination as a matter of law.  *Id.*; *see also Nat'l Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (finding fair use as a matter of law).  The party asserting fair use bears the burden of proof.  *Ashley Furniture Indus. v. Am. Signature, Inc.*, No. 2:11-cv-427, 2014 U.S. Dist. LEXIS 197503, at *14 (S.D. Ohio June 25, 2014) (*citing Princeton*, 99 F.3d at 1390 n.5); *Dassault Sys., S.A. v. Childress,* No. 09-10534, 2014 U.S. Dist. LEXIS 167548, at *36–37 (E.D. Mich. Dec. 3, 2014).  This statute "requires a case-by-case determination of whether a particular use is fair." *Harper & Row*, 471 U.S. at 549.

### a.  Purpose & Character of the Use

The first factor looks at the purpose and character of the defendant's use of the plaintiff's copyrighted work.  The statute provides that the use of a copyrighted work for teaching is fair, however, "[t]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement."  *Id.* at 585.  Some courts, however, have found that if a use falls into one of the purposes enumerated in the statute, such as teaching, the use is presumptively fair.  *Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 705 n.7 (E.D. Mich. 1998) (citing cases). In addition to looking at the purposes enumerated in the statute, courts look to whether the new

work is transformative. *Campbell*, 510 U.S. at 580. A non-transformative use merely supersedes the objects of the original creation while a transformative use adds something new, with a further purpose or different character. *Id.* A transformative use is more likely to be fair. *Id.* It is not necessary, however, for a finding of fair use. *Id.*

Defendant argues both Coach Luzador and Coach Souder used the passage to teach. (*See* Def.'s Mot. Summ. J. at 17–20.) Defendant notes that neither coach used the WIN Passage for a commercial purpose. (*See id.*) Plaintiff argues Defendant "remains certainly a commercial endeavor" as it provides information regarding fundraisers and other means to raise money through "its website." (*Id.*) Plaintiff also argues the coaches copied the WIN passage near verbatim and thus their use was not transformative. (Pl.'s Mot. Summ J. at 12.)

The Court agrees with Defendant that the purpose of the coaches' use of the WIN passage was educational, not commercial. Couch Souder testified that Worthington's coaches sought to teach their student athletes lessons throughout the season including lessons in good sportsmanship and fair play. (Souter Aff. ¶ 6.) Coach Souder also testified that he "derived no financial or commercial benefit from [his] use of the [WIN] passage." (*Id.* ¶ 12.) Neither party has offered evidence that the coaches profited from their uses of the passage. (*See* Bell Dep. 125:8–11 ("[D]o you have any evidence that [Defendant] has profited from the alleged use of the [WIN] passage? I have no information either way.").)

Plaintiff's assertion that Defendant is a commercial endeavor because it provides information on fundraisers on its website is unpersuasive. If Defendant, a public-school board, was profiting, it would not likely need to fundraise. Additionally, this assertion is unsupported by the record. Plaintiff does not cite to evidence when he makes this statement. (*See* Pl.'s Mot. Summ. J. at 12.) Plaintiff does have an exhibit of a screenshot of the basketball website. (*See id.*

at Ex. 7, ECF No. 49-8.) Defendant objects to the use of this exhibit arguing it is inadmissible because it is unauthenticated. (*See* Def.'s Reply Supp. Mot. Summ. J. at 6, ECF No. 55; Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. at 6–7, ECF No. 52; Def.'s Mot. Strike, ECF No. 63.)

The Court need not address whether this exhibit is admissible because it does not support Plaintiff's argument that Defendant's purpose in using the WIN passage was commercial. The exhibit states "Meat Sale Fundraiser." (Pl.'s Mot. Summ. J. at Ex. 7.) It does not state anything about either coach or the WIN passage. (*See id.*) It does not mention Coach Luzador's team at all. (*See id.*) It does mention Coach Souder's team, Kilbourne basketball, but does not in any way mention his use of the WIN passage or show that Coach Souder's use was somehow commercial. Coach Souder's testimony makes clear that the coaches' use of the WIN passage was educational, and Plaintiff provides no evidence to refute this. This supports a finding that Defendant's use was fair. *See Higgins*, 4 F. Supp. 2d at 705 n.7.

The Court agrees with Plaintiff that the use was not transformative, for the parties do not dispute that the language used by the coaches was almost verbatim to the original passage. This factor, however, still weighs in favor of a finding of fair use, for while it may not be transformative, the use was clearly educational. *Campbell*, 510 U.S. at 580 (noting the use need not be transformative for a finding of fair use).

### b. Nature of the Work

"This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former are copied." *Id.* at 586. A use is more likely to be fair when the work is factual rather than fictional. *Harper & Row*, 471 U.S. at 563. Additionally, whether a work is published is a critical element of its "nature." *Id.* at 564. The scope of fair use is narrower when a work is

unpublished, while even a substantial quantity of a published work may be within the fair use doctrine. *Id.* This is because "the author's right to control the first public appearance of his expression weighs against such use of the work before its release." *Id.*

Defendant focuses on the fact that WIN has been published for many years. (Def.'s Mot. Summ. J. at 20.) Defendant argues the WIN passage was widely available online prior to these alleged infringements and thus, neither of the coaches' actions affected Plaintiff's ability to control the passage's first public appearance. (*Id.*) Plaintiff focuses on the genre of the WIN book, arguing it is "Dr. Bell's creative and expressive observations of competition generally, a result of his many years as a successful swimmer and sports psychologist." (Pl.'s Mot. Summ. J. at 13.) Plaintiff argues that because the work is not purely factual or fictional it deserves protection. (*See id.*)

The Court begins by looking at a case in the District Court of Arizona addressing whether an alleged infringement of Dr. Bell's WIN passage qualified as a fair use. *See Bell v. Moawad Grp., LLC*, 326 F. Supp. 3d 918 (D. Ariz. 2018). The case is instructive for it addresses a similar type of infringement of the same work.

In *Bell v. Moawad Group, LLC*, a consulting company posted the WIN passage on their social media account. *Id.* at 922. The consulting company argued it was a fair use. *Id.* In considering the nature of the WIN passage, the court noted that "the passage was widely available on the Internet, including Plaintiff's own website, and the particular image [the defendants] used had appeared on the Internet before they used it." *Id.* at 923. The court also noted that the WIN passage does not fit perfectly into a category as fact or fiction because it has elements of both genres. *Id.* at 927. The wide dissemination of this particular passage prior to the defendant's use persuaded the court that this factor weighed in favor of a finding of fair use. *Id.*

The Court finds the *Moawad* court's analysis of this factor applicable here. The evidence shows that both the WIN book and the WIN passage were widely published prior to the coaches' use. Plaintiff testified he believes "at least 40,000 to 50,000" WIN books had been sold since he started publishing the book and "it's possible it's as much as 80,000." (Bell Dep. 56:18–22, 57:1–13.) Plaintiff also testified that, as to the WIN passage in particular, the passage has gone "viral on the internet" with a particular photo of the passage displayed over one to two million times. (*Id.* 64:22–65:7, 75:13.) In fact, both coaches in this case found the WIN passage on the Internet. (*Id.* 92:16–18; Souder Aff. ¶ 8.) Thus, it is clear both the WIN book and the WIN passage were widely published prior to the coaches' use and thus, their uses did not affect Dr. Bell's right to control the first appearance of his work.

The Court also agrees with the *Moawad* Court that this work is not solely fact or solely fiction, and thus, this aspect of the nature of the book does not persuade the Court in either direction. In sum, the widely published nature of this work prior to Defendant's use leads this factor to weigh in favor of a finding of fair use.

### c.  Amount of the Copyrighted Work Used

The third factor asks whether the amount and substantiality of the portion of the work used was reasonable in relation to the purpose of the copying. *Campbell*, 510 U.S. at 586. "There are no absolute rules as to how much of the copyrighted work may be copied and still be considered a fair use." *Higgins*, 4 F. Supp. 2d at 707. The facts bearing on the third factor also address the fourth, by revealing the degree to which the copyrighted work may serve as a market substitute for the original work or potentially licensed derivatives. *Campbell*, 510 U.S. at 587.

Defendant argues the coaches used only a small portion of a much longer book. (Def.'s Mot. Summ. J. at 21.) Plaintiff argues that despite the small amount copied, the copied passage is

the heart of the book and thus, substantial.  (Pl.'s Mot. Summ. J. at 13–14.)  The Court sees this copying as low in quantity, but substantial in quality.  Thus, this factor is neutral.

### d. Extent of Market Harm

The Supreme Court has stated this factor "is undoubtedly the single most important element of fair use."  *Harper & Row*, 471 U.S. at 566.  In evaluating this factor, "courts look to whether the 'copying' can be used as a substitute for the plaintiff's [sic] original work."  *Higgins*, 3 F. Supp. 2d at 708.  "Where the copy does not compete in any way with the original, this concern is absent."  *Pro Arts Inc. v. Hustler Magazine, Inc.*, No. 85-3041, 1986 U.S. App. LEXIS 19428, at *10 (6th Cir. Mar. 25, 1986) (citing *Consumer Union of United States, Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1051 (2d Cir. 1983)).  When the challenged use is noncommercial, the burden of proof to show harm to the market is on the copyright holder.  *Princeton*, 99 F.3d at 1385.

Defendant argues Plaintiff has provided no evidence of market harm and his deposition testimony confirms that this is because there is no market harm.  (*See* Def.'s Mot. Summ. J. at 21–22.)  Defendant admits that Dr. Bell lost the licensing fee for the retweet and the fee for a poster used by Coach Souder.  (*See id.*)  Defendant argues, however, Plaintiff's conclusory statements do not prove any widespread harm to his market.  (*See id.*)  Plaintiff argues that if this type of activity "were to become widespread" it "would plainly have an adverse impact on the market for Dr. Bell's work."  (Pl.'s Mot. Summ. J. at 15.)

First, the coaches' use of the WIN passage was educational, not commercial.  *See infra* Section III.B.3.a.  Thus, the burden is on Plaintiff to show there is a market affect from the alleged infringement.  *Princeton*, 99 F.3d at 1385.  Additionally, as Defendant points out, at the time of Defendant's use of the WIN passage Plaintiff only had a registered copyright for the WIN book,

16

not the WIN passage.  (*See* Pl.'s Mot. Summ. J. at Exs. 2, 3.)  Thus, this factor considers the market for the WIN book, not the WIN passage.

Turning to the evidence, Plaintiff's deposition testimony shows that despite what he believes have been thousands of infringements of the WIN passage, Dr. Bell has no evidence that any of these infringements, including Defendant's, have impacted the market for WIN.  Defendant asked Plaintiff how the coaches' use of the WIN passage hurt the market for WIN.  (Bell Dep. 75:13–17, 179:16–20.)  Plaintiff stated that Defendant's posting of the WIN passage would de-motivate people from buying the work.  (*Id.*)  He also stated he lost licensing fees for the retweet and the poster.  (*Id.* 153:8–13.)  Importantly, however, when asked what evidence he had that the overall market for his book was harmed, or what facts he had to support this contention, Plaintiff admitted he had no evidence or facts to back up this belief.  (*Id.* 210:22–211:8, 249:7–12.)

Additionally, Dr. Bell testified that he does not keep track of revenue from book sales.  (Bell Dep. 60:20–61:1.)  Similarly, he does not keep track of how many posters or t-shirts he sells.  (*Id.* 79:13–15, 70:23–71:1.)  Further, he does not track his speaking engagements or revenue from them.  (*Id.* 210–219.)  Thus, Plaintiff has nothing with which he could show a loss of sales despite his allegation of thousands of infringements like Defendant's infringement.

The only concrete statement Plaintiff could provide regarding a loss of sales was that he noticed speaking engagements decreasing sometime in 2005 to 2010.  (*Id.* 212:4–9.)  First, Defendant's use of the passage occurred subsequent to this time, and thus, it is clear Defendant's use did not cause this decrease.  Additionally, Dr. Bell's last book was published in 2005, thus, there have been no new works for purchase after this time.  (*Id.* 219:5–6.)  Most importantly, however, Dr. Bell has no data to back up this belief for he does not track any of his sales.

Further, in looking specifically at Coach Souder's reading of the passage, it should be noted that only the basketball team and one individual, Ms. Kerns, heard Couch Souder read the WIN passage.  (*Id.* 89:20–90:2.)  Dr. Bell testified that other than this, he knows of no other coach, or any of Defendant's other employees, who read the WIN passage.  (*Id.* 105:12–18.)  Thus, the use of the WIN passage by one coach did not apparently lead to any other use within the school.  This refutes any argument that Coach Souter's use of the WIN passage would hurt the market by causing widespread use in the school without payment.

Similarly, in looking specifically at the tweet, Dr. Bell does not know how many people viewed the tweet while it was online.  (*Id.* 157:7–9.)  Additionally, Dr. Bell does not know which fee schedule would have been in place when Coach Luzador retweeted the WIN passage, and thus, cannot be sure how much, if any, Coach Luzador would have had to pay.  (*Id.* 162:13–24.)  There is no evidence the use of the tweet caused widespread market harm.

In sum, despite Plaintiff's allegations that thousands of infringements like Defendant's alleged infringement have been occurring for many years, Plaintiff has no facts which could show a connection between these infringements and an impact on the market for WIN.  Plaintiff's conclusory argument does not create a genuine issue of material fact as to the market impact of the infringements.

In contrast, Dr. Bell's testimony as to how he obtains speaking engagements and sells books indicates that posting the WIN passage on social media or in a locker room could help the market for his book.  Dr. Bell testified that he derives income based on his reputation.  (*Id.* 44:17–18.)  He stated "[s]ometimes people buy books because they know me as a coach.  Sometimes . . . it's the other way around.  People join the team because of books, because of my seminars, because of my events, and all the way around."  (*Id.* 44:19–45:1; *see also id.* at 62:5 (responding to a

question regarding creating a market for the WIN book with "my reputation is important in that").)
Thus, if people were to read the WIN passage and discover Dr. Bell wrote it, for example from
Coach Souder attributing the quote to him, they may be interested in buying a WIN book, or
attending a seminar.  In other words, Dr. Bell testified his income is derived from his reputation
and his reputation is enhanced by interest in WIN.  Interest in WIN is increased through sharing
the WIN passage for educational purposes to an athletic team or social media followers.

In sum, Plaintiff has submitted no evidence to create a genuine dispute of material fact as
to any market harm.  Thus, this factor weighs in favor of fair use.

### e.  Balancing the Factors

The Court must now weigh the four factors together, being mindful of the purposes served
by copyright law.  *Ashley Furniture*, 2014 U.S. Dist. LEXIS at *35 (citing *Campbell*, 510 U.S. at
577–78).  This Court has previously explained that:

> The goal of copyright law is to advance the arts for the benefit of society.  It does
> so by providing some incentive to those who create original works by granting them
> a limited monopoly to reproduce, distribute, and display the copyrighted work.
> Nonetheless, permitting fair use is also essential for the advancement of the arts,
> and hence, the public good.

*Id.* (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431–32 (1984);
*Campbell*, 510 U.S. at 575).

The Court has found the purpose of the coaches' uses of the WIN passage was to educate
student athletes on sportsmanship and becoming a better athlete.  Thus, the purpose weighs in
favor of fair use.  The Court has also found that the WIN passage had been widely published in
books and on the internet prior to the coaches' uses, and thus, the nature of the work weighs in
favor of fair use.  Additionally, the Court found the amount of the work allegedly infringed upon
is neutral because the part of the WIN book used was small in comparison to the whole, but Dr.

Bell testified the passage is the heart of the book. Finally, the Court has found no evidence that one twitter post containing the passage, reading the passage to one group of high school basketball players, and leaving the passage in the locker room of those same basketball players for a few months, had an adverse effect on the market for the WIN book.

With three factors weighing in favor of fair use and one factor being neutral, the Court finds as a matter of law that the coaches' uses of the WIN passage were fair. Because the Court finds the actions of these two coaches cannot be the basis for a claim of copyright infringement the Court need not address the Defendant's arguments that the infringements were de minimus, innocent, and that Defendant cannot be held vicariously liable for the coaches' actions.

Worthington's motion for summary judgment on Count I is **GRANTED** and Dr. Bell's motion for summary judgment on Count I is **DENIED**.

### C. Count III:[5] Contributory Copyright Infringement

Plaintiff alleges in Count III that Defendant contributed to CME's and Coach Luzador's[6] copyright infringement. (Compl. ¶¶ 60–64.) Contributory copyright infringement is a doctrine of secondary liability which emerged from common law principals. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). This secondary liability is based on the defendant's relationship to the direct infringement. *Id.* (citing *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 732–33 (S.D.N.Y. 1996)). The Supreme Court described contributory infringement as when one intentionally induces or encourages direct infringement. *Id.* at 929–30. Similarly, the Sixth Circuit described contributory infringement as occurring "when one, 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of

---

[5] The Court will address Count III before Count II as it more naturally flows from the discussion of Count I.
[6] Plaintiff asserts this as an alternative claim to Count I alleging Defendant directly infringed on Plaintiff's copyright through the tweet.

another.'" *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see also Design Basics, LLC v. Landmark Cmtys., Inc.*, No. 1:17-cv-449, 2019 U.S. Dist. LEXIS 92896, at *16–17 (S.D. Ohio Aug. 19, 2019) (using the same definition).

### 1. CME's Website

Plaintiff argues that CME infringed his copyright by posting the WIN passage on its website. (Pl.'s Mot. Summ. J. at 7.)  Plaintiff contends that Defendant contributed to CME's infringement through a link to CME's website on the basketball website, www.wolvesbasketball.com.  (*Id.*; Compl. ¶ 34.)  Plaintiff argues this link on the basketball website encouraged Defendant's audience to view CME's infringing material.  (*Id.*)  Importantly, Plaintiff is not claiming that Defendant contributed to any infringement on the basketball website, but instead that Defendant contributed to the infringement on the CME website, through the basketball website.

Defendant argues that it had no involvement with the CME website or the basketball website.  (Def.'s Mot. Summ. J. at 27.)  Thus, regardless of whether the link on the basketball website contributes to infringement on CME's website, Defendant argues it does not run the basketball website and so this is not its contributory infringement.  (*Id.*)

Dr. Bell acknowledged that Ms. Kerns owns CME and Worthington does not employ Ms. Kerns.  (Bell Dep. 94:5–9.)  Dr. Bell also admitted that Worthington is not involved with CME's business, and therefore does not run, control, or post on the CME website.  (*Id.* 94:18–95:3.)  Thus, the only act which could provide a basis for Defendant contributing to CME's infringement, is the placement of a link to the CME website on the basketball website.  Neither party provides direct evidence as to who placed the link in question on the basketball website.  Instead, Plaintiff implies

it had to be Defendant because it is Defendant's website. Defendant argues, in contrast, it could not have been Defendant because it is not its website. As the following discussion explains, the Court finds there is no genuine dispute of material fact that this is not Defendant's website, and thus, there is no evidence that Defendant placed the link on the basketball website.

Beginning with Defendant's evidence that it does not operate the basketball website, Defendant points out that Dr. Bell's testimony provides no support for this claim because he had no recollection of the basis for the claim during his deposition. (*See id.* 92:21–93:10, 102:3–9, 102:23–103:13.) Additionally, Dr. Bell admitted in his deposition that he has never seen the WIN passage on any of Defendant's own websites, accounts or social media. (*Id.* 142:9–20.) In addition to looking at Dr. Bell's testimony, Defendant provides Coach Souder's testimony that this website "is not a website that is owned, operated, or managed by the Worthington School District." (*Id.*) Importantly, Coach Souder notes that "[w]ebsites associated with the school district include the Worthington.k12.oh.us designation." (*Id.*) The basketball website ends in .com and does not include the district's designation. (*See* Compl. ¶ 34.)

Turning to Plaintiff's evidence, Plaintiff cites three exhibits to support his contention that the basketball website is "Defendant's website." (Pl.'s Mot. Summ. J. at 2, 7 (citing Exs. 4, 5, 7).) The first two exhibits are the Complaint and the Answer. (*Id.* at Exs 4, 5.) A party may not oppose a summary judgment motion with reliance on the pleadings. *Fish v. Stone*, No. 2:17-cv-2093, 2017 U.S. Dist. LEXIS 213232, at *5 (W.D. Tenn. Dec. 29, 2017) (citing *Beckett v. Ford*, 384 F. App'x 435, 443 (6th Cir. 2010)). Additionally, the answer denies the statement that Defendant placed a link on its website. (*See* Answer ¶¶ 34–35, ECF No. 13.) Thus, neither of these exhibits support Plaintiff's argument.

The third exhibit Plaintiff cites appears to be a screenshot of a website titled "Worthington Kilbourne High School Boys Basketball."  (Pl.'s Mot. Summ. J. at Ex. 7.)  Defendant moves to strike Plaintiff's exhibit 7, arguing it is unauthenticated.  Assuming, for the moment, that this exhibit is admitted, nowhere on the exhibit does it show Defendant's name, address, or any other designation which would show Defendant operates it.  The exhibit only depicts information about the Kilbourne Basketball Team, namely some upcoming events.  It also mentions the "Breakers Club" which may indicate who actually operates this website.  Plaintiff's Exhibit 7 alone, when compared to Defendant's clear evidence from Coach Souder that this is not Defendant's website, does not create a genuine issue of material fact as to who operates this website.

Having found no genuine issue of material fact that this is not Defendant's website, Plaintiff has no other evidence or argument as to why Defendant would be contributorily liable for infringement on CME's website.  The Court will now turn to Plaintiff's second basis for his claim of contributory infringement.

### 1. Coach Luzador's Retweet

Plaintiff argues Defendant is contributorily liable for Coach Luzador's infringing tweet because "Defendant had actual notice of Dr. Bell's copyright claim several weeks prior to Coach Luzador's Twitter post of the WIN passage . . . [and] certainly had the ability to stop or limit its employees from infringing on Dr. Bell's copyright protections."  (*Id.*)

Importantly, in order for there to be a finding that Defendant contributed to Coach Luzador's infringement, there must be a finding that Coach Luzador infringed Dr. Bell's copyright. *See Tovey v. Nike Inc.*, No. 1:12-cv-448, 2012 U.S. Dist. LEXIS 185715, at *36 (N.D Ohio July 3, 2012) (noting there must be an underlying direct infringement before there can be secondary liability through contributory liability or vicarious liability); *Bridgeport Music*, 376 F.3d at 621

(noting the other's conduct must be "infringing conduct").  This Court has already found that as a matter of law Coach Luzador's conduct was protected by the doctrine of fair use and thus, not copyright infringement.  *See infra* Section III.B.3.  Defendant cannot be held contributorily liable for copyright infringement when there was no copyright infringement.[7]

Thus, there is no genuine dispute of material fact that Defendant is not contributorily liable for copyright infringement.  Defendant's motion for summary judgment on Count III is **GRANTED** and Plaintiff's motion for summary judgment on Count III is **DENIED**.

### D. Count II: Removing Copyright Management Information

Count II alleges that Defendant violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.  (Compl. ¶¶ 57–59.)

DMCA provides:

> No person shall, without the authority of the copyright owner or the law—
> (1) intentionally remove or alter any copyright management information . . . or
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.[8]

17 U.S.C. § 1202(b).  The statute defines copyright management information to include, among other information, the title and other identifying information about the work and the name and other identifying information about the author.  *Id.* at (c)(1)–(2).

---

[7] Even if Coach Luzador's conduct had been copyright infringement, Plaintiff did not present any evidence that Defendant induced, caused, or contributed to the retweet.  Plaintiff argues only that Defendant could have prevented the retweet after receiving the cease and desist letter.  (Pl.'s Mot. Summ. J. at 7.)  This is quite different than actually contributing to the retweet.  Plaintiff seems to be conflating two doctrines of secondary liability, contributory liability and vicarious liability.  The ability to prevent infringing conduct may be relevant to vicarious liability but is not relevant to contributory liability.  *See Gordon v. Nextel Communs.*, 345 F.3d 922, 925 (6th Cir. 2003) (noting that vicarious copyright liability requires a showing that the defendant had the right and ability to supervise the infringing conduct).

[8] DMCA also provides another method by which someone can violate this section of the statute, but Plaintiff only alleges Defendant violated the first and third sections and thus, the Court has excluded that section.

Plaintiff alleges Defendant violated DMCA in two ways.  First, through Coach Luzador's retweet and second, through placing a link to CME's website on the basketball website.

## 1. Coach Luzador's Tweet

Plaintiff argues that Defendant violated Section 1202 through the retweet because "the WIN passage is clearly written by an author, and yet, Plaintiff's name was removed from the copy appearing in the Twitter Post."  (Pl.'s Mot. Summ. J. at 10.)  Defendant argues that no copyright management information was removed from the WIN passage.  (Def.'s Mot. Summ. J. at 25.) Defendant points out that at the time of the retweet, only the WIN book was copyrighted, not the WIN passage.  (*Id.*)  Defendant contends there was no copyright management information for the book on the pages of the book where the WIN passage appeared.  (*Id.* (citing Compl. ¶ 31).) Defendant cites *Schiffer Publ'g Ltd. v. Chronicle Books, LLC*, No. 03-4962, 2004 U.S. Dist. LEXIS 23052 (E.D. Pa. Nov. 12, 2005), in support of its argument.  Defendant notes that under Plaintiff's theory, Coach Luzador would have had to add copyright management information to the retweet.  (Def.'s Mot. Summ. J. at 25.)

In *Shiffer Publishing*, the Eastern District of Pennsylvania encountered a situation similar to this one.  The plaintiffs had copyrighted photographs from inside of books which included copyright management information on their inside covers.  2004 U.S. Dist. LEXIS 23052 at *45–46.  There was no copyright management information on or near the images.  *Id.*  The court decided the defendants could not be held liable under Section 1202(b) because "to be actionable under § 1202(b), a defendant must remove copyright management information from the 'body' of, or area around, plaintiff's work itself."  *Id.* at *46.

Several other district courts have adopted the *Shiffer* holding.  These courts find that when a part of a copyrighted work is used, a defendant cannot be liable under § 1202(b) unless they

removed copyright management information from the part of the work they copied, or close to the part of the work they copied.  These courts recognize that to hold otherwise would require defendants to have added copyright management information which is not contemplated by the statute.  *See Fischer v. Forrest*, 286 F. Supp. 3d 590, 609–610 (S.D.N.Y. 2018) (finding the plaintiff, who used four phrases from a copyrighted website and brochure, could not be liable under § 1202(b) because copyright management information was not removed from on or near the phrases themselves); *Drauglis v. Kappa Map Grp., LLC*, 128 F. Supp. 3d 46 (D.D.C. 2015) (finding the plaintiff, who used a photograph on the outside of an atlas which included copyright management information on the inside, could not be liable under  § 1202(b) because the copyright management information was not conveyed with the copied work); *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 928–30 (N.D. Ill. 2013) (finding the plaintiff, who copied a poem displayed on a website on which a generic copyright notice appeared at the bottom of each page, could not be held liable under § 1202(b) because the copyright management information was not conveyed near the poem).

At least one district court has rejected this rule and instead held that to prove a cause of action under § 1202(b) the defendant need only show that the piece of the work used was obtained from a source which contained copyright management information.  *See Tomelli v. Zazzle, Inc.,* No. 13-CV-2576, 2015 U.S. Dist. LEXIS 165007, at *40–43 (D. Ariz. Dec. 9, 2015) (finding the plaintiff, who had used images from a book which contained copyright management information on the front page, plus a line noting all images were also copyrighted, could have be liable under § 1202 had the defendants proved the action was taken intentionally).

Here, Defendant argues that no copyright management information existed near the text of the WIN passage which Coach Luzador retweeted.  (Def.'s Mot. Summ. J. at 24–26.)  Defendant

notes that Plaintiff provided a copy of the WIN passage in the Complaint and there is no copyright management information pictured.  (*Id.* (citing Compl. ¶ 31).)  Defendant also notes the particular picture Coach Luzador retweeted had no copyright management information.  (*Id.* (citing Compl. ¶¶ 41–42, Ex. H).)  Thus, Defendant argues, Coach Luzador would have had to add copyright management information, which as *Shiffer* indicates, the statute does not require.  (*Id.*)

Plaintiff does not rebut this in his briefs and instead only argues that Coach Luzador must have known the WIN passage was written by someone and thus, because his name was not on the retweet it must have been removed.  (Pl.'s Mot. Summ. J. at 10.)

The Court finds the *Shiffer* holding appropriate under the facts and circumstances of this case.  Plaintiff has not provided any evidence that there was any copyright management information on or near the WIN passage that Coach Luzador retweeted.  Plaintiff cites only to Plaintiff' Exhibit 9, which is an apparent screen shot of Coach Luzador's retweet.[9]  (Pl.'s Mot. Summ. J. at 9–10 (citing Ex. 9); Pl.'s Reply Supp. Mot. Summ. J. at 7, ECF No. 56.)  This does not show copyright management information was included on or near this passage.  Additionally, though not citing to them in connection with this argument, Plaintiff attaches the WIN passage several other times throughout his many exhibits, some of which include copyright information on the bottom of the WIN passage and some which do not.  (*See* Compl. ¶ 31; Pl.'s Mot. Summ. J. at Ex. C; Bell Decl. at Ex. 16, ECF No. 57-10.)  Plaintiff provides no explanation or argument as to which passage was the one in the retweet or why some of the passages he includes have copyright management information and some do not.  Instead, Plaintiff cites only the screenshot, which as stated, provides no evidence of such copyright management information being close enough to the passage to create a dispute of fact as to whether Defendant can be held liable for § 1202(b).

---

[9] The Court need not address Defendant's Motion to Strike this exhibit, or the other exhibits the Court mentions in this paragraph, for they do not create a genuine dispute of material fact as to this claim.

Additionally, even if the Court were to assume that Plaintiff's Exhibit 16, the WIN book including copyright information at the bottom of each page, was the passage used in the retweet, Plaintiff provided no argument or evidence that Coach Luzador *intentionally* removed this information. Thus, Defendant cannot be held liable under § 1202(b)(1) which requires an intentional removal. Similarly, Plaintiff has provided no evidence or argument that Coach Luzador *knew* someone else removed copyright management information and knew or reasonably *should have known* his retweet would enable, facilitate, or conceal a copyright infringement. Simply stating that Coach Luzador had to have known that someone in the world wrote this passage is not sufficient. This does not show Coach Luzador knew that the person who wrote the passage had included copyright management information, or that someone else removed such information without the copyright holder's authorization, or that his retweet was facilitating or concealing this infringement. Plaintiff has not provided evidence that would create any dispute of material fact as to Defendant's liability under § 1202(b)(3) for the retweet.

### 2. Link to CME's Website

Plaintiff argues throughout his briefs that Defendant included a link on its own website which lead to CME's website. Here, Plaintiff alleges that this action violated § 1202(b) by distributing and displaying a copy of the WIN passage with false copyright management information. (Pl.'s Mot. Summ. J. at 10.) This Court has already found, however, that there is no genuine dispute of material fact that the basketball website, where someone placed a link to CME's website, was not operated by Defendant. *See infra* Section III.C.1. Therefore, Defendant did not distribute or display the WIN passage with false copyright management information by placing a link on its website.

There is no genuine dispute of material fact that neither the retweet nor the link on the Kilbourne basketball website constituted Defendant violating § 1202(B).  Thus, Defendant's motion for summary judgment as to Plaintiff's Count II is **GRANTED** and Plaintiff's motion for summary judgment as to Count II is **DENIED**.

### E.  Count IV & V: Federal Trademark Infringement & Ohio Common Law Trademark Infringement and Unfair Competition

Count IV alleges that Defendant infringed on Plaintiff's trademark in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  (Compl. ¶¶ 65–70.)  Count V alleges that Defendant infringed on Plaintiff's trademark in violation of Ohio common law trademark infringement and engaged in unfair competition.  (*Id.* ¶¶ 71–78.)  The Court will consider Counts IV and V together because courts in the Sixth Circuit use the same standard to analyze federal trademark infringement, Ohio common law trademark infringement, and unfair competition. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) ("[T]he elements that tend to show trademark infringement and unfair competition under section 43(a) [of the Lanham Act] are appropriate for assessing a trademark infringement action under Ohio common law.  Accordingly, the theories of infringement actionable under the Lanham Act are also actionable under the common law."); *Microsoft Corp. v. McGee*, 940 F. Supp. 2d 874, 880 (S.D. Ohio 2007) ("The analysis of an unfair competition claim under Ohio law is the same as that for a claim under the Lanham Act.") (citing *ETW Corp. v. Jireh Publ'g Inc.*, 332 F.3d 915, 920 (6th Cir. 2003) (other citations omitted)); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (noting that under the Lanham Act courts in the Sixth Circuit "use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin"); *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 n.5 (6th Cir. 2009) (noting that courts employ the

"likelihood of confusion" test to federal trademark infringement claims, claims of unfair competition, and common law trademark infringement).

> Under the Lanham Act:
>
> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which–(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. §1125(a)(1).

A claim for trademark infringement under the Lanham Act requires a plaintiff to establish: (A) the plaintiff owns the registered trademark; (B) the defendant used the mark in commerce; and (C) the use was likely to cause confusion. *Hensley*, 579 F.3d at 609. The parties in this case do not dispute the first element.

Plaintiff asserts Defendant infringed his trademark and engaged in unfair competition when: (1) there was an article as well as a video posted on the CME website attributing the WIN passage to Coach Souder; and (2) Coach Luzador retweeted the WIN passage. (Compl. ¶ 67.)

## 1. CME's Website

Defendant first argues that it has nothing to do with CME and thus, it cannot be held liable for CME's alleged use of Plaintiff's trademark. (Def.'s Mot. Summ. J. at 32.) The Court agrees. In order for the Court to hold Defendant vicariously liable for trademark infringement under the Lanham Act, Defendant and the infringer, CME, must have "an actual or apparent partnership, have authority to bind one another in transactions, or exercise joint ownership of control over the

infringing product." *Grubbs v. Sheakely Grp., Inc.*, 807 F.3d 785, 793 (6th Cir. 2015).

Plaintiff has not alleged any facts to make out vicarious liability. Instead, Plaintiff admitted in his deposition that Ms. Kerns operates CME, is the one who attributed the WIN Passage to Couch Souder on the CME website, and is not employed by Defendant. (Bell Dep. 94:1–9, 98:10–18.) In fact, Plaintiff admitted that Defendant is not involved with CME's business at all. (*Id.* 94:18–95:3.) Plaintiff has not introduced any facts or argument which could show Defendant vicariously liable for trademark infringement or unfair competition based on posts on CME's website. Thus, there is no genuine dispute of material fact that Defendant cannot be held liable for trademark infringement based on CME's website.

**2. Coach Luzador's Retweet**

Defendant argues it cannot be liable for trademark infringement or unfair competition due to Coach Luzador's retweet because it was not used in connection with the sale or advertising of goods or services and it did not cause confusion. (Def.'s Mot. Summ. J. at 31–35.)

### a. Used in Commerce in Connection with the Sale or Advertising of Goods or Services

The Lanham requires the defendant's use of the mark to be "in commerce" which is defined as "the bona fida use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "In the computer and Internet context, courts have consistently held that providing information over the Internet satisfies this requirement of the Lanham Act." *Savannah Coll. of Art & Design, Inc. v. Houeix*, 369 F. Supp. 2d 929, 943 (S.D. Ohio 2004) (citing *Cable News Network L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506, 517–18 n.25 (E.D. Va. 2001)). Coach Luzador's dissemination of the WIN passage over the Internet satisfies the in-commerce requirement.

In addition to a use in commerce, the defendant's use must be "in connection with the sale . . . or advertising of any goods or services." *Id.* at 775 (citing 15 U.S.C. § 1125(a)(1)). The Sixth Circuit has explained that courts must analyze first whether a use is commercial, and then whether it is also confusing, for only confusing commercial speech is outside of the protections of the First Amendment. *Taubman Co. v. Webfeats*, 319 F.3d 770, 774–775 (6th Cir. 2003).

This Court has found that selling a good with the infringing mark affixed falls within the Lanham Act. *See Ohio State Univ v. Redbubble, Inc.*, No. 2:17-cv-1092, 2019 U.S. Dist. LEXIS 53695, at *8 (S.D. Ohio Mar. 29, 2019) (noting it is well established that selling an item falls within "use"). Additionally, including advertising links on an otherwise non-commercial website falls within the Lanham Act. *Taubman Co.*, 319 F.3d at 775; *see also Savannah College*, 369 F. Supp. 2d at 944 (noting that when the defendant's website, containing an allegedly infringing mark, had contained an advertisement for another website, it used the mark in connection with the advertisement of goods within the statute).

In contrast, in *Savannah College of Art and Design, Incorporated v. Houeix*, a defendant's website contained information for foreign students about the American education system, including critiques of the Savannah College of Art and Design ("SCAD"). 369 F. Supp. 2d at 942–43. SCAD claimed the defendant's website infringed its mark in violation of the Lanham Act. *Id.* The defendant argued it did not do so commercially. *Id.* SCAD responded that this website was interfering with its commercial success by diverting users from its website. *Id.* at 946–47. The Court noted that the website contained "no advertising, no sales of goods or services, and no solicitations of donations or other payments." *Id.* at 944. Additionally, the Court found SCAD's argument that its customers were being diverted from its website unpersuasive in light of the fact

that the defendant's website did not sell or endorse any goods or services.  *Id.* at 947.  The court

concluded the use was not commercial and dismissed the claim.  *Id.* at 948.

Other activities which courts in the Sixth Circuit have found do not satisfy the Lanham

Act's commercial requirement include registering a business name, soliciting investments, and

distributing flyers not for the purpose of any sale or advertisements.  *Calabrese, Racek, & Markos,*

*Inc. v. Racek*, No. 5:12-cv-2891, 2013 U.S. Dist. LEXIS 105260, at *12 n.4 (N.D. Ohio July 26,

2013) (noting that "nearly every [c]ourt to have decided whether mere registration or activation of

a domain name constitutes 'commercial use' has rejected such arguments, even when the domain

name or names includes the .com designation." (internal citations omitted)); *Charleston Labs., Inc*

*v. SIDIS Corp.*, No. 26-195, 2017 U.S. Dist. LEXIS 138724, at *15–19 (E.D. Ky Aug. 29. 2017)

(soliciting investments does not fall within the Lanham Act because it does not involve the sale of

goods or services); *WHS Entm't Ventures v. United Paperwork Int'l Union*, 997 F. Supp. 946,

949–50 (M.D. Tenn. 1998) (finding a union's distribution of flyers on a restaurant's property,

which publicized health code violations, was not a commercial use).

Defendant argues that Coach Luzador's tweet on his personal twitter account was not a

commercial use.  (Def.'s Mot. Summ. J. at 32.)  Defendant notes there is no evidence that the post

was commercially driven or that Defendant profited from it.  (*Id.* (citing Bell Dep. 122:11–125:16;

Souder Aff. ¶ 12).)  Plaintiff does not address how the tweet was commercial.

The Court agrees with Defendant.  This case is similar to *Savannah College* in that there is

no evidence which shows Coach Luzador's Twitter account contains any advertisements or sales

of goods or services, endorses any goods or services, or solicits any donations or payments.  369

F. Supp. 2d at 942–43.  Thus, the tweet cannot be said to hinder Dr. Bell's commercial success in

selling the WIN book or other related products.  The Court concludes the use of the WIN passage

was not used in connection with the sale or advertisement of goods or services.[10]  Even if Plaintiff could show Coach Luzador used the mark commercially, as the subsequent section shows, Coach Luzador's use of the mark was not likely to cause any confusion.

### b. Confusion

"The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  In order to obtain injunctive relief a plaintiff need only show a "likelihood of confusion." *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982); *Audi AG*, 469 F.3d at 542.  To recover damages, however, as Dr. Bell attempts to do here, a plaintiff must prove that the public was "actually deceived." *Id.*; *Audi AG*, 469 F.3d at 542.

In making this determination, courts in the Sixth Circuit weigh eight factors: (1) the strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.*  These factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *The Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 759 (S.D. Ohio 2010) (internal citations omitted). "The 'ultimate question is whether relevant consumers are likely to believe that the products or

---

[10] The Northern District of California recently addressed a similar case brought by Dr. Bell against a non-profit swim team which had posted the WIN passage on its website and twitter account.  *See Bell v. The Oakland Cmty Pools Porject, Inc.*, No. 19-cv-01308-JST, Order Granting Def.'s Mot. Summ. J. & Denying Pl.'s Mot. Summ. J., ECF No. 65 (N.D. Cal. May 4, 2020).  The court granted the defendant's motion for summary judgment on Dr. Bell's trademark infringement claim finding no commercial use.  *Id.* at 13.  The court noted that Dr. "Bell has presented no evidence that [the defendant] offers *any* competing product or service, much less one that poses a likelihood of confusion with [Dr.] Bell's own goods or services." *Id.* at 12.

services are offered by the parties are affiliated in some way.'" *Id.* (quoting *Champions Gold Club, Inc. v. Champions Golf Club, Inc.*, 28 F.3d 1111, 1116 (6th Cir. 1996) (internal citations omitted)).

Defendant argues that Plaintiff cannot establish a majority of the eight factors and thus, cannot show that Coach Luzador's retweet was likely to cause confusion. (*See* Def.'s Mot. Summ. J. at 33–35.) Plaintiff, states that "[t]hese factors support Dr. Bell's claim" and makes a general argument. (*See* Pl.'s Mot. Summ. J. at 11.) It is unclear which particular factors Plaintiff believes support his claim that the public has been deceived by Coach Luzador's retweet. The Court will briefly examine all 8 factors to determine which, if any, support Plaintiff's argument that the retweet caused confusion.

### a. Strength of the Mark

"The strength of a mark is a factual determination of the mark's distinction. The more distinct the mark, the more likely is the confusion resulting from its infringement, and, therefore, the more protection it is due." *Frisch's Rest.*, 729 F.2d at 1264. Neither party makes an argument applicable to the distinctiveness or strength of the WIN passage. Thus, the Court will assume the parties believe it is irrelevant.

### b. Relatedness of the Goods or Services

The Sixth Circuit has explained that:

> Cases will generally fit into one of three categories regarding the relatedness of the goods and services of the parties. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods and services are totally unrelated, confusion is unlikely. . . . The question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser? . . . Similarly, courts must examine whether the products of the parties perform the same function, concentrating on whether consumers will be confused as to the origin of the product.

*Daddy's Junky Music*, 109 F.3d at 282–83 (internal citations omitted).

Plaintiff argues the WIN passage was posted "in connection with the operation of [Defendant's] basketball program." (Pl.'s Mot. Summ. J. at 11.) This, Plaintiff argues, "is in direct competition with Dr. Bell's services and materials covered by his trademark." (*Id.*) As evidence of such, Plaintiff cites several exhibits including the screenshot of the retweet, Defendant's response to interrogatories, Attorney Urbanczyk's declaration, what appears to be a screenshot from amazon, and what appears to be a screenshot from the United States Patent and Trademark Office website for the word mark WIN. (*Id.* citing Exs.1, 4, 9, 11, 15).) Plaintiff makes no argument as to how each of these exhibits support his contention. Defendant argues this factor is inapplicable because there was no commercial use. (Def.'s Mot. Summ. J. at 33.)

The Court finds Coach Luzador's use of the mark fits into the second category in that the "goods" are somewhat related, but not competitive, and thus, other factors will determine whether there is confusion. The Court agrees with Plaintiff that the two marks are somewhat related because the WIN passage on the retweet was similar to, if not identical to, the passage as presented in WIN. Even assuming each of the exhibits cited by Defendant are admissible,[11] however, they do not support an argument that there is direct competition for there is no evidence that Coach Luzador was offering the WIN passage for sale or otherwise competing with Dr. Bell's market. There is no evidence that a prospective purchaser of the WIN book, a seminar put on by Plaintiff, a poster, etc., can purchase this through Coach Luzador. Because the relatedness falls into the second category, the likelihood of confusion will depend on other factors.

### c. Similarity of the Marks

---

[11] Defendant argues many of these exhibits are not admissible and thus, should not be considered by the Court, because they are unauthenticated and submitted late. (*See* Def.'s Mot. Strike.) The Court need not consider this argument because even if these exhibits are considered, as the subsequent subsections show, there is no confusion and thus, there is no genuine dispute of fact as to either Count IV or V.

When analyzing the similarity of two marks, a factor of "considerable weight," courts examine the "pronunciation, appearance, and verbal translation of the conflicting marks." *Daddy's Junky Music*, 109 F.3d at 283. Neither party provides a clear argument as to the two marks' similarity. Plaintiff states Defendant posted "Dr. Bell's trademark" and thus, may be arguing the exact same mark was posted. To support this statement, Plaintiff cites his exhibit displaying Coach Luzador's retweet.[12] The WIN passage in the tweet appears to be very similar, if not identical to that appearing in the book. Thus, this factor points to confusion.

### d. Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music*, 109 F.3d at 284. Securing such evidence, however, is difficult, and thus, the lack of such evidence is not greatly significant. *See id.*

Defendant argues Plaintiff has presented no evidence of actual confusion. Defendant contends this is because there is no such evidence because Coach Luzador did not attribute the quote to himself. (Def.'s Mot. Summ. J. at 34.) Plaintiff states only that members of the public viewing the tweet were likely to be confused "believing that Dr. Bell authorized [the infringement]." (Pl.'s Mot. Summ. J. at 11.) Plaintiff cites to no evidence to support this statement. (*See id.*)

Plaintiff has not provided evidence of actual confusion and thus this factor points to no confusion. As directed by the Sixth Circuit, however, the Court will not consider this factor to have great significance because securing such evidence is difficult.

### e. Marketing Channels Used

---

[12] The Court need not address Defendant's argument as to the issues with this exhibit. *See infra* Section III.D.3.b.n.2.

This factor considers the similarities and differences between the parties' customers and marketing approaches. *The Ohio State Univ.*, 738 F. Supp. 2d at 752–52 (citing *Daddy's Junky Music*, 109 F.3d at 258). Plaintiff provides no evidence or argument as to this factor and Defendant argues it is inapplicable. The Court agrees. No marketing channels were used by Coach Luzador and there is no evidence about similarities or differences between the parties' customers.

### f.  Likely Degree of Purchaser Care

"The degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion." *Daddy's Junky Music*, 109 F.3d at 285. Again, like the previous factor, Plaintiff provides no argument or evidence relating to this factor and Defendant argues it is inapplicable.

### g.  Intent of the Defendant in Selecting the Mark

Proof of the defendant's intent is relevant because when someone intentionally chooses a particular mark because it is similar to another, he is saying, "in effect, that he thinks there is at least a possibility that he can divert some business from the senior user." *Little Caesar Enters. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987). Defendant argues the intent of Coach Luzador was to teach student athletes. Plaintiff does not address this point. The Court agrees with Defendant, there is no evidence it intended to choose the WIN passage to divert any business from Dr. Bell. This factor weighs in favor of no confusion.

### h.  Likelihood of Expansion of the Product Lines

This factor considers the possibility that either party will expand his business to compete with the other. *Homeowners Grp., Inc. v. Home Mktg Specialists*, 931 F.2d 1100, 1112 (6th Cir.

1991).  Plaintiff provides no direct argument or evidence relating to this factor and Defendant argues it is inapplicable.

### i.  Conclusion as to 8 Factors

Only one of the above factors, the similarity between the two marks, weighs in favor of confusion.  In contrast, both evidence of actual confusion and Defendant's intent weigh in favor of no confusion.  In addition, many of the factors are simply inapplicable because Defendant did not offer Plaintiff's mark for sale.  The Court finds there is no genuine dispute of material fact that Defendant's use of the mark did not deceive the public.  As such, Defendant's motion for summary judgment on Counts IV and V is **GRANTED** and Plaintiff's motion for summary judgment on Counts Iv and V is **DENIED**.[13]

### IV.

In sum, Plaintiff's motion for summary judgment (ECF Nos. 49, 50) is **DENIED** and Defendant's Motion for summary judgement (ECF No. 47) is **GRANTED**.

Additionally, Plaintiff's Motion for Leave to File an Amended Complaint (ECF No. 53) is **GRANTED**, Plaintiff's Request for Judicial Notice (ECF No. 58) is **DENIED as moot,** and Defendant's Motion to Strike (ECF No. 63) is **DENIED as moot.**  The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED.**

**6/2/2020**                                              **s/Edmund A. Sargus, Jr.**
**DATED**                                                **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**

---

[13] Having granted Defendant's motion for summary judgment on all claims, the Court need not address Plaintiff's arguments regarding damages and attorney's fees.  Additionally, the Court need not address the motion to strike for the exhibits Defendant sought to strike either did not create a genuine issue of material fact, were cited to by Plaintiff only in connection with sections which the Court did not need to consider, or were not cited to by Plaintiff at all.